# 23-7876

Consolidated Appeals, Nos. 23-7876, 23-7915, and 23-7983

─────────────

## In the United States Court of Appeals for the Second Circuit

─────────────

ALTA PARTNERS, LLC,

*Plaintiff-Appellee/Cross-Appellant*,

CRCM INSTITUTIONAL MASTER FUND (BVI) LTD.,
CRCM SPAC OPPORTUNITY FUND LP,

*Plaintiffs-Appellees*,

v.

GETTY IMAGES HOLDINGS, INC.,

*Defendant-Appellant/Cross-Appellee.*

─────────────

On Appeal from the United States District Court for the
Southern District of New York, Nos. 23-cv-01074-JSR & 22-cv-08916-JSR,
Hon. Jed S. Rakoff, *United States Senior District Judge*

─────────────

## GETTY IMAGES HOLDINGS, INC.'S
## OPENING BRIEF AND SPECIAL APPENDIX

─────────────

*Counsel information on inside cover*

Susan Saltzstein
Scott Musoff
Jeremy Patashnik
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
One Manhattan West
New York, NY 10001

John A. Neuwirth
WEIL, GOTSHAL & MANGES LLP
767 Fifth Ave.
New York, NY 10153

Shay Dvoretzky
  *Counsel of Record*
Parker Rider-Longmaid
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
1440 New York Ave., NW
Washington, DC 20005
Telephone: 202-371-7000
shay.dvoretzky@skadden.com

Nicole Welindt
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
525 University Ave.
Palo Alto, CA 94301

*Counsel for Defendant-Appellant/Cross-Appellee Getty Images Holdings, Inc.*

## DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Getty Images Holdings, Inc., hereby certifies that it has no parent company and no publicly held corporation owns 10% or more of its common shares.

# TABLE OF CONTENTS

**Page**

DISCLOSURE STATEMENT.................................................................i

TABLE OF AUTHORITIES.............................................................. vi

GLOSSARY ....................................................................................... xi

REQUEST FOR ORAL ARGUMENT................................................ xii

INTRODUCTION ...............................................................................1

JURISDICTION..................................................................................7

STATEMENT OF ISSUES .................................................................8

PERTINENT STATUTES AND REGULATIONS...............................8

STATEMENT OF THE CASE............................................................9

      A.    Legal background....................................................9

      B.    Factual background...............................................11

           1.    Getty Images becomes a public company in July 2022..........................................................11

           2.    Getty Images files a Form S-4 registration statement before the Business Combination closes, and a Form S-1 registration statement afterwards. ................................12

           3.    Getty Images' share price surges in late July and August 2022 before returning to its stable level, below the warrant-exercise price, in September. ..............15

           4.    Alta and CRCM try to exercise Getty Images warrants in August 2022. ....................................17

      C.    Procedural background ........................................19

## TABLE OF CONTENTS
(continued)

Page

STANDARD OF REVIEW ....................................................... 21

SUMMARY OF ARGUMENT ................................................... 22

ARGUMENT ............................................................................ 28

I.  Getty Images did not breach the Warrant Agreement by
    declining to allow Alta and CRCM to exercise their warrants in
    August 2022, because federal securities law prohibited warrant
    exercise at that time. ....................................................... 28

    A.  Alta and CRCM could not exercise their warrants in
        August 2022 because there was no then-effective
        registration statement for the issuance and sale of warrant
        shares. ...................................................................... 28

        1.  There was no effective registration statement for the
            issuance and sale of warrant shares until Getty
            Images' Form S-1 became effective. ....................... 29

        2.  The district court's reasoning and Alta and CRCM's
            counterarguments lack merit. ................................ 33

        3.  Even if the Form S-4 registered the issuance and
            sale of warrant shares, the filing of the updated
            prospectus with the Form S-1 made the Form S-4
            ineffective for those transactions, so there was no
            effective registration statement until the Form S-1
            became effective. ................................................. 35

    B.  Alta and CRCM could not exercise their warrants in
        August 2022 for another reason—there was no then-
        current prospectus relating to the warrant shares, given
        material and fundamental developments after the Form
        S-4 was filed. ............................................................ 36

## TABLE OF CONTENTS
(continued)

1. A prospectus is no longer current if material or fundamental changes to the information presented in the registration statement have occurred. .....................37

2. Getty Images' Form S-1 disclosed material—indeed, fundamental—developments after the Form S-4 became effective, making the Form S-4 prospectus not current. ............................................................41

3. Getty Images could not have kept the Form S-4 prospectus current by stickering it, and Getty Images' decision not to use a sticker was commercially reasonable......................................44

II. The district court erred in granting CRCM and Alta summary judgment on damages. ..................................................47

A. A breach-of-contract plaintiff is entitled to summary judgment on damages only if there is no genuine dispute over whether the plaintiff has shown damages..........................49

1. Summary judgment on damages is appropriate only if, drawing all inferences in favor of the non-movant, the factfinder must accept the damages estimate the movant has put forward.................................49

2. A plaintiff bears the burden of proving the fact of damages and providing a reasonable estimate. ................50

B. Alta and CRCM are not entitled to summary judgment on damages. ............................................................54

# TABLE OF CONTENTS
(continued)

Page

1.    A reasonable jury could conclude that neither Alta nor CRCM suffered damages because the price of Getty Images' shares would have been below the warrant exercise price if Alta and CRCM had been able to exercise their warrants...............................................54

2.    A reasonable factfinder could conclude that even if Alta and CRCM established damages, they did not offer a stable foundation for estimating damages. ...........63

3.    The Court should remand for a jury to resolve these genuine disputes of material fact........................................66

C.    The district court's reasons for granting summary judgment lack merit. ........................................................66

CONCLUSION ....................................................................................69

CERTIFICATE OF COMPLIANCE ...................................................70

CERTIFICATE OF SERVICE .............................................................71

SPECIAL APPENDIX TABLE OF CONTENTS................................73

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Alta Partners, LLC v. Getty Images Holdings, Inc.*,
 Nos. 22-cv-08916, 23-cv-01074, 2023 WL 7095975
 (S.D.N.Y. Oct. 26, 2023) ........................................................................9

*Aroneck v. Atkin*,
 456 N.Y.S.2d 558 (App. Div. 1982)............................................ 53, 54

*Baker v. Drake*,
 53 N.Y. 211 (1873) ...............................................................................50

*Borley v. United States*,
 22 F.4th 75 (2d Cir. 2021) .................................................. 21, 22, 49

*Boyce v. Soundview Technology Group, Inc.*,
 464 F.3d 376 (2d Cir. 2006) .............................................. 26, 50, 51,
 ........................................................................ 52, 53, 65, 67, 68

*Castle Coal & Oil Co. v. Frank's Fuel, Inc.*,
 415 N.Y.S.2d 237 (App. Div. 1979)....................................................53

*Contemporary Mission, Inc. v. Famous Music Corp.*,
 557 F.2d 918 (2d Cir. 1977) .............................................. 51, 52, 68

*Cottam v. 6D Global Technologies, Inc.*,
 No. 21-1031, 2022 WL 16908708
 (2d Cir. Nov. 14, 2022) (summary order).............................. 54, 65

*Delaware & Hudson Railway v. Consolidated Rail Corp.*,
 902 F.2d 174 (2d Cir. 1990) ...................................................... 21, 49

*Doehler Metal Furniture Co. v. United States*,
 149 F.2d 130 (2d Cir. 1945) .............................................. 26, 49, 50

*Folger Adam Co. v. PMI Industries, Inc.*,
 938 F.2d 1529 (2d Cir. 1991) .............................................................38

*Freund v. Washington Square Press, Inc.*,
 314 N.E.2d 419 (N.Y. 1974)....................................... 25, 26, 50, 51

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Holland Loader Co. v. FLSmidth A/S,*
  313 F. Supp. 3d 447 (S.D.N.Y. 2018)..........................................45, 46

*Litwin v. Blackstone Group, L.P.,*
  634 F.3d 706 (2d Cir. 2011) ...............................................................38

*Liu v. Securities & Exchange Commission,*
  140 S. Ct. 1936 (2020)........................................................................37

*Lloyd Capital Corp. v. Pat Henchar, Inc.,*
  603 N.E.2d 246 (N.Y. 1992)................................................................34

*Massaro v. Palladino,*
  19 F.4th 197 (2d Cir. 2021) .................................................. 7, 21, 22

*Matrixx Initiatives, Inc. v. Siracusano,*
  563 U.S. 27 (2011).......................................................... 24, 38, 39, 42

*McCutcheon v. Colgate-Palmolive Co.,*
  62 F.4th 674 (2d Cir. 2023) ................................................................34

*McMahan & Co. v. Wherehouse Entertainment, Inc.,*
  65 F.3d 1044 (2d Cir. 1995) ......................................................... 52, 53

*Miller v. Robertson,*
  266 U.S. 243 (1924)............................................................................50

*Press v. Chemical Investment Services Corp.,*
  166 F.3d 529 (2d Cir. 1999) ...............................................................39

*Process America, Inc. v. Cynergy Holdings, LLC,*
  839 F.3d 125 (2d Cir. 2016) ................................................ 25, 26, 50,
  ....................................................................................... 51, 66, 67, 68

*Randall-Smith, Inc. v. 43rd St. Estates Corp.,*
  215 N.E.2d 494 (N.Y. 1966)...............................................................51

*Reeves v. Sanderson Plumbing Products, Inc.,*
  530 U.S. 133 (2000)............................................................................22

*Rodriguez v. Village Green Realty, Inc.,*
  788 F.3d 31 (2d Cir. 2015) .................................................................66

# TABLE OF AUTHORITIES
(continued)

Page(s)

*Schonfeld v. Hilliard*,
218 F.3d 164 (2d Cir. 2000) ...................................................................51

*Securities & Exchange Commission v. Cavanagh*,
155 F.3d 129 (2d Cir. 1998) ..................................................................29

*Securities & Exchange Commission v. Manor Nursing Centers, Inc.*,
458 F.2d 1082 (2d Cir. 1972) ................................................................37

*Securities & Exchange Commission v. Texas Gulf Sulphur Co.*,
401 F.2d 833 (2d Cir. 1968) ..................................................................38

*Securities & Exchange Commission v. Universal Express, Inc.*,
475 F. Supp. 2d 412 (S.D.N.Y. 2007).....................................................29

*Shane Campbell Gallery, Inc. v. Frieze Events, Inc.*,
838 Fed. App'x 608 (2d Cir. 2020) ............................................... 45, 46

*Sharma v. Skaarup Ship Management Corp.*,
916 F.2d 820 (2d Cir. 1990) ......................................................... 53, 54

*Simon v. Electrospace Corp.*,
269 N.E.2d 21 (N.Y. 1971)....................................................................53

*Tractebel Energy Marketing v. AEP Power Marketing*,
487 F.3d 89 (2d Cir. 2007) ......................................................... 51, 52, 65

*TSC Industries, Inc. v. Northway, Inc.*,
426 U.S. 438 (1976).................................................................. 39, 40, 44

*United States v. Cartwight*,
411 U.S. 546 (1973)...............................................................................52

*Walsh v. Schlecht*,
429 U.S. 401 (1977)...............................................................................34

*Williams v. New York City Housing Authority*,
61 F.4th 55 (2d Cir. 2003) .....................................................................49

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

**STATUTES**

Securities Act of 1933,
  15 U.S.C. § 77a *et seq.* ................................................ 5, 6, 14, 18, 29,
  .............................................................................. 30, 33, 34, 35, 46

  15 U.S.C. § 77b(a)(3) ...................................................................30

  15 U.S.C. § 77e .............................................................................46

  15 U.S.C. § 77e(a)(1) ............................................................. 30, 34

  15 U.S.C. § 77e(c) ........................................................................30

28 U.S.C. § 1291 ...............................................................................7

28 U.S.C. § 1331 ...............................................................................7

28 U.S.C. § 1332 ...............................................................................7

28 U.S.C. § 1367(a) ..........................................................................7

**REGULATIONS**

17 C.F.R. § 229.512 .........................................................................40

  17 C.F.R. § 229.512(a)(1)(ii) ................................... 24, 40, 46

17 C.F.R. § 230.145(a) .......................................... 12, 31, 32

17 C.F.R. § 230.424(b)(3) ..............................................................40

17 C.F.R. § 230.429 .................................... 14, 23, 29, 35, 36

  17 C.F.R. § 230.429(a) ......................................... 29, 35

  17 C.F.R. § 230.429(b) ..................................... 14, 35, 36

17 C.F.R. § 239.11 ...........................................................................31

17 C.F.R. § 239.25 .......................................... 22, 31, 32

**RULES**

Fed. R. App. P. 4(a)(1) ...........................................................7, 8

Fed. R. Civ. P. 56(a) ......................................................................49

- ix -

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

OTHER AUTHORITIES

*Delayed or Continuous Offering and Sale of Securities*,
   46 Fed. Reg. 42,001 (Aug. 18, 1981)........................................ 24, 39, 40

Form 8-K, Instruction B.1 ......................................................................42

Form S-1, Instruction I .................................................................... 14, 31

Form S-4, Instruction A.1 ................................................................ 12, 31

Securities & Exchange Commission,
   Compliance & Disclosure Interpretations,
   Question 139.01 (Aug. 14, 2009)....................................... 30, 31, 32

Securities & Exchange Commission,
   Compliance & Disclosure Interpretations,
   Question 139.28 (Aug. 14, 2009).................................................40

Securities & Exchange Commission,
   Compliance & Disclosure Interpretations,
   Question 225.01 (Jan. 26, 2009) .................................................36

Securities & Exchange Commission Division of Corporation Finance,
   *Financial Reporting Manual* (2022) .......................................... 39, 46

Securities & Exchange Commission,
   *Form 8-K*, https://www.sec.gov/answers/form8k.htm .................... 42, 43

Securities & Exchange Commission,
   *What is a registration statement?*, https://www.sec.gov/
   education/smallbusiness/goingpublic/registrationstatement.......... 10, 11

1 Securities Practice Guide § 6.04 (Lexis 2023) ................................36

## GLOSSARY

| | |
|---|---|
| Alta | Plaintiff-Appellee/Cross-Appellant Alta Partners, LLC |
| Alta action | *Alta Partners, LLC v. Getty Images Holdings, Inc.*, No. 22-cv-08916 (S.D.N.Y) |
| Business Combination | The de-SPAC transaction by which Getty Images became a public company |
| CCNB | CC Neuberger Principal Holdings II |
| CRCM | Plaintiffs-Appellees CRCM Institutional Master Fund (BVI) Ltd. and CRCM SPAC Opportunity Fund LP |
| CRCM action | *CRCM Institutional Master Fund (BVI) Ltd. et al. v. Getty Images Holdings, Inc.*, No. 23-cv-01074 (S.D.N.Y.) |
| de-SPAC | A transaction in which a SPAC acquires a private company to take it public |
| Getty Images | Defendant-Appellant/Cross-Appellee Getty Images Holdings, Inc. |
| New CCNB | Vector Holding, LLC; subsidiary of CCNB formed to carry out the Business Combination |
| SEC | U.S. Securities and Exchange Commission |
| SPAC | Special-purpose acquisition company; a publicly traded shell company that merges with a private target company |
| Warrant Agreement | The contract governing the exercise of the warrants at issue |

## REQUEST FOR ORAL ARGUMENT

These appeals present important legal issues that the district court incorrectly resolved. Defendant-Appellant/Cross-Appellee Getty Images Holdings, Inc., submits that oral argument would help the Court resolve these appeals.

## INTRODUCTION

Plaintiffs-Appellees Alta Partners, LLC, and CRCM Institutional Master Fund (BVI) Ltd. and CRCM SPAC Opportunity Fund LP filed these actions to extract from Getty Images Holdings, Inc., through breach-of-contract litigation what their failed investment strategies couldn't make them in the market. Alta and CRCM held warrants—rights to buy Getty Images stock, or warrant shares, at $11.50 per share—which they wanted to exercise in late August 2022, when Getty Images' share price had spiked to $29 per share. But Alta and CRCM couldn't exercise their warrants at that time, because there was no effective Securities and Exchange Commission (SEC) registration statement for sale of the warrant shares. And even if issuing the warrant shares had been legal, Alta and CRCM would not have made any money. The moment the market learned the warrants were exercisable—20.7 million warrants, all told—Getty Images' stock price would have plummeted to well below the warrant exercise price of $11.50 per share. That's exactly what happened in September 2022 after Getty Images' registration statement became effective and the warrants could be exercised. Alta and CRCM wouldn't have made a dime.

Alta and CRCM nonetheless sued Getty Images for breach of contract. They contend that Getty Images should have allowed them to exercise their warrants in August 2022, when, they claim, they could have sold each share for about $29. The district court granted summary judgment, holding that the Warrant Agreement obligated Getty Images to allow the warrant exercise in late August 2022 and that the securities laws posed no obstacle. The court awarded Alta and CRCM damages based on a $29-per-share market price—approximately $51 million for CRCM and $37 million for Alta.

The district court's decision was wrong as a matter of contract interpretation and securities law. Worse still, it was wrong as a matter of basic economics and summary judgment principles. The district court ignored Getty Images' ample evidence that had Alta and CRCM been able to exercises their warrants, the anticipated increase of millions of tradeable shares would have sent share prices plunging below $11.50 before Alta or CRCM could make any money.

By way of background, CC Neuberger Principal Holdings II (CCNB) was a special-purpose acquisition company, or SPAC, designed to take Getty Images public by issuing hundreds of millions of shares of stock plus millions of warrants. But when that deal closed in July 2022, CCNB shareholders

had a choice: redeem their CCNB shares for $10 each or convert them into Getty Images shares. Almost all CCNB shareholders—99.4%—took the cash. That left just 508,311 publicly tradeable Getty Images shares available until September 2022, when millions more shares would become available.

It was a perfect storm. With so few Getty Images shares available, demand spiked. That wasn't because those shares were *worth* more than $11.50, or even the $10 that CCNB shareholders had originally invested and preferred to simply take back. It was because short-sellers needed that small supply of shares—a "low float"—badly, and fast, to cover the bets they had made on Getty Images stock. Short-sellers try to make money by betting that a stock's price will go down. They borrow a stock they don't own, sell it, and hope to buy it back for a lower price before returning it to its owner and pocketing the difference. But betting wrong can be costly, because every cent a stock climbs is a cent the short-seller loses—there's no cap. And short-sellers of Getty Images shares in the summer of 2022 were in a tight spot. They had sold short almost 1.4 million shares of Getty Images stock. But with only half a million shares to go around, the squeeze was on—igniting a race to buy back shares and return them to their owners. The price shot up.

But the "short squeeze" was short-lived, and so, too, was Getty Images stock's high price. Once millions of shares became available in September, the price plummeted to under $9 per share, where it has since remained.

Similarly, if Alta and CRCM had been able to exercise their warrants, then 20.7 million additional shares would have become available to trade. The short squeeze would have disappeared, and Alta and CRCM, having paid $11.50 per warrant share, wouldn't have been able to sell those shares for even that much. In other words, what happened in September would have happened in August. So even if Getty Images breached the Warrant Agreement, neither Alta nor CRCM suffered any damages. The district court was wrong that there were no genuine disputes of material facts relating to damages, and it erred in concluding that Alta and CRCM had shown that they were entitled to their requested damages as a matter of law.

The district court also erred in holding that Getty Images was required to let CRCM and Alta exercise their warrants in the first place, and that Getty Images breached the Warrant Agreement by failing to do so. To allow warrants to be exercised, the agreement required an effective registration statement for the sale of warrant shares and a current prospectus disclosing important information about the securities being offered or sold. Neither

requirement was satisfied in August 2022, when CRCM and Alta wanted to exercise their warrants. That was true even though allowing the exercise of warrants would have benefitted Getty Images by bringing in $11.50 in revenue for the company for each warrant share—especially valuable funds given the 99.4% redemption rate.

There was no effective registration statement for the sale of warrant shares, because Getty Images properly registered the sale of warrant shares *after* the merger. Registration of a security is transaction-specific. Securities law required that Getty Images register the *offer* of warrant shares on a particular form, the S-4, used for securities offered or sold in mergers. But because the warrant shares would not be *sold* for weeks or even months after the transaction, Getty Images needed to register the sale of warrant shares separately. It used another form, the S-1, which it filed on August 9, 2022. But the Form S-1 didn't become effective until September 15. Taking an over-simplified view of the federal securities law, the district court determined that an effective registration statement for the *offer* of warrant shares was sufficient to satisfy the Warrant Agreement's effective-registration requirement. But that interpretation of the contract is not defensible: Getty Images would have violated the Securities Act if it had issued warrant shares in

- 5 -

August 2022, as Alta and CRCM requested, before those shares were registered for sale. What's more, even if the Form S-4 could have registered the sale of warrant shares, securities law would have halted sales of those shares between August 9, when the Form S-1 was filed, and September 15, when it took effect—so neither Alta nor CRCM could have exercised their warrants (or resold any warrant shares) in late August.

Nor was there a current prospectus covering the warrant shares when CRCM and Alta wanted to exercise their warrants, as required by the Warrant Agreement. A prospectus isn't current if material or fundamental changes have occurred since it took effect. Changes to the business after the Business Combination made the prospectus in the Form S-4 outdated, meaning Getty Images had to report that new material information on its Form S-1. And warrant shares couldn't be issued until the Form S-1 prospectus became effective.

Despite all this, the district court granted summary judgment for Alta and CRCM, awarding them tens of millions of dollars that neither securities law nor the market would have permitted them to collect. The court erred as a matter of securities law. It also violated the fundamental summary judgment standard, usurping the jury's role by construing the evidence against

Getty Images and resolving genuine factual disputes in favor of Alta and CRCM—whose experts could not explain the surge in Getty Images' share price. The Court should reverse.

## JURISDICTION

**a.** The district court had jurisdiction over the Alta action and the CRCM action, because they include claims arising under the laws of the United States. *See* 28 U.S.C. § 1331. The district court had supplemental jurisdiction over the related state-law claims. *See id.* § 1367(a). The district court also had jurisdiction over the Alta action because the parties are diverse—Alta is a citizen of Puerto Rico and New York, and Getty Images is a citizen of Delaware and Washington—and the amount in controversy exceeds $75,000. *See id.* § 1332; JA49-JA50.

**b.** This Court has jurisdiction to review the district court's grant of summary judgment, which is a final appealable order. *See* 28 U.S.C. § 1291; *Massaro v. Palladino*, 19 F.4th 197, 208 (2d Cir. 2021).

**c.** This appeal is timely. The district court granted summary judgment on October 26, 2023, SA32-SA33, and entered final judgment for Alta on October 27, 2023, SA34, and for CRCM on November 6, 2023, SA37. Getty

Images timely filed a notice of appeal in each case on November 22, 2023, JA1686, JA3023, within thirty days of each judgment. Fed. R. App. P. 4(a)(1).

## STATEMENT OF ISSUES

1.      Whether the district court erred in holding that Getty Images breached the Warrant Agreement, because Alta and CRCM could not have exercised their warrants in August 2022 given that (a) there was not a then-effective SEC registration statement for the sale of the warrant shares, and (b) there was not a then-current prospectus covering the warrant shares.

2.      Whether the district court erred in granting summary judgment to Alta and CRCM as to damages because there is a genuine dispute of fact whether Alta and CRCM would have been able to resell the warrant shares for more than $11.50 given that the low float and short squeeze causing a market price above $11.50 would have ended before Alta or CRCM could resell their shares.

## PERTINENT STATUTES AND REGULATIONS

Pertinent statutes and regulations are set forth in the Special Appendix bound with this brief. *See* SA38-SA64.

## STATEMENT OF THE CASE

This case is a contract dispute arising from Alta's and CRCM's attempts to exercise public warrants to purchase shares of Getty Images stock. Alta and CRCM separately sued Getty Images, claiming (among other things) that it breached the Warrant Agreement by refusing to allow them to exercise those warrants. The district court (Rakoff, J., S.D.N.Y.) consolidated the cases through discovery and, in a single opinion, granted Alta's and CRCM's motions for summary judgment on their breach-of-contract claims and awarded them damages. The court's opinion (SA1-SA33) is available at *Alta Partners, LLC v. Getty Images Holdings, Inc.*, Nos. 22-cv-08916, 23-cv-01074, 2023 WL 7095975 (S.D.N.Y. Oct. 26, 2023).

### A.    Legal background

A special-purpose acquisition company is a publicly traded company formed to merge with a private company and take it public. JA447-JA448. A SPAC uses the proceeds from its own initial public offering to accomplish its later merger (or "de-SPAC") once a suitable target company is identified. JA449-JA450. A proposed de-SPAC must typically be approved by the SPAC's investors, who decide whether to redeem their SPAC shares for cash or continue holding shares in the new company. JA452.

Investors in a SPAC's initial public offering usually purchase "units," each of which includes a share of SPAC stock and a public warrant (or some fraction of one). JA450-JA451. Warrants are like options: each warrant gives the holder the right to buy a share in the merged company, some time after the de-SPAC is complete, at a set "exercise price." JA451. Public warrants are themselves tradeable securities. *Id.* Selling warrants helps companies generate funds, and warrants can be attractive to investors because they cost a fraction of the price of shares but present the possibility for investment returns if the share price climbs above the warrants' exercise price. JA449-JA451.

A warrant agreement sets out the terms and conditions for exercising warrants. JA453. Most warrant agreements provide that at least two conditions must be satisfied for a warrant to be exercised: *First*, there must be an effective registration statement, filed with the SEC, covering the shares underlying the warrants. *Second*, the prospectus in that registration statement must be current. JA453-JA454. A prospectus is "the legal offering or 'selling' document that must be delivered to everyone who is offered or buys the securities." SEC, *What is a registration statement?*, https://www.sec.gov/education/smallbusiness/goingpublic/registrationstatement. It "must

clearly describe important information about [the company's] business operations, financial condition, results of operations, risk factors, and management." *Id.*

### B. Factual background

### 1. Getty Images becomes a public company in July 2022.

In July 2022, Getty Images went public through a de-SPAC—the Business Combination—merging with a SPAC called CCNB. SA2. Specifically, Getty Images' previous, then-private holding company, Griffey Global Holdings, Inc., merged with Vector Holding, LLC ("New CCNB"), a CCNB affiliate formed to carry out the merger. SA3 n.1. CCNB shareholders approved the Business Combination on July 19, 2022, and the merger closed on July 22. JA201-JA202. New CCNB, the surviving entity, changed its name to Getty Images Holdings, Inc. JA197. (Thus, for simplicity, this brief uses "Getty Images" to refer to "New CCNB," where appropriate.)

Just before the Business Combination closed, CCNB shareholders chose to either redeem their CCNB shares for $10 each or convert them into Getty Images shares. JA362. Almost all shareholders—99.4%—took the cash. *Id.* Thus, after the Business Combination closed, there were only 508,311 Getty Images shares held by the public and available for trading—the so-

called public float—only 0.2% of all Getty Images shares. JA203. The remaining publicly available shares were subject to restrictions and would not be tradeable for weeks or months after the Business Combination closed. JA203-JA204.

> **2.** **Getty Images files a Form S-4 registration statement before the Business Combination closes, and a Form S-1 registration statement afterwards.**

Getty Images filed two relevant registration statements with the SEC: a Form S-4, filed before the close of the Business Combination, and a Form S-1, filed afterwards.

**a.** On January 18, 2022, Getty Images filed a Form S-4. SA5. As relevant here, that form is used to register the offer or sale of securities in connection with a transaction where a merger "is submitted for the vote or consent of … security holders." 17 C.F.R. § 230.145(a); Form S-4, Instruction A.1. Getty Images was required to file the Form S-4 because it would be issuing certain securities, upon approval of CCNB's shareholders, in the Business Combination. The purpose of the Form S-4 was to inform CCNB shareholders about the Business Combination before they would vote on whether to approve it and decide whether to redeem their CCNB shares for

cash. The form listed three relevant securities as being registered "in connection with the Business Combination," JA229:

- 150,475,093 shares of "Class A Common Stock" "issuable upon completion of the Business Combination." JA229-JA230 & n.2.

- 39,260,000 "Warrants to purchase common stock," which included "20,700,000 public warrants" and "18,560,000 Private Placement Warrants" (warrants issued to CCNB's founders). JA229-JA230 & n.5. Getty Images would assume CCNB's liabilities and obligations for pre-existing CCNB warrants if shareholders approved the Business Combination. JA200.

- 39,260,000 "Class A Common stock underlying warrants"—that is, the shares issuable upon exercise of the warrants. These shares could be issued only upon exercise of warrants *after* "completion of the Business Combination" and pursuant to the terms of the Warrant Agreement. JA229-JA230 & n.6; *infra* pp. 17-18.

The Form S-4 included a combined proxy statement for the CCNB shareholder vote on the Business Combination and a prospectus covering the securities listed on the form. Among other things, the prospectus provided information about Getty Images and CCNB, JA243; the terms of the Business Combination and the expected equity structure in the new company, JA247-JA249; and the risks and benefits of the merger, JA273-JA328. It also included relevant contracts and financial statements. JA251-JA252. The SEC declared the Form S-4 effective on June 30, 2022. SA6.

**b.**    On August 9, 2022, Getty Images filed a Form S-1. SA9. Form S-1 is used to register securities "for which no other form is authorized or prescribed." Form S-1, Instruction I. Getty Images registered the sale of approximately 400.8 million Getty Images common shares, 3.8 million additional warrants, and additional underlying warrant shares. JA1347, JA1358. Getty Images also addressed the status of the warrant shares that had been listed on the Form S-4. JA2475-JA2476 tbl.3 & nn.5-6. It stated that those shares were "included [in] this registration statement" and that, "pursuant to Rule 429(b) under the Securities Act," the Form S-1 would "constitute post-effective amendments to the [Form S-4]." *Id.* Rule 429 allows a registrant to use a prospectus filed with a later registration statement as a combined prospectus for purposes of transactions registered on an earlier registration statement. *See* 17 C.F.R. § 230.429.

The Form S-1 prospectus differed significantly from the prospectus in the Form S-4. The Form S-4 prospectus informed CCNB shareholders about the Business Combination and focused on the investment decisions presented to those stockholders: whether to approve the Business Combination and whether to redeem their CCNB shares or continue holding Getty Images shares. The Form S-1 prospectus, on the other hand, focused on post-merger

investment decisions, including whether to buy Getty Images stock and whether to buy or exercise Getty Images warrants. The Form S-1 prospectus, thus, omitted no-longer-relevant information about the Business Combination that had been included on the Form S-4. JA494-JA495. The Form S-1 prospectus also provided an additional quarter of financial statements, *id.*; updated tax consequences of buying, owning, or selling Getty Images shares and warrants, JA493 n.239; and pro forma financial statements addressing changes to Getty Images' capital structure and disclosing that 99.4% of CCNB shareholders had redeemed their CCNB shares for cash, JA493. The SEC declared the Form S-1 effective, with amendments, on September 15, 2022. SA9.

### 3. Getty Images' share price surges in late July and August 2022 before returning to its stable level, below the warrant-exercise price, in September.

**a.** The market responded as soon as it became public that 99.4% of CCNB shareholders had cashed out, leaving only 508,311 shares in the public float. Getty Images disclosed that information in its Form 8-K after markets closed on July 28, 2022. JA203. Its share price had closed that day at $10.50. JA204. The very next morning, when markets opened, Getty Images' share price had more than doubled, reaching $26.48. *Id*. The price closed on

- 15 -

July 29 at $26.15, with a trading volume of 12,928,290 shares—even though there were only 508,311 shares available to trade. *Id.* That means each share exchanged hands an average of 25 times that day. Over the following month—during which time the number of publicly tradable shares remained constant—Getty Images' share price closed at an average of about $29 per share. JA205.

The surge in Getty Images' share price was short-lived. As noted, the Form S-1 had registered about 400.8 million additional shares of common stock, *supra* p. 14, with 86 million becoming tradeable when the Form S-1 was declared effective after market close on September 15, 2022, JA2930. The next day, September 16, Getty Images' stock price opened at $11.25 and closed at $8.49. JA377-JA378, JA208. The price has remained below the $11.50 warrant exercise price ever since and has generally traded at between $4 and $7 per share. JA390, JA398.

**b.** Getty Images' damages expert, Daniel Fischel, a world-renowned economics expert and former dean of the University of Chicago Law School, JA402-JA430, explained why the share price spiked between late-July and mid-September 2022. Fischel analyzed market conditions, the contemporaneous perspective of market commentators, and the behavior of

CCNB shareholders. JA384-JA390. In his view, the small initial public float of Getty Images stock set up conditions for a short squeeze—a phenomenon where a sudden rise in the price of a stock forces many traders who had previously shorted the stock to cover their losses by buying stock at the higher price, causing the price to increase even more as demand outstrips the limited supply. JA383 n.48. As explained, short-selling a stock is a way to try to profit from expected decreases in stock prices. It involves borrowing shares, selling them, and then buying them back at a lower price, thus turning a profit. *Supra* p. 3. In Fischel's opinion, given the many traders who had shorted Getty Images stock in July 2022, the sudden and short-lived surge in the share price reflected a short squeeze that did not fully abate until the Form S-1 was effective and new shares became tradeable. JA385.

### 4. Alta and CRCM try to exercise Getty Images warrants in August 2022.

By mid-August 2022, Alta and CRCM had amassed millions of Getty Images public warrants. The Warrant Agreement governed the exercise of those warrants. That contract is governed by New York law. JA36 § 9.3.

**a.** The Warrant Agreement allowed a warrant holder to purchase a Getty Images share for $11.50, starting thirty days after the Business

- 17 -

Combination closed, provided two relevant conditions were satisfied. JA25 § 3.2. *First*, at the time of exercise, there needed to be an "effective" "registration statement under the Securities Act with respect to the [warrant shares] underlying the Public Warrants." JA26 § 3.3.2. *Second*, there needed to be a "current" "prospectus relating []to" the warrant shares. *Id*. The Warrant Agreement required Getty Images to "use commercially reasonable efforts to cause" a registration statement for the warrant shares "to become effective within sixty (60) Business Days after the closing of its initial Business Combination and to maintain a current prospectus relating thereto." JA33 § 7.4.1.

    **b.** By around August 22, 2022, thirty days after the Business Combination closed, CRCM had more than 2.4 million Getty Images warrants and Alta had more than 2 million. SA8. CRCM sought to exercise its warrants on August 22 and 23, and Alta sought to exercise on August 24. SA25-SA26 nn.11-12. In response, Getty Images explained that the warrants could not be exercised until the Form S-1 was declared effective (which didn't occur until September 15). SA9.

### C.    Procedural background

**1.    a.**    Alta and CRCM separately sued Getty Images for breaching the Warrant Agreement. JA69, JA1732-JA1734. They also brought various other claims, some in the alternative. JA69-JA79, JA1734-JA1746. The district court consolidated the cases through discovery, and the parties cross-moved for summary judgment. SA10. The two primary issues were whether Getty Images breached the Warrant Agreement and, if so, whether Alta and CRCM suffered damages. SA12.

**b.**    The district court granted summary judgment for Alta and CRCM on their breach-of-contract claims, and to Getty Images on all other claims. The court awarded Alta and CRCM damages.

As to liability, the court held that Getty Images breached the Warrant Agreement by refusing to allow Alta and CRCM to exercise their warrants because all conditions for the exercise of warrants were satisfied on August 22, 2022. The court first concluded that the Form S-4 satisfied the Warrant Agreement's effective-registration requirement when it became effective on June 30, 2022. The court rejected Getty Images' argument that the Form S-4 had registered only the *offer* of warrant shares and not their *sale*. SA16-SA17.

The court also rejected the argument that the prospectus in the Form S-4 was not current in August 2022. SA20-SA22.

As to damages, the court determined that Alta and CRCM were entitled to their requested damages for the purported breach of the Warrant Agreement on August 22 and 24. SA22. Getty Images explained that Alta and CRCM did not suffer damages, because the low-float, short-squeeze conditions meant that the stock price was inflated, and once warrant holders were able to exercise their warrants, the share price would have plummeted. SA23-SA25. As Fischel explained, market conditions in August 2022 meant that the actual trading price of Getty Images' stock would have been below the warrant exercise price of $11.50 if Alta and CRCM had been able to exercise their warrants, foreclosing any finding of damages. JA391-JA392.

Alta and CRCM disagreed. They argued that the court should calculate damages by simply taking the average market price of a Getty Images share on the dates that Alta and CRCM wanted to exercise their warrants and subtracting the $11.50 exercise price. SA22-SA23. The district court accepted Alta's and CRCM's damages measures, concluding that Getty Images' analysis rested on "speculation." SA24-SA25. The district court ordered

$36,946,713 in damages plus prejudgment interest to Alta, and $50,967,348 in damages plus prejudgment interest to CRCM. SA32, SA35-SA36.

The district court ruled for Getty Images on the remaining summary judgment issues. Relevant here, the court held that Alta could not recover damages for warrants it purchased after August 24, 2022, the date of Getty Images' purported breach with respect to Alta. SA25-SA26. And the court granted summary judgment to Getty Images on plaintiffs' other claims. SA27-SA32.

**2.** Getty Images timely appealed from the judgments on the breach-of-contract claims in both the CRCM action (No. 23-7876), JA3023, and the Alta action (No. 23-7915), JA1686. Alta cross-appealed as to the claims for which the district court had granted summary judgment to Getty Images (No. 23-7983). JA1688.

## STANDARD OF REVIEW

The Court reviews de novo grants of summary judgment, *Borley v. United States*, 22 F.4th 75, 78 (2d Cir. 2021), including whether genuine disputes of material fact exist, *Delaware & Hudson Railway v. Consolidated Rail Corp.*, 902 F.2d 174, 177-78 (2d Cir. 1990). The Court "examin[es] the evidence in the light most favorable to, and draw[s] all reasonable inferences in favor

of, the non-movant." *Massaro*, 19 F.4th at 209. The court "may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000). Summary judgment "is appropriate only where the record as a whole could not lead a rational trier of fact to find for the non-movant." *Borley*, 22 F.4th at 78 (brackets omitted).

## SUMMARY OF ARGUMENT

**I.** Getty Images did not breach the Warrant Agreement. The contract required for warrant exercise (1) an effective registration statement for the issuance of warrant shares and (2) a current prospectus covering those shares. JA26 § 3.3.2. Neither requirement was satisfied when CRCM and Alta wanted to exercise their warrants.

**A.** There was no effective registration statement covering the issuance of the warrant shares in August 2022. Registration of a security is transaction-specific: the offer and sale of a security can be registered separately, and warrants and warrant shares can be registered separately. And a Form S-4 can be used only for registering "securities issued in business combination transactions." 17 C.F.R. § 239.25. Thus, Getty Images properly registered the offer of warrant shares on its Form S-4, because it issued warrants as part of the Business Combination. Under SEC guidance, the warrant

- 22 -

shares were considered to be offered—but not issued—along with those warrants, as part of the merger. Getty Images could not register the sale of warrant shares on its Form S-4, because those shares would not be sold until at least a month after the Business Combination closed. Instead, Getty Images properly registered the sale of the warrant shares on the Form S-1, which became effective on September 15, 2022. Thus, Alta and CRCM couldn't exercise their warrants in August.

CRCM and Alta are wrong that the registration of the *offer* of warrant shares could have satisfied the Warrant Agreement's effective-registration requirement. Getty Images could not legally issue warrant shares unless they were registered for issuance, and a court cannot enforce an illegal contract.

Even if the Form S-4 had registered the sale of warrant shares, there was still no effective registration statement when Alta and CRCM wanted to exercise their warrants because the Form S-4 became ineffective for the sale of warrant shares when Getty Images filed its Form S-1 on August 9, 2022. Rule 429 allows a registrant to file a combined prospectus in a later registration statement. *See* 17. C.F.R. § 230.429. That later registration statement acts as a post-effective amendment to the earlier statement, meaning no sales can

proceed under the earlier registration statement until the SEC declares the later statement effective. Getty Images' Form S-1 didn't become effective until September 15.

**B.** Even assuming the Form S-4 registered the sale of warrant shares, there was no current prospectus covering the warrant shares when CRCM and Alta wanted to exercise their warrants. A prospectus isn't current where material or fundamental changes have occurred since it took effect. A material change is one that a "reasonable investor" would think "significantly altered the 'total mix' of information made available." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 38 (2011). A fundamental change occurs when a single material change or multiple developments are "major and substantial." *Delayed or Continuous Offering and Sale of Securities*, 46 Fed. Reg. 42,001, 42,007 (Aug. 18, 1981). Where there has been a fundamental change, or a material change that cannot be stated succinctly, a registrant must file a post-effective amendment to bring the prospectus up to date. *Id.*; *see* 17 C.F.R. § 229.512(a)(1)(ii).

Here, the Business Combination resulted in fundamental (and material) changes that Getty Images addressed on its Form S-1 but that could not have been disclosed on the Form S-4. The Form S-1 prospectus omitted

- 24 -

outdated information about the mechanics of the Business Combination, and it provided updates that Getty Images was required by the SEC to disclose after the merger.

CRCM and Alta contended below that, even if material changes made the Form S-4 prospectus not current, Getty Images breached the Warrant Agreement by not using "commercially reasonable efforts," JA33 § 7.4.1, to keep that prospectus current with a "sticker"—a prospectus supplement that does not require prior SEC approval. But Getty Images could not have used a sticker, and had to use a post-effective amendment, because the changes were fundamental and Getty Images could not have described them succinctly. What's more, it was commercially reasonable for Getty Images to satisfy its obligations to update the Form S-4 prospectus by filing the Form S-1. At a minimum, the court could not have resolved these questions as a matter of law at the summary-judgment stage.

**II.** This Court should remand for a jury to resolve the genuine factual disputes as to damages.

**A.** A breach-of-contract plaintiff is entitled to summary judgment on damages only if there is no genuine dispute whether the plaintiff has shown damages. It is the plaintiff's burden to establish the fact of damages

and present a stable foundation for a reasonable estimate of damages. *Process America, Inc. v. Cynergy Holdings, LLC*, 839 F.3d 125, 141 (2d Cir. 2016); *Freund v. Washington Square Press, Inc.*, 314 N.E.2d 419, 421 (N.Y. 1974). Damages should put the plaintiff in the economic position he would be in but for the defendant's breach. *Boyce v. Soundview Technology Group, Inc.*, 464 F.3d 376, 392 (2d Cir. 2006). Summary judgment for plaintiffs on damages is appropriate only if, construing all the evidence in the light most favorable to the defendant, a reasonable factfinder must find that plaintiffs are entitled to the specific amount of damages they sought. *See Doehler Metal Furniture Co. v. United States*, 149 F.2d 130, 135-36 (2d Cir. 1945).

**B.** Alta and CRCM were not entitled to summary judgment because Getty Images' evidence created genuine disputes of material facts about damages. Under the law and economics alike, damages turn on the price at which the warrant shares would have sold had there been no breach, minus the warrants' exercise price. A reasonable jury could credit Getty Images' evidence that low-float, short-squeeze conditions had inflated the stock price and that had the warrants been exercisable when Alta and CRCM wanted to exercise them, the market price would have dropped below the $11.50 exercise price. Getty Images submitted voluminous evidence supporting that

conclusion, including its expert's analysis; the results of the CCNB shareholder redemption, reflecting that those shareholders had almost unanimously taken $10 rather than accept Getty Images shares; contemporaneous valuations by outside analysts and by Alta and CRCM themselves; the relatively flat price of the warrants; and historical data on Getty Images' stock price, showing it has traded at or well below $11.50 since the Form S-1 was declared effective. Based on that evidence, a jury could find that Alta and CRCM cannot prove that they suffered damages, much less provide a stable foundation for estimating what they claim are tens of millions of dollars of damages.

**C.** The district court's reasoning is flawed. The court held that the observed market price when Alta and CRCM wanted to exercise the warrants in August 2022 was necessarily the price at which they would have resold their shares. But the district court failed to consider whether the purported breach itself would have altered market conditions. Getty Images' evidence shows that a reasonable jury could conclude that, had Alta and CRCM been able to exercise their warrants, the market price for Getty Images stock would have plummeted below the warrant exercise price. Neither Alta nor CRCM would have been able to resell the shares for profit. That

evidence, and how to evaluate it under the wrongdoer rule, presented questions for the jury.

## ARGUMENT

### I. Getty Images did not breach the Warrant Agreement by declining to allow Alta and CRCM to exercise their warrants in August 2022, because federal securities law prohibited warrant exercise at that time.

Getty Images did not breach the Warrant Agreement. The contract conditioned the exercise of warrants on two requirements: an effective registration statement for the issuance of warrant shares and a current prospectus covering those shares. JA26 § 3.3.2. Neither requirement was satisfied when CRCM and Alta attempted to exercise their warrants.

#### A. Alta and CRCM could not exercise their warrants in August 2022 because there was no then-effective registration statement for the issuance and sale of warrant shares.

Getty Images was not permitted—much less obligated—to issue warrants to CRCM and Alta on August 22 and 24, because there was no effective registration statement for the issuance of warrant shares. As required by law, Getty Images registered the *offer* of the warrant shares on its Form S-4 and the *issuance and sale* of the warrant shares on its Form S-1. Thus, there was no effective registration statement for the issuance of warrant shares until September 15, when Getty Images' Form S-1 became effective.

Even assuming the Form S-4 registered the issuance of the warrant shares, there was still no effective registration statement when CRCM and Alta tried to exercise their warrants. Pursuant to Rule 429, Getty Images' Form S-1 included a combined prospectus covering the warrant shares. *See* 17 C.F.R. § 230.429(a). From its filing on August 9, the combined prospectus acted as a post-effective amendment, halting any sale of warrant shares until the Form S-1 became effective.

> **1.    There was no effective registration statement for the issuance and sale of warrant shares until Getty Images' Form S-1 became effective.**

CRCM and Alta could not exercise their warrants in August 2022 because there was no then-effective registration statement for the issuance of warrant shares.

**a.**    "Registration of a security is 'transaction-specific' in that the requirement of registration applies to each act of offering or sale." *SEC v. Universal Express, Inc.*, 475 F. Supp. 2d 412, 422 (S.D.N.Y. 2007) (Lynch, J.) (quoting *SEC v. Cavanagh*, 155 F.3d 129, 133 (2d Cir. 1998)). Thus, the sale of a security generally need not be registered with its offer, and warrant shares need not be registered with warrants.

**i.**    The Securities Act draws two relevant distinctions.

- 29 -

*First*, it differentiates between the *offer* and the *sale* of securities. Section 5(c) of the Securities Act governs "offers," providing that "[i]t shall be unlawful for any person … to offer to sell or offer to buy … any security, unless a registration statement has been filed as to such security." 15 U.S.C. § 77e(c). Section 5(a)(1) governs "sales," providing that "[u]nless a registration statement is in effect as to a security, it shall be unlawful for any person … to sell such security." *Id.* § 77e(a)(1).

*Second*, the Securities Act differentiates between the offer or sale of *warrants* and the offer or sale of *warrant shares*. Section 2(a)(3) provides that when a security, like a warrant, "giv[es] the holder" "the right to convert such security into another security," like a warrant share, the offer or sale of the first security "shall not be deemed to be an offer or sale of such other security." 15 U.S.C. § 77b(a)(3). Thus, offering or selling a warrant is a separate transaction from offering or selling a warrant share.

Still, the SEC's Compliance and Disclosure Interpretations (C&DI) instruct that, if warrants being registered for sale are "exercisable within one year," then the warrant shares must also be included on that registration statement. SEC, C&DI, Question 139.01 (Aug. 14, 2009). But SEC guidance makes clear that it is the offer of the warrant shares, and not their sale, that

- 30 -

must be registered with the warrants. The guidance explains that when the warrants are exercisable within a year, "an *offering* of both the overlying security [*i.e.*, the warrants] and underlying security [*i.e.*, the warrant shares] is deemed to be taking place." *Id.* (emphasis added).

**ii.** Because registration is transaction-specific, the SEC has promulgated regulations explaining which transactions can be registered on which forms.

Form S-4 is used to register "securities issued in business combination transactions." 17 C.F.R. § 239.25. Specifically, it can be used in five categories of transactions, including, as relevant here, "a transaction of the type specified in paragraph (a) of rule 145 (§ 230.145 of this chapter)." 17 C.F.R. § 239.25; *see* Form S-4, Instruction A.1. Rule 145 covers, in relevant part, transactions where a merger or consolidation "is submitted for the vote or consent of … security holders." 17 C.F.R. § 230.145(a).

Form S-1, by contrast, is used to register securities transactions "for which no other form is authorized or prescribed." 17 C.F.R. § 239.11; Form S-1, Instruction I.

**b.** Adhering to these rules, Getty Images registered the offer of warrant shares on Form S-4 and the issuance and sale of warrant shares on Form

S-1. Getty Images' Form S-1 would not become effective until September 15, 2022. SA9. Thus, Getty Images did not breach the Warrant Agreement by declining to allow Alta and CRCM to exercise their warrants on August 22 and August 24, because there was no then-effective registration statement for the issuance of warrant shares.

Getty Images had to register on its Form S-4 any securities that were offered or sold in the Business Combination, because that transaction was "submitted for the vote or consent of … security holders." 17 C.F.R. § 230.145(a); *supra* pp. 12-13. The Form S-4 thus registered the issuance of Getty Images common stock, which could be issued to CCNB shareholders upon approval of the Business Combination. S*upra* pp. 11-13. It also registered the issuance of Getty Images warrants, which were to be exchanged for existing CCNB warrants, with Getty Images assuming responsibility for those warrants upon shareholder approval. *Supra* p. 13. And because Getty Images would be issuing warrants that would become exercisable within a year of when the Form S-4 was filed, it also had to register the offering of the underlying warrant shares. *See* 17 C.F.R. § 239.25; C&DI, Question 139.01.

At the same time, Getty Images could not register the *issuance or sale* of warrant shares on the Form S-4 because no warrant shares would be issued

in the Business Combination. The Warrant Agreement provided that no warrant shares could be issued until thirty days after the Business Combination closed, JA25 § 3.2, and issuance of warrant shares might continue for weeks, months, or even years. Unlike the issuance of the securities registered on the Form S-4, the issuance of warrant shares did not require the approval of CCNB shareholders. Rather, the issuance of warrant shares involved a separate investment decision that would be made by individual warrant holders after the Business Combination.

Getty Images, thus, didn't breach the Warrant Agreement. Getty Images was not required to allow warrant exercise until after the Form S-1 became effective, well after Alta and CRCM wanted to exercise their warrants, and by which time share prices had fallen below the exercise price, *supra* pp. 15-16.

## 2. The district court's reasoning and Alta and CRCM's counterarguments lack merit.

The district court ruled, and Alta and CRCM argue, that Getty Images nonetheless breached the Warrant Agreement. In their view, even if the Form S-4 registered only the offer of the warrant shares, the Form S-4 nevertheless satisfied the Warrant Agreement's requirement that a "registration

statement under the Securities Act *with respect to*" the warrant shares be effective. JA26 § 3.3.2 (emphasis added).

That interpretation of the Warrant Agreement is wrong. A security cannot be sold without an effective registration statement for its sale. 15 U.S.C. § 77e(a)(1). Thus, under Alta and CRCM's reading, Getty Images was obligated to issue warrant shares even though doing so would be illegal. But "[i]llegal contracts" are "unenforceable," *Lloyd Capital Corp. v. Pat Henchar, Inc.*, 603 N.E.2d 246, 247 (N.Y. 1992), and "[c]ontracts should not be interpreted to render them illegal and unenforceable," *McCutcheon v. Colgate-Palmolive Co.*, 62 F.4th 674, 697 (2d Cir. 2023) (quoting *Walsh v. Schlecht*, 429 U.S. 401, 408 (1977)). The straightforward reading of the Warrant Agreement—and the interpretation that would make it legal and enforceable—is that Getty Images wasn't obligated to issue warrant shares without an effective registration statement *for their issuance and sale*. Interpreting the Warrant Agreement to require Getty Images to issue warrant shares that could not be legally sold would make the contract unenforceable. *See Lloyd Capital*, 603 N.E.2d at 247.

Even if there were an enforceable contractual duty to issue warrant shares that could not be legally traded, Alta's and CRCM's claims would still

fail. Without an effective registration statement for the warrant shares' sale, Alta and CRCM could not have resold the shares. They thus couldn't have made any money, meaning they suffered no damages from any purported breach. *See also infra* pp. 47-68.

> **3.** **Even if the Form S-4 registered the issuance and sale of warrant shares, the filing of the updated prospectus with the Form S-1 made the Form S-4 ineffective for those transactions, so there was no effective registration statement until the Form S-1 became effective.**

Even if the Form S-4 registered the sale of warrant shares, CRCM and Alta still could not have exercised their warrants on August 22 or August 24, because the filing of the Form S-1 on August 9 made the Form S-4 ineffective for the sale of warrant shares.

**a.** Rule 429 contemplates that a registrant might file "two or more registration statements" for the offer or sale of certain securities. 17 C.F.R. § 230.429(a). The rule allows a registrant to file a single "combined prospectus" "in the latest registration statement in order to satisfy the requirements of the [Securities] Act." *Id.* The rule further provides that "the registration statement containing the combined prospectus shall act, upon effectiveness, as a post-effective amendment to any earlier registration statement whose prospectus has been combined in the latest registration statement." *Id.*

§ 230.429(b). Because post-effective amendments require SEC review, sales under the earlier registration statement must stop after the post-effective amendment is filed and may not resume until the SEC approves it and it becomes effective. *See* SEC, C&DI, Question 225.01 (Jan. 26, 2009); 1 Securities Practice Guide § 6.04 (Lexis 2023).

**b.** Getty Images' Form S-1 expressly invoked Rule 429 and contained a combined prospectus. JA2475-JA2476 tbl.3 & n.6. The Form S-1 thus acted as a post-effective amendment to the Form S-4, *see* 17 C.F.R. § 230.429(b), halting sales of warrant shares covered by the Form S-1 combined prospectus between its filing on August 9 and its effectiveness on September 15. And because the sale of warrant shares was halted between August 9 and September 15, Getty Images did not breach the Warrant Agreement by declining to allow Alta and CRCM to exercise their warrants on August 22 and 24.

**B.** **Alta and CRCM could not exercise their warrants in August 2022 for another reason—there was no then-current prospectus relating to the warrant shares, given material and fundamental developments after the Form S-4 was filed.**

Even assuming the Form S-4 registered the issuance and sale of warrant shares, Getty Images did not breach the Warrant Agreement because

the contract's separate requirement that there be a current prospectus covering those shares, *see* JA26 § 3.3.2, was not satisfied. A prospectus isn't current if material or fundamental developments have occurred since it took effect. Here, the close of the Business Combination after the Form S-4 became effective resulted in material and fundamental changes, disclosed on Getty Images' Form S-1, filed on August 9, 2022. Those changes made the Form S-4 prospectus no longer current. And because the Form S-1 prospectus didn't become effective until September 15, the Warrant Agreement's current-prospectus requirement was not satisfied when CRCM and Alta wanted to exercise their warrants on August 22 and 24.

### 1. A prospectus is no longer current if material or fundamental changes to the information presented in the registration statement have occurred.

A prospectus isn't current if there have been "[p]ost-effective developments which materially alter the picture presented in the registration statement." *SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1095 (2d Cir. 1972), *abrogated on other grounds by Liu v. SEC*, 140 S. Ct. 1936 (2020). Determining whether a change is material involves a fact-intensive inquiry into how reasonable investors would have viewed the change in light of all the information available. If a material change can be succinctly explained, the

registrant can update the prospectus through a short "sticker," which doesn't require SEC prior approval and which immediately amends the prospectus. But if a material change cannot be succinctly explained, or if the change is fundamental, the registrant must file a new prospectus in a post-effective amendment, which requires SEC review to take effect.

**a.** A *material* change is one that a "reasonable investor" would think "significantly altered the 'total mix' of information made available." *Matrixx*, 563 U.S. at 38. For example, any fact "which in reasonable and objective contemplation *might* affect the value of the corporation's stock or securities" is material. *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 849 (2d Cir. 1968). Thus, "information disclosing the earnings and distributions of a company" is material, as are "facts which affect the probable future of the company." *Id.* What's more, "it is not necessary to assert that the investor would have acted differently" given the new information. *Litwin v. Blackstone Group, L.P.*, 634 F.3d 706, 717 (2d Cir. 2011). The information simply must be important enough to have assumed "significance in the deliberations of the reasonable shareholder." *Folger Adam Co. v. PMI Industries, Inc.*, 938 F.2d 1529, 1533 (2d Cir. 1991).

A *fundamental* change occurs when a single material change or multiple individual developments are "major and substantial." 46 Fed. Reg. at 42,007. Examples include "major changes in the issuer's operations, such as significant acquisitions or dispositions," and "any change in the business or operations … that would necessitate a restatement of the financial statements." *Id.* And even if a single change would not be fundamental standing alone, "[n]umerous small changes to information in the registration statement can become cumulatively fundamental." *Id.* at 42,007 n.47. Ultimately, determining whether a change is fundamental "is the responsibility of management." SEC Division of Corporation Finance, *Financial Reporting Manual* § 2045.3 (2022).

Assessing whether a change is material or fundamental "requires delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences." *Matrixx*, 563 U.S. at 36-37. Because these assessments require context-specific review, they "are peculiarly ones for the trier of fact." *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976). Indeed, as this Court has explained, the question of materiality "generally should be presented to a jury." *Press v. Chemical Investment Services Corp.*, 166 F.3d 529, 538 (2d Cir. 1999). Only if the

importance or unimportance of the information is so obvious "that reasonable minds cannot differ on the question of materiality" can materiality be determined at summary judgment. *TSC Industries*, 426 U.S. at 450.

**b.** For "[m]aterial changes that can be accurately and succinctly stated," the registrant can update the prospectus with a supplement, also called a "sticker." 46 Fed. Reg. at 42,007. A sticker describes the "substantive change from or addition to the information" from the prior prospectus. 17 C.F.R. § 230.424(b)(3). It takes effect upon filing and does not require SEC approval. *See id*.

To report a fundamental change, by contrast, a registrant must file a post-effective amendment to a registration statement to bring the prospectus up to date. 17 C.F.R. § 229.512(a)(1)(ii). That amendment requires the same SEC review process as a new registration statement. *Supra* p. 36. Thus, after a registrant files a post-effective amendment to address a fundamental change, sales of the underlying security are halted until the SEC declares the amendment effective. *See* 17 C.F.R. § 229.512; SEC, C&DI, Question 139.28 (Aug. 14, 2009).

### 2. Getty Images' Form S-1 disclosed material—indeed, fundamental—developments after the Form S-4 became effective, making the Form S-4 prospectus not current.

After the Form S-4 prospectus became effective on June 30, Getty Images and CCNB completed the de-SPAC. That transaction resulted in fundamental—or, at least, material—changes that Getty Images addressed on its Form S-1 prospectus, which would not become effective until September 15.

The differences between the Form S-4 and Form S-1 prospectuses reflect the fundamental changes that occur during most mergers and that occurred during this Business Combination. Indeed, the prospectuses in the two registration forms served different purposes. The Form S-4 prospectus informed CCNB shareholders about the Business Combination before the shareholder vote. *Supra* pp. 12-13. That registration statement contained more than 800 pages of disclosures focusing on the proposed de-SPAC transaction. *See* SA20-SA21.

The Form S-1 prospectus, on the other hand, informed potential investors' decisions whether to buy Getty Images shares or warrants, or whether to exercise warrants. The Form S-1 prospectus was thus much shorter—Getty Images removed no-longer-relevant information about the Business

Combination, which would have been confusing and unhelpful to potential investors after the Business Combination closed. Getty Images also added material information that it could not have reported on the Form S-4 prospectus. All told, Getty Images' Form S-1:

- Removed information about the Business Combination, including information about the corporate governance of CCNB before the de-SPAC, details about the CCNB shareholder vote on the Business Combination, and risk factors that no longer applied. JA494-JA495, JA2765-JA2766.

- Updated pro forma financial statements addressing changes to Getty Images' capital structure and disclosing that 99.4% of CCNB shareholders had opted to redeem their CCNB shares for cash, rather than take Getty Images shares. JA493-JA494; *supra* p. 15.

- Added a quarter of financial statements, through June 2022. JA493-JA494.

- Updated information about the tax consequences for potential investors of buying, owning, or selling Getty Images shares and warrants (whereas the tax information on the Form S-4 prospectus focused on the Business Combination). JA493 n.239.

Those changes "altered the 'total mix' of information made available," *Matrixx*, 563 U.S. at 38, compared to the Form S-4 prospectus. The SEC must have thought so too, because its Form 8-K *required* Getty Images to disclose material updates within several days of the Business Combination's closing. JA360; *see* Form 8-K, General Instructions B.1. The Form 8-K is meant to

"announce major events that shareholders should know about." SEC, *Form 8-K*, https://www.sec.gov/answers/form8k.htm. For example, Getty Images disclosed on its July 28, 2022 Form 8-K the high percentage of CCNB shareholders who had redeemed their shares for cash, leaving only 508,311 Getty Images shares in the public float. *Supra* p. 15. While Getty Images properly included that information on its Form S-1, it could not have done so on its Form S-4, which predated the Business Combination. Nor is there any argument that that information on Getty Images' Form 8-K (which was included on the Form S-1) was immaterial. The SEC, after all, required the Form 8-K, and the market found it important: Getty Images' stock price more than doubled the morning after its release. *Supra* pp. 15-16. What's more, after Getty Images disclosed those changes on its Form S-1, the SEC sent a comment letter requesting that Getty Images provide more information, JA2822-JA2823, and thus requiring an amendment to the Form S-1, JA207. Apparently, the SEC did not think that the Form S-1 prospectus, as filed on August 9, had included all relevant material information. That same information, of course, was missing from the Form S-4 prospectus—so that prospectus could not have been current when Alta and CRCM wanted to exercise their warrants on August 22 and 24.

Thus, the district court erred in granting summary judgment to CRCM and Alta, because they have failed to show "that reasonable minds cannot differ on the question of materiality." *TSC Industries*, 426 U.S. at 450. A reasonable factfinder presented with all the evidence could conclude that material and fundamental changes made the Form S-4 prospectus not-current in August 2022. And because the Form S-1 prospectus addressing those changes didn't become effective until September 15, *supra* p. 15, there was no current prospectus covering the warrant shares when CRCM and Alta wanted to exercise their warrants.

### 3. Getty Images could not have kept the Form S-4 prospectus current by stickering it, and Getty Images' decision not to use a sticker was commercially reasonable.

CRCM and Alta contend that even if there was no current prospectus, Getty Images nonetheless breached the Warrant Agreement because the agreement required Getty Images to "use commercially reasonable efforts … to maintain a current prospectus." JA33 § 7.4.1. They argue that Getty Images could have done so by stickering the Form S-4 and that it had a contractual duty to do so. Both contentions are wrong.

**a.** Getty Images could not have used a sticker to update the Form S-4 prospectus. Stickers can be used only for non-fundamental material changes that can be stated succinctly. *Supra* p. 40. But the developments disclosed on Getty Images' Form S-1 were fundamental changes, or at the very least, material changes that could not have been described succinctly, given that the Form S-4 and Form S-1 prospectuses served fundamentally different purposes. *Supra* pp. 14-15, 41-43. A sticker could not have removed the many pages of no-longer-relevant information about the Business Combination shareholder vote. And a jury could find that the developments Getty Images disclosed on the Form S-1, such as updates on share redemption during the Business Combination, were fundamental changes, which Getty Images could not report by sticker. Thus, Getty Images was required to file a post-effective amendment, which it accomplished by filing a combined prospectus with its Form S-1. *Supra* p. 36.

**b.** Even if Getty Images could have stickered the Form S-4 prospectus, the record does not support a finding that Getty Images' decision to file the Form S-1 was commercially unreasonable.

Although "the case law on New York's commercial reasonability standard is scant," "the standard set forth in *Holland Loader Co. v. FLSmidth*

*A/S*, 313 F. Supp. 3d 447 (S.D.N.Y. 2018)," provides guidance. *Shane Campbell Gallery, Inc. v. Frieze Events, Inc.*, 838 Fed. App'x 608, 609-10 (2d Cir. 2020). That standard requires "some conscious exertion to accomplish the agreed goal" but it does not require efforts "that jeopardize[] one's business interests." *Holland Loader*, 313 F. Supp. 3d at 473. The burden is on "the party seeking to enforce the efforts provision to establish the objective standard by which the [other] party's efforts are to be judged, in the context of the particular industry." *Id.* at 472. The inquiry doesn't look to whether, in hindsight, another effort "could have been undertaken to produce a better result." *Id.* at 472-73. Rather, "a court should evaluate only whether the party's actual conduct was sufficient." *Id.*

CRCM and Alta cannot show that it was commercially unreasonable for Getty Images to file a Form S-1 to make the Form S-4 prospectus current. Determining whether a company must file updated information in a post-effective amendment "is the responsibility of management," *Financial Reporting Manual* § 2045.3, which has a duty to comply with SEC reporting requirements, *e.g.*, 17 C.F.R. § 229.512(a)(1)(ii). A registrant violates the Securities Act if it sells securities under a not-current prospectus. 15 U.S.C. § 77e. The commercially-reasonable-efforts provision did not require Getty

Images to risk violating federal law in order to update the Form S-4 prospectus in CRCM and Alta's preferred manner. To the contrary, the Warrant Agreement expressly contemplated, in the same commercially-reasonable-efforts provision that CRCM and Alta seek to enforce, that Getty Images would file a registration statement covering the warrant shares and cause it "to become effective within sixty (60) Business Days *after* the closing of" the Business Combination, JA33 § 7.4.1 (emphasis added)—a requirement that Getty Images satisfied by filing the Form S-1. And the evidence showed that the vast majority of similarly situated companies—about 85%—filed a Form S-1 (or equivalent) covering the sale of warrant shares after de-SPACs. JA467. On motions for summary judgment, CRCM and Alta cannot establish that Getty Images' filing the Form S-1 was commercially unreasonable as a matter of law.

## II. The district court erred in granting CRCM and Alta summary judgment on damages.

The district court also erred in granting summary judgment to Alta and CRCM because there were genuine factual disputes regarding damages. To prove that damages existed, Alta and CRCM had to show that there was no genuine dispute about whether the market price of the warrant shares

would have been higher than the warrant exercise price, had they been able to exercise their warrants and resell the shares in August 2022. But Getty Images' damages expert explained why Alta and CRCM couldn't make that showing. His report and deposition testimony established that Getty Images' stock price in August 2022 was inflated due to the low number of available shares. His analysis also demonstrated that once the warrants became exercisable, the price of shares would drop below the warrant exercise price before the warrant holders would be able to resell those shares. That is exactly what happened when additional Getty Images shares entered the market in September 2022. Of course, if Alta and CRCM couldn't have sold the warrant shares for more than the $11.50 exercise price, they couldn't have suffered any damages as a result of any breach. The district court erred by resolving genuine factual disputes that should have been left to a jury.

### A. A breach-of-contract plaintiff is entitled to summary judgment on damages only if there is no genuine dispute over whether the plaintiff has shown damages.

#### 1. Summary judgment on damages is appropriate only if, drawing all inferences in favor of the non-movant, the factfinder must accept the damages estimate the movant has put forward.

Summary judgment is appropriate "only when 'there is no genuine dispute as to any material fact.'" *Borley*, 22 F.4th at 78 (quoting Fed. R. Civ. P. 56(a)). "A genuine dispute of fact exists when there is sufficient 'evidence on which the jury could reasonably find'" for either party. *Id.* At summary judgment, a court must "constru[e] the evidence in the light most favorable to the non-moving party and draw[] all reasonable inferences in [its] favor." *Williams v. N.Y.C. Housing Authority*, 61 F.4th 55, 68 (2d Cir. 2003); *Delaware*, 902 F.2d at 177. Put another way, "[s]ummary judgment is appropriate [only] [w]here the record taken as a whole could not lead a rational trier of fact to find for the [non-movant]." *Borley*, 22 F.4th at 78 (alterations in original).

This Court has cautioned that, when "damages are in question, the courts should go slow about making haste by a summary judgment." *Doehler*, 149 F.2d at 135-36. That's because "a summary disposition of issues of damage should be on evidence which a jury would not be at liberty to

disbelieve" and would therefore "require a directed verdict for the moving party." *Id*. Stated differently, a plaintiff is entitled to summary judgment on damages only when, construing the evidence in the light most favorable to the non-moving party, a reasonable factfinder *must* find as a matter of law that the plaintiff is entitled not just to damages, but to the specific amount of damages requested.

### 2. A plaintiff bears the burden of proving the fact of damages and providing a reasonable estimate.

**a.** A breach-of-contract plaintiff bears the burden of proving "the fact of damages by a preponderance of the evidence." *Process America*, 839 F.3d at 141 (emphasis omitted). "[T]he key concept" is that "damages are meant to put a plaintiff in the same economic position he would otherwise be in but for a defendant's breach." *Boyce*, 464 F.3d at 392. By the same token, a plaintiff "certainly has no right to be placed in a better position than he would be in if" the defendant had performed under the contract. *Baker v. Drake*, 53 N.Y. 211, 217 (1873); *accord Miller v. Robertson*, 266 U.S. 243, 260 (1924).

A plaintiff also bears the burden of "show[ing] a 'stable foundation for a reasonable estimate[]' of damages to which he is entitled as a result of the

breach." *Boyce*, 464 F.3d at 391; *accord Freund*, 314 N.E.2d at 421. Only if the plaintiff convinces the factfinder that it has suffered damages and shown a stable foundation for a reasonable estimate does the "burden of uncertainty as to the amount of damage[s]" shift to "the wrongdoer." *Process America*, 839 F.3d at 141. The rationale for this so-called "wrongdoer rule" is that, when a plaintiff has carried its burden and shown the fact of damages by a preponderance of the evidence, "and the only uncertainty is as to their amount, there can rarely be good reason for refusing, on account of such uncertainty, any damages whatever for the breach." *Randall-Smith, Inc. v. 43rd St. Estates Corp.*, 215 N.E.2d 494, 498 (N.Y. 1966). But this principle does not excuse a plaintiff from establishing "the *existence* of" damages "with the requisite certainty." *Schonfeld v. Hilliard*, 218 F.3d 164, 175 (2d Cir. 2000). Nor does it excuse a plaintiff from providing a "stable foundation for a reasonable estimate" of damages. *Freund*, 314 N.E.2d at 421.

What's more, factfinders "have significant flexibility in estimating general damages" for breach of contract even "once the fact of liability is established." *Tractebel Energy Marketing v. AEP Power Marketing*, 487 F.3d 89, 112 (2d Cir. 2007). A factfinder "will make the best appraisal that it can, summoning to its service whatever aids it can command." *Contemporary Mission,*

*Inc. v. Famous Music Corp.*, 557 F.2d 918, 926-27 (2d Cir. 1977). In exercising that flexibility and "arriv[ing] at a reasonable estimate," exact precision is not required. *Tractebel*, 487 F.3d at 112. A factfinder may make assumptions about "certain variables," or decline to do so if "evidence is presented that undermines the basis for the assumption[s]" and the factfinder credits that evidence. *Id.* And that evidence "need not be conclusive in order to be relevant." *Contemporary Mission*, 557 F.2d at 927. Rather, evidence about damages is admissible so long as "the evidence has any tendency to show their probable amount." *Boyce*, 464 F.3d at 391.

**b.** Generally, for a breach of an option or warrant agreement, "the measure of damages is the difference between the [warrant exercise] price and the market value of the stock" on the day of the purported breach. *Id.* at 385. In a "straightforward" case, the market value of a publicly traded stock on a given day is generally calculated by using "the mean between the highest and lowest quoted selling prices" on that day. *Id.* (quoting *United States v. Cartwright*, 411 U.S. 546, 551 (1973)).

The mean-price method is not, as a matter of law, the exclusive way to value a stock, and in fact it is an erroneous way to value a stock when the assumptions on which the method rests do not hold. This Court has

explained that "the value of a security may not be equivalent to its market price." *McMahan & Co. v. Wherehouse Entertainment, Inc.*, 65 F.3d 1044, 1048 (2d Cir. 1995). For example, courts might "adjust[] the market price to account for panic selling in the market." *Id.* at 1049. Thus, where market conditions "are not depicted with sufficient clarity," "there remain issues of fact which require a trial for determination." *Castle Coal & Oil Co. v. Frank's Fuel, Inc.*, 415 N.Y.S.2d 237, 239 (App. Div. 1979).

The point is that the factfinder must determine what the market conditions would have been had no breach occurred, meaning it must consider whether the breach itself would have changed market conditions. The ultimate inquiry—what amount would restore the plaintiff to the "economic position he would have occupied had the breaching party performed the contract," *Boyce*, 464 F.3d at 391-92—is the same "when the breach of contract is nondelivery of shares of stock." *Simon v. Electrospace Corp.*, 269 N.E.2d 21, 26 (N.Y. 1971). When the purported breach is nondelivery of stock, a plaintiff's theory of damages will often turn on the plaintiff's reselling those shares for profit. Thus, the factfinder must consider how the market would have behaved had that stock actually been resellable—a fact-intensive inquiry that depends, in part, on "what knowledgeable investors anticipated

the future conditions and performance" of the stock "would be at the time of the breach." *Sharma v. Skaarup Ship Management Corp.*, 916 F.2d 820, 826 (2d Cir. 1990); *see Aroneck v. Atkin*, 456 N.Y.S.2d 558, 558 (App. Div. 1982).

A recent ruling from this Court illustrates these principles. In *Cottam v. 6D Global Technologies, Inc.*, No. 21-1031, 2022 WL 16908708, at *2 (2d Cir. Nov. 14, 2022) (summary order), the panel rejected a damages calculation based solely on market price, explaining that the market price there "does not reflect the impact of trading restrictions," "the dilution that would be occasioned by the issuance of additional shares as [the plaintiff] seeks," or "the uncertainties in the market price on account of relatively light trading." The panel thus concluded that the plaintiff "failed to provide a stable foundation for a reasonable estimate of damages." *Id.*

### B. Alta and CRCM are not entitled to summary judgment on damages.

#### 1. A reasonable jury could conclude that neither Alta nor CRCM suffered damages because the price of Getty Images' shares would have been below the warrant exercise price if Alta and CRCM had been able to exercise their warrants.

A reasonable jury could determine that the market price of Getty Images' shares would have been below the warrant exercise price if Alta and

CRCM had been able to exercise their warrants. Fischel explained why market conditions in August 2022 caused the price of Getty Images stock to trade significantly above the price at which the market would ordinarily value it. Crucially, Fischel also explained why those unusual market conditions would have ceased to exist had the public warrants been exercisable as of August 22, 2022. Multiple contemporaneous metrics—including Alta's and CRCM's own internal valuations—support Fischel's opinion. *Infra* pp. 60-61. Alta's and CRCM's experts' contrary opinions only underscore that there are genuine disputes that a factfinder must resolve.

**a.** Getty Images' share price surged after the July 28, 2022 disclosure that over 99% of CCNB shareholders had elected to redeem their shares for about $10, rather than exchange their CCNB shares for Getty Images shares. JA376; *supra* pp. 15-16. That meant there would be only 508,311 shares in Getty Images' public float until additional shares would become available, JA376—once the Form S-1 was declared effective.

With news of the low float, Getty Images' stock price rocketed. On July 28, 2022, just before the disclosure, Getty Images' stock closed at $10.50. JA1765. The following morning, the share price opened at $26.48. *Id.*; JA376. The average trading price of Getty Images' common shares then hovered at

$29 per share until August 26, 2022. JA1766. But on September 16, 2022, the first trading day after Getty Images' Form S-1 became effective and more shares entered the float, the trading price would close at $8.49. JA1769.

Fischel explained that the surging stock price resulted from the unusual low-float, short-squeeze conditions and did not reflect the market price under ordinary conditions—the very conditions that would resume if and when Alta and CRCM exercised their warrants and tried to sell their warrant shares, flooding the market with new supply. Just before the July 28 announcement regarding the low public float, the Getty Images "short interest"—that, is, "the number of its shares sold short"—was 1,392,806. JA385. News that the float contained only 508,311 shares meant that in late July there were approximately three times as many Getty Images shares sold short as there were shares available in the public float to cover those short sales. *Id.*

Fischel opined that these two market conditions in late July and August 2022—a high short interest combined with a low public float—created the perfect environment for a short squeeze of Getty Images stock. As Fischel explained, "[a] 'short squeeze' occurs when the price of a heavily shorted stock increases, forcing short sellers, who are betting that the stock price will

decline, to 'cover' their short positions by buying stock, which pushes up prices even further." JA383 n.48. Because many traders needed Getty Images shares to close out their short positions, the news that there were few shares to go around propelled prices upward. Market commentators noted the surge in Getty Images' share price, viewing it as the result of a short squeeze. JA385-JA386. Indeed, as of July 29, 2022, Alta itself had shorted Getty Images' stock. JA1447, JA1450. The upshot is that a reasonable factfinder could have concluded from Getty Images' evidence that the price of its shares in August 2022 did not reflect what the price would have been had the warrants been exercisable at that time, because relatively few shares were then tradeable.

**b.** Indeed, Fischel specifically opined that, because the short-lived surge in Getty Images' share price was driven by the low public float—and, in fact, abated once additional shares entered the float—"it is highly likely that eliminating the limited float and rumored short squeeze (whenever the Public Warrants became exercisable) would have caused Getty Images' stock price to fall below the Public Warrants' exercise price of $11.50." JA391. Put simply, Fischel explained that if the warrants could have been exercised,

traders would have known that shares were available, ending the conditions producing the short squeeze and forcing the share price back down.

A short squeeze abates, and a stock's price returns to normal levels, when the market learns that additional shares are available to trade, because short sellers no longer have to compete over shares. Short squeezes happen when the number of sales sold short is a high percentage of the total float. As one of plaintiffs' damages experts explained, "[a] percentage above 20% is the threshold above which one might expect an impending short squeeze." JA1174. As of August 22, there were 508,311 Getty Images shares in the public float, with 474,590 shares sold short—meaning shares sold short were 88% of the float, more than four times above plaintiffs' 20% threshold. JA391 & n.81. Had all of the 20.7 million outstanding warrants been exercised, however, the size of the float would have increased *forty-fold*, dropping the number of shorted shares to just 2% of the publicly tradeable shares—well below the 20% threshold of concern for a short squeeze. JA391; *see* JA1174.

For these reasons, Fischel opined that Getty Images' stock price would fall to under $11.50 per share as soon as the market learned that the public warrants were exercisable. JA388. "What's important," Fischel explained, is that "if all the public warrants became exercisable on August 22nd and that

was publicly known, that would convey information that the short squeeze—the temporary market inflation and prices caused by the short squeeze[—]was over and Getty's stock price would fall." JA2958 (44:16-24). And the market would have learned that warrants were exercisable. As Fischel explained, "an event where 20.7 million public warrants would be declared to be immediately exercisable is not something that can be done confidentially." JA2992 (178:3-7). Indeed, additional shares "would be noticed in the marketplace." JA2977 (118:2-4). At the very least, at the summary judgment phase—when inferences must be drawn in Getty Images' favor— it is certainly reasonable to infer that the price would have plummeted as soon as the exercisability of 20.7 million warrants became public.

How the market *actually* reacted when Getty Images' Form S-1 became effective in September 2022, and millions more shares entered the float, reinforces Fischel's opinion of how the market would have reacted had the warrants become exercisable in August 2022. On September 15, 2022, the share price closed at $13.35, above the exercise price. JA377-JA378. The SEC declared the Form S-1 effective after market close that day. JA390. The next morning, the trading price *opened* at $11.25 and closed at $8.49—both of which were below the warrant exercise price. JA377-JA378, JA208. Getty

Images' stock price has remained below the warrant exercise price since the Form S-1 became effective. JA390.

**c.**    Fischel's opinion was supported by other metrics from the same timeframe.

*First*, during the Business Combination in July 2022, 99.4% of CCNB shareholders redeemed their CCNB shares for about $10 each, rather than take Getty Images shares. JA202, JA376. Speaking with their pocketbooks, CCNB shareholders nearly unanimously priced the stock at less than the $10 redemption price. JA387. Their near-uniform view provides "direct evidence that market participants did not value Getty Images' stock at more than $10 per share, let alone at $20 or $30 per share," *id.*, and reflects the "overwhelming consensus of Getty investors that the long-term prospects of Getty's stock were worth less than $10," JA2970 (93:6-8).

*Second*, various sophisticated parties agreed that the market price of Getty Images stock in August 2022 was much higher than it would have been had the warrants been exercisable. JA2753-JA2756. Indeed, J.P. Morgan, Kroll, and other respected analysts assessed Getty Images stock at under $11.50 per share. JA2936-JA2939. Even CRCM's own internal valuation of Getty Images shares was below the warrant exercise price of $11.50. JA2753-

JA2756, JA2766-JA2768. What's more, on July 29, the day after Getty Images disclosed the low float, a CRCM partner sent a message to a CRCM analyst, remarking that "Spac stock often get squeezed." JA1770. That partner concluded that the increase in Getty Images' price was "just stock [manipulation]." *Id.* Similarly, an Alta principal wrote in a September 12 email that "a small float stock such as gety [*sic*] would be a stock that could easily be manipulated." JA215.

*Third*, the trading price of the warrants remained relatively flat during this period, despite the surge in Getty Images' share price. JA397, JA2764-JA2765. If the increased share price in July and August 2022 reflected the price investors thought the market would reliably set for Getty Images stock under ordinary conditions, the price of the warrants should have also risen significantly, to reflect the increase in the underlying share price. But, although Getty Images' *share* price increased from $10.50 on July 28 to $26.15 on July 29, the warrant price increased by only $0.26 (from $0.67 to $0.92). JA387-JA388. The comparatively low (and stable) warrant price shows that the market did not think that the inflated price at which the shares were trading reflected the price the shares would command absent low-float, short-squeeze conditions. *Id.*

**d.**     To be sure, Alta's and CRCM's damages experts disagreed with Getty Images' evidence, but that disagreement creates a *jury* question.

Alta's expert, C. Paul Wazzan, agreed that adding Alta's stock to the market would reduce the share price, but concluded that the price would decrease by only cents. JA1144-JA1145. He opined that market price accurately reflected the price at which Alta could sell warrant shares, because the market believed that the warrant shares could be exercised in August, so it had already taken the impending influx of shares into account. JA1175-JA1176.

CRCM's expert, Allen Ferrell, similarly concluded that the increase in available shares would have decreased the stock price only minimally. JA2932-JA2934. He opined that because no public disclosure of the exercise was required, if the warrants had been exercisable on August 22, the market would not have adjusted to reflect that the low-float and short-squeeze conditions had abated. JA2270. For that reason, and because more shares actually entered the public float on September 16, 2022, than would have become available if the warrants could have been exercised on August 22, 2022, Ferrell concluded that the conditions in September did not inform what would have happened in August. JA2269-JA2270 & n.9.

In short, the parties' experts disagreed on numerous fronts—how much additional shares would decrease share price; when the market would learn of warrant exercisability and what effect that news would have on share price; and the relevance of market behavior on September 16. Taking the evidence in the light most favorable to Getty Images, a reasonable jury could conclude that the share price would have fallen below the $11.50 exercise price once warrant exercisability was disclosed, before Alta or CRCM could profit from any sales. Neither Alta nor CRCM can explain why Getty Images' share price rose almost three-fold overnight (in the hours after the low float was disclosed) and then fell below the warrant exercise price once the market learned that additional shares would enter the public float. Those were questions for the jury, not the district court at summary judgment.

> **2.** **A reasonable factfinder could conclude that even if Alta and CRCM established damages, they did not offer a stable foundation for estimating damages.**

There is also a genuine dispute over whether Alta and CRCM have established a stable foundation for estimating damages. Alta's and CRCM's experts assumed that damages should be calculated using the mean Getty Images share price on the dates of attempted exercise. But they ignore the evidence that the mere disclosure of the fact that the warrants were

exercisable could have caused the share price to drop precipitously. A jury crediting Fischel's opinions could find that Alta's and CRCM's damages calculations were not reasonable.

As Fischel explained, Alta's and CRCM's models rest on the "critical"—yet "flawed"—assumption that Alta and CRCM could have resold their warrant shares at the prevailing market price when they wanted to. JA383-JA384. While both models make "minor discounts for dilution," JA384, they assume that their *millions* of warrant shares underlying the warrants, once exercisable, would be sold "at or near Getty Images' prevailing stock prices," JA383-JA384. For example, Ferrell concluded that any short squeeze would be "irrelevant" to his calculations, JA2285, and Wazzan also thought he didn't need to adjust his calculations for a short squeeze, JA1176. In short, both experts failed to incorporate into their estimates what Fischel opined were the critical market conditions. And as Fischel put it, any reliable model would need to account for those factors, and calculate "the impact that the expected increase of millions of new shares added to Getty Images' limited float"—a *40-fold increase* in shares—"would have had on its stock price." JA388.

A factfinder, crediting Fischel's opinion and drawing inferences in Getty Images' favor, could conclude that Alta's and CRCM's models do not provide a stable foundation for a reasonable estimate of damages because they fail to account for those critical market conditions. "Determining value" is inherently "a factual inquiry," and a factfinder must evaluate "all the elements of the particular case." *Boyce*, 464 F.3d at 387; *see supra* pp. 50-54. A factfinder can make assumptions about certain variables but must also consider whether "evidence is presented that undermines the basis for the assumption[s]." *Tractebel*, 487 F.3d at 112. That's why a plaintiff doesn't set forth a stable foundation for estimating securities-related damages when it fails to "account for … factors that would significantly impact the value of the shares." *Cottam*, 2022 WL 16908708, at *2. Because Fischel's report and deposition testimony provide evidence "undermin[ing] the basis for [plaintiffs'] assumption[s]," *Tractebel*, 487 F.3d at 112, the district court usurped the jury's role by crediting plaintiffs' evidence over Getty Images'. A reasonable factfinder could—and should—credit Fischel's model over Alta's and CRCM's and conclude that Alta and CRCM have not met their burden of establishing a reasonable estimate of damages.

### 3. The Court should remand for a jury to resolve these genuine disputes of material fact.

Getty Images' evidence created genuine disputes over whether Alta and CRCM suffered damages and whether they offered a stable foundation to reasonably calculate their alleged damages. A factfinder could credit that evidence and conclude that Alta and CRCM did not suffer damages, or that their damages estimates would actually "put [them] in a *better* position than if the contract was performed." *Process America*, 839 F.3d at 143. Those disputes precluded summary judgment. The Court should remand for a trial to determine if Alta and CRCM suffered damages. *See, e.g.*, *Rodriguez v. Village Green Realty, Inc.*, 788 F.3d 31, 51 (2d Cir. 2015).

### C. The district court's reasons for granting summary judgment lack merit.

The district court granted Alta and CRCM summary judgment on damages because it thought that, as a matter of law, mean stock price was the magic metric for calculating damages, no matter the underlying market conditions. That was wrong. The district court further erred by failing to view the evidence in the light most favorable to Getty Images and to draw all reasonable inferences in Getty Images' favor.

**1.** The district court was wrong that the mean stock price minus the warrant exercise price is the exclusive permissible calculation for damages. *See* SA22-SA23. The court dismissed Getty Images' evidence and arguments as "conflat[ing] the abstract notion of a share's *intrinsic* value with what is actually used to calculate damage—'the market value of the stock.'" SA23 (quoting *Boyce*, 464 F.3d at 385). But that reasoning ignores the correct inquiry: Damages for breach of contract are supposed to put the non-breaching party in the same position as if no breach had occurred, and here, the stock price would have been below $11.50 per share had Alta and CRCM been able to exercise their warrants. *Supra* pp. 55-60.

**2.** The district court also failed to construe the evidence in the light most favorable to Getty Images and, in doing so, misapplied the wrongdoer rule. The court suggested that the wrongdoer rule required it to resolve doubts "against the party in breach." SA25. That might be true for a factfinder weighing the evidence after concluding that plaintiffs had shown the fact of damages and offered a reasonable foundation to estimate damages. *Supra* pp. 50-52. But a district court cannot use the wrongdoer rule at summary judgment to resolve disputes about whether the factual assumptions underlying plaintiffs' damages estimates are valid. *See Process America*, 839

F.3d at 142. That's why this Court's cases on the wrongdoer rule frequently address issues arising at trial, not summary judgment. *See Boyce*, 464 F.3d at 383-84; *Contemporary Mission*, 557 F.2d at 926.

The parties disagree about what the market price for Getty Images shares would have been had Alta and CRCM been able to exercise their warrants. "[A]ll of the evidence" should be placed before a jury. *Contemporary Mission*, 557 F.2d at 928.

## CONCLUSION

The Court should reverse the grant of summary judgment and hold that Getty Images did not breach the Warrant Agreement. Otherwise, it should vacate the grant of summary judgment and remand for a jury to resolve whether Alta or CRCM is entitled to damages.

Dated: March 6, 2024

Respectfully submitted,

*/s/ Shay Dvoretzky*

Susan Saltzstein
Scott Musoff
Jeremy Patashnik
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
One Manhattan West
New York, NY 10001

John A. Neuwirth
WEIL, GOTSHAL & MANGES LLP
767 Fifth Ave.
New York, NY 10153

Shay Dvoretzky
  *Counsel of Record*
Parker Rider-Longmaid
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
1440 New York Ave., NW
Washington, DC 20005
Telephone: 202-371-7000
shay.dvoretzky@skadden.com

Nicole Welindt
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
525 University Ave.
Palo Alto, CA 94301

*Counsel for Defendant-Appellant/Cross-Appellee Getty Images Holdings, Inc.*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), I hereby certify that this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) and Local Rule 32.1(a)(4)(A) because, as calculated by Microsoft Word, it contains 13,968 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f). I also certify that this brief complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in a 14-point Book Antiqua font.

Dated: March 6, 2024

Respectfully submitted,

*/s/ Shay Dvoretzky*
Shay Dvoretzky
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
1440 New York Ave., NW
Washington, DC 20005
202-371-7000
shay.dvoretzky@skadden.com

*Counsel for Defendant-Appellant/Cross-*
  *Appellee Getty Images Holdings, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on March 6, 2024, I electronically filed the forego-ing brief and following Special Appendix with the Clerk of the Court for the United States Court of Appeals for the Second Circuit by using the ACMS system. I certify that all participants in the case are registered ACMS users and that service will be accomplished by the ACMS system.

Dated: March 6, 2024          Respectfully submitted,

*/s/ Shay Dvoretzky*
Shay Dvoretzky
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
1440 New York Ave., NW
Washington, DC 20005
202-371-7000
shay.dvoretzky@skadden.com

*Counsel for Defendant-Appellant/Cross-Appellee Getty Images Holdings, Inc.*

[This page intentionally left blank.]

# SPECIAL APPENDIX

## SPECIAL APPENDIX TABLE OF CONTENTS

**Page**

Opinion and Order Granting in Part Alta's and CRCM's Motions for Summary Judgment and Granting in Part Getty Images' Motions for Summary Judgment (Oct. 26, 2023) (Doc. 74, No. 22-cv-08916) (Doc. 51, No. 23-cv-01074) ...................... SA1

Judgment for Alta (Oct. 27, 2023) (Doc. 75, No. 22-cv-08916) .................. SA34

Order Setting Damages for CRCM (Nov. 6, 2023) (Doc. 53, No. 23-cv-01074) ................................................................... SA35

Judgment for CRCM (Nov. 6, 2023) (Doc. 54, No. 23-cv-01074) .............. SA37

15 U.S.C. § 77b(a) ............................................................................................ SA38

15 U.S.C. § 77e ................................................................................................. SA41

17 C.F.R. § 229.512(a)(1) ................................................................................ SA44

17 C.F.R. § 230.145 ......................................................................................... SA47

17 C.F.R. § 230.424 ......................................................................................... SA53

17 C.F.R. § 230.429 ......................................................................................... SA63

17 C.F.R. § 239.25 ........................................................................................... SA64

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
┌─────────────────────────────────────────┐
│ ALTA PARTNERS, LLC,                      │
│                                          │
│              Plaintiff,                  │
│                                          │
│       -against-                          │
│                                          │
│ GETTY IMAGES HOLDINGS, INC.,             │
│                                          │
│              Defendant.                  │
│                                          │
│ CRCM INSTITUTIONAL MASTER                │
│ FUND (BVI) LTD., and CRCM                │
│ SPAC OPPORTUNITY FUND LP,                │
│                                          │
│              Plaintiffs,                 │
│                                          │
│       -against-                          │
│                                          │
│ GETTY IMAGES HOLDINGS, INC.,             │
│                                          │
│              Defendant.                  │
└─────────────────────────────────────────┘
```

22-cv-8916 (JSR)
23-cv-1074 (JSR)

OPINION AND ORDER

JED S. RAKOFF, U.S.D.J.

Plaintiffs Alta Partners, LLC ("Alta"), CRCM Institutional Master Fund (BVI) Ltd., and CRCM SPAC Opportunity Fund LP (the latter two referred to collectively as "CRCM") held warrants to purchase shares of defendant Getty Images Holdings, Inc. ("Getty"). All agree that, under the applicable contract, the warrants were exercisable 30 days after the closing of the business combination that made Getty a public company, so long as a registration statement for the shares underlying the warrants was effective and a prospectus was current. When the calendar hit the

date in question, August 22, 2022, plaintiffs believed all conditions were met and soon sought to exercise their warrants. Getty refused. In Getty's view, although it had "registered" and filed a prospectus for the underlying warrant shares in a Form S-4 that the SEC declared effective on June 30, 2022, the registration statement covered only the "offer," not the "issuance and sale" of the shares, and the prospectus was no longer "current."

Alta and CRCM separately sued Getty in this Court for breach of contract under several theories of liability, and, in the alternative, for alleged violations of the federal securities laws. The Court consolidated the two actions through the close of discovery, which has now been completed, and all parties have moved for summary judgment. For the reasons explained below, the Court grants summary judgment for Alta and CRCM on Count I of their respective Amended Complaints, but grants summary judgment for Getty on all other claims.

I.   Factual and Procedural Background

Getty, the defendant in both of these consolidated cases, became a public company on July 22, 2022, when it merged with CC Neuberger Principal Holdings II ("CCNB"), a special purpose acquisition company ("SPAC") that had become public through an initial public offering ("IPO") on August 4, 2020. 23-cv-1074, ECF

- 2 -

No. 33 ("CRCM 56.1 Statement"), ¶¶ 1, 7, 9.[1] Through its IPO, CCNB had sold 82.8 million "units," each comprising one class A share of CCNB common stock and one-fourth of a warrant to purchase a class A share of CCNB common stock at an exercise price of $11.50. Id. ¶¶ 9-11, 15. Both the class A shares and the warrants traded on the New York Stock Exchange. Id. ¶ 13. Plaintiffs Alta and CRCM each purchased warrants on the open market. Id. ¶ 29; 22-cv-8916, ECF No. 56 ("Alta 56.1 Statement"), ¶ 86.

The terms governing exercise of the warrants were set forth in a Warrant Agreement between CCNB and a transfer agent, Continental Stock Transfer & Trust Company. Alta 56.1 Statement ¶ 20; see 23-cv-1074, ECF No. 35-1 ("Warrant Agreement"). The Warrant Agreement provided that the warrants could be exercised starting on "the date that is thirty days after the first date on which [CCNB] completes a merger . . . or similar business combination." Warrant Agreement § 3.2. Because CCNB merged with Getty's holding company on July 22, 2022, that meant the warrants could be exercised starting on August 22, 2022. And because the surviving company in the merger was Getty, that meant the warrants, if exercised, would be for shares of Getty stock.

_____

[1] To be specific, after becoming public through an IPO, CCNB combined with Griffey Holdings, Inc., Getty's then-private holding company, leaving Getty as the surviving public company. CRCM 56.1 Statement ¶ 24.

The Warrant Agreement imposed two conditions, however, to be met before the warrants could be exercised. In particular, "the Company" -- Getty -- "shall not be obligated to deliver any Ordinary Shares pursuant to the exercise of a Warrant and shall have no obligation to settle such Warrant exercise unless [(1)] a registration statement under the Securities Act with respect to the Ordinary Shares underlying the Public Warrants is then effective and [(2)] a prospectus relating thereto is current, subject to the Company's satisfying its obligations under Section 7.4." Id. § 3.3.2.

In turn, Section 7.4 required "that as soon as practicable, but in no event later than twenty (20) Business Days after the closing of its initial Business Combination, [the Company] shall use commercially reasonable efforts to file . . . a registration statement for the registration, under the Securities Act, of the Ordinary Shares issuable upon exercise of the Warrants." Id. § 7.4.1. In addition, "[t]he Company shall use commercially reasonable efforts to cause the same to become effective within sixty (60) Business Days after the closing of its initial Business Combination and to maintain a current prospectus relating thereto." Id.

CCNB filed a registration statement under the Securities Act on SEC Form S-4 on January 18, 2022.[2] See 22-cv-8916, ECF No. 57-4 ("S-4"). The S-4 included a proxy statement for CCNB shareholders to use in voting on the business combination, as well as a prospectus for the shares to be registered. Id. The S-4 referred to Getty as "New CCNB," and registered several categories of securities. Id.; see Alta 56.1 Statement ¶ 48. In particular, it registered 39,260,000 warrants: the "20,700,000 public warrants" that CCNB had issued through its IPO,[3] and "18,560,000 Private Placement Warrants" that CCNB had sold outside of the IPO. S-4 at 3.[4] Of particular relevance here, the S-4 also registered the "39,260,000 shares of New CCNB Class A Common Stock, issuable upon exercise by holders of New CCNB Warrants following the completion of the Business Combination." Id. In a separate table cataloguing "Each Class of Securities to be Registered," the S-4 again listed 39,260,000 "New CCNB Warrants to purchase common stock" and

---

[2] CCNB did so through its subsidiary, Vector Holding, LLC. See CRCM 56.1 Statement ¶ 30.

[3] As noted above, CCNB, through its IPO, sold 82.8 million "units," each of which included a share of CCNB common stock and one-fourth of one warrant to purchase an additional share under the terms of the Warrant Agreement. The 82.8 million units thus collectively represented 20.7 million public warrants (82.8 million units * ¼ warrant), in addition to the 82.8 million shares they comprised.

[4] Because the S-4 is not itself paginated, the Court refers to the page numbers of the PDF containing the S-4 located at 22-cv-8916, ECF No. 57-4.

39,260,000 "New CCNB Class A Common stock underlying warrants."
Id. at 2. The S-4 also listed a registration fee of $41,853.12 for
the 39,260,000 shares of "New CCNB Class A Common stock underlying
[the] warrants." Id.

CCNB filed amended S-4 forms on April 22, 2022 and June 27,
2022, the latter responding to SEC staff comments, reiterating the
above. See CRCM 56.1 Statement ¶¶ 35-36. The June 27 amended S-4
also included an opinion from CCNB's counsel of the legality and
validity of the registration. Id. ¶ 36. That opinion stated that
it was "being rendered in connection with the registration under
the above-referenced Registration Statement of . . . 39,260,000
New CCNB Warrants and . . . 39,260,000 Warrant Shares." Id. ¶ 37.
Similarly, the prospectus included in the S-4 stated that it was
a "prospectus for 189,735,093 shares of class A common stock";
that figure included the 39,260,000 shares underlying the public
and private warrants. See id. ¶ 32; S-4 at 4. The SEC declared the
S-4 effective on June 30, 2022. CRCM 56.1 Statement ¶ 40.

On August 9, 2022, Getty filed a registration statement on
SEC Form S-1, registering new securities that had not been included
in the S-4.[5] Id. ¶¶ 55-56. The S-1 listed the 39,260,000 shares of

---

[5] These "included shares that had been issued to former Getty
stockholders in the Business Combination, privately placed shares
that had been issued to fund the Business Combination . . . and
the secondary offering of the private placement warrants." CRCM
56.1 Statement ¶ 57.

"Class A Common Stock underlying warrants" as having been "previously registered" on the S-4 that was made effective on June 30, 2022. 23-cv-1074, ECF No. 35-20 ("S-1"), Ex. 107. The S-1 further specified that "[n]o registration fee is payable in connection with the 39,260,000 shares of Class A Common Stock previously registered on a registration statement on Form S-4 (File No. 333-262203), which was declared effective on June 30, 2022 (the 'Prior Registration Statement') because such shares are being transferred from the Prior Registration Statement pursuant to Rule 429(b) under the Securities Act." Id. at n.5. Accordingly, the S-1 continued, "[i]f securities previously registered under the Prior Registration Statement are offered and sold before the effective date of this registration statement, the amount of previously registered securities so sold will not be included in the prospectus hereunder." Id. at n.6. The S-1 thus contained an updated prospectus that pertained to the newly registered securities as well as the shares underlying the warrants, which had been "previously registered" on the S-4. Id.

Getty's share price rose noticeably in the weeks after the merger closed on July 22, 2022, well exceeding both the $9.39 opening share price and the $11.50 exercise price of the warrants. CRCM 56.1 Statement ¶¶ 47-52. For instance, the share price ascended from $10.50 on July 28 to $26.15 on July 29. Alta 56.1 Statement ¶ 84. And the share price closed at $31.36 on August 17.

Id. ¶ 85. Noticing that opportunity for profit, Alta acquired 2,066,371 warrants between July 29 and August 24. Id. ¶ 86. CRCM already held more than 1.4 million warrants, which it had acquired by February 14, 2022, and acquired over 1 million more by August 23. CRCM 56.1 Statement ¶¶ 29, 73-74, 81.

Getty's high share price was, of course, also a boon for its insiders and affiliates. Aside from the benefit that Getty insiders received as shareholders themselves, those insiders also stood to benefit from a provision in the business combination agreement that entitled them to "earnouts" of tens of millions of additional shares if Getty's share price stayed above certain levels for 20 of 30 consecutive trading days. Id. ¶¶ 28, 84-85. In particular, the Getty insiders received a first earnout if the share price stayed above $12.50, a second earnout if it stayed above $15, and a third earnout if it stayed above $17.50. Id. ¶ 28. The exercise of tens of millions of warrants stood as a potential obstacle to those earnouts. If the market were flooded with tens of millions of additional shares, the excess supply may have pushed down Getty's share price, preventing it from maintaining its perch above the earnout targets.

As Getty's share price was rising in August 2022, both Alta and CRCM (as well as other warrant holders) contacted Getty to confirm that their warrants could be exercised under the Warrant Agreement beginning on August 22 -- 30 days after the business

combination had closed. Id. ¶¶ 62, 64-65, 69; Alta 56.1 Statement ¶¶ 97-103. Getty responded that, although "the shares underlying the warrants were included in the S-4," the warrants could not be exercised until they were "registered on the Form S-1." Alta 56.1 Statement ¶ 99; see CRCM 56.1 Statement ¶¶ 63, 70. While Getty filed the S-1 on August 9, the SEC did not declare it effective until September 15. CRCM 56.1 Statement ¶¶ 55, 91. Without any share price dilution from the exercise of the warrants, the Getty insiders met their earnouts on August 25. Id. ¶ 84.

By the time Getty allowed the warrants to be exercised on September 15, Getty's share price gains had disappeared. Although Getty's share price had been above $18 for all of August, by market open on September 16 the share price had plummeted below the $11.50 exercise price of the warrants. Id. ¶ 92; 23-cv-1074, ECF No. 35-13. On September 19, Getty informed warrant holders that, 30 days later, it would be redeeming (essentially, voiding) the warrants and paying just $0.01 per warrant to the holders for their troubles. CRCM 56.1 Statement ¶ 94.[6] Getty indeed redeemed the

---

[6] The Warrant Agreement contained a provision allowing such unilateral redemption of the warrants by Getty under certain circumstances. In particular, "not less than all of the outstanding Warrants may be redeemed, at the option of the Company, at any time while they are exercisable . . . at the price . . . of $0.01 per Warrant; provided that the last reported sales price of the Ordinary Shares reported has been at least $18.00 per share . . . on each of twenty trading days within the thirty-trading day period ending on the third Business Day prior to the date on which notice of the redemption is given." Warrant Agreement § 6.1 (emphasis

warrants on October 19. Id. ¶ 97; ECF No. 38, ¶ 97. At no point between Getty's notice of the redemption and October 19 did its shares trade at, or exceed, the $11.50 exercise price. ECF No. 38, ¶ 97.

On October 19, 2022, Alta sued Getty in this Court for breach of the Warrant Agreement, including breach of the implied covenant of good faith and fair dealing, and, in the alternative, brought a claim under Section 11 of the Securities Act for filing a materially misleading registration statement. 22-cv-8916, ECF No. 1. CRCM filed a similar suit on February 8, 2023. 23-cv-1074, ECF No. 1. On February 17, 2023, the Court consolidated the two actions "through the close of discovery" with the consent of both parties. 22-cv-8916, ECF No. 19.

Discovery closed in both cases on August 28, 2023. See 23-cv-1074, Minute Entry of 6/21/23. On September 11, Alta and CRCM each moved for summary judgment, and Getty separately cross-moved for summary judgment in both actions. See 22-cv-8916, ECF Nos. 51, 55; 23-cv-1074, ECF Nos. 29, 34. All parties filed answering papers on September 25, see 22-cv-8916, ECF Nos. 62, 65; 23-cv-1074, ECF Nos. 37, 42, and replies on October 2, see 22-cv-8916, ECF Nos.

---

omitted). The Warrant Agreement required Getty to provide 30 days' notice of such a redemption, id. § 6.3, which it did, CRCM 56.1 Statement ¶ 94.

68, 71; No. 23-cv-1074, ECF Nos. 45, 48. The Court heard oral argument on October 10.

## II.   Legal Standard

A party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In evaluating the record, the Court construes "the evidence in the light most favorable to the non-moving party and draw[s] all reasonable inferences in" favor of that party. Williams v. N.Y.C. Hous. Auth., 61 F.4th 55, 68 (2d Cir. 2023). The Court must enter "summary judgment against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." El-Nahal v. Yassky, 835 F.3d 248, 252 (2d Cir. 2016).[7]

## III.   Analysis

### A. Alta and CRCM are entitled to summary judgment on Count I of their respective Amended Complaints.

All parties have moved for summary judgment on Count I of plaintiffs' respective Amended Complaints, which allege that Getty breached the Warrant Agreement by refusing to allow Alta and CRCM to exercise their warrants 30 days after Getty's business

---

[7] Here and elsewhere, all internal alterations, citations, and quotation marks are omitted unless otherwise indicated.

combination with CCNB. There is no dispute that the Warrant Agreement governs the exercise of Alta's and CRCM's warrants, that the Agreement imposes obligations on Getty as the successor to CCNB, and that Alta and CRCM have rights under the Agreement as third-party beneficiaries. The parties also agree that the Warrant Agreement is governed by New York law.

"Under New York law, the elements of a breach of contract claim are (i) the existence of a contract; (ii) performance of the contract by one party; (iii) breach by the other party; and (iv) damages suffered as a result of the breach." FaZe Clan Inc. v. Tenney, 467 F. Supp. 3d 180, 189 (S.D.N.Y. 2020). "[A] written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms." UBS Fin. Servs., Inc. v. W. Va. Univ. Hosps., Inc., 660 F.3d 643, 649 (2d Cir. 2011). When that is the case, a court may not look beyond "the four corners of the contract" for its meaning. Ellington v. EMI Music, Inc., 21 N.E.3d 1000, 1003 (N.Y. 2014).

There is no dispute that the Warrant Agreement formed a contract and that both Alta and CRCM performed. Rather, the parties dispute whether Getty breached the Agreement and whether either plaintiff suffered damages. Beginning with breach, Getty contends that it was justified in refusing to allow Alta or CRCM to exercise their warrants on August 22, 2022, 30 days after the business combination closed, because not all of the Warrant Agreement's

conditions for exercise had been met. In particular, Getty argues
that no registration statement was effective for the "issuance and
sale" of the shares underlying the warrants until September 15,
and that the prospectus for those shares was not "current" when
Alta and CRCM tried to exercise their warrants. 22-cv-8916, ECF
No. 51 ("Getty Mem. against Alta"), at 8-15; 23-cv-1074, No. 29
("Getty Mem. against CRCM"), at 8-15. Both of those arguments fail.

The Warrant Agreement provides that "the Company shall not be
obligated to deliver any Ordinary Shares pursuant to the exercise
of a Warrant and shall have no obligation to settle such Warrant
exercise <u>unless a registration statement under the Securities Act</u>
<u>with respect to the Ordinary Shares underlying the Public Warrants</u>
<u>is then effective</u>." Warrant Agreement § 3.3.2 (emphasis added).
That condition was plainly met by June 30, 2022, when the S-4 that
registered the "39,260,000 shares of New CCNB Class A Common Stock,
issuable upon exercise by holders of New CCNB Warrants following
the completion of the Business Combination," was made effective by
the SEC. S-4 at 3; CRCM 56.1 Statement ¶ 40.

Getty itself confirmed as much when it later filed the S-1 on
August 9, 2022, which it did to register new securities that had
not been included in the S-4. CRCM 56.1 Statement ¶¶ 55-56. The S-
1 listed the 39,260,000 shares of "Class A Common Stock underlying
warrants" as having been "previously registered" on the S-4 that
was made effective on June 30, 2022. S-1, Ex. 107. The S-1 further

specified that "[n]o registration fee is payable in connection with the 39,260,000 shares of Class A Common Stock previously registered on a registration statement on Form S-4 (File No. 333-262203), which was declared effective on June 30, 2022." Id. at n.5. It would be hard for Getty to have been any clearer that "a registration statement under the Securities Act with respect to the Ordinary Shares underlying the Public Warrants [was] then effective" as of June 30, 2022 -- well in advance of when Alta and CRCM sought to exercise their warrants in August 2022, 30 days after the business combination closed on July 22, 2022. Warrant Agreement § 3.3.2.

Getty's arguments to the contrary distort the text of the Warrant Agreement, federal securities law, and Getty's own contemporaneous representations. Getty's first response is that "the plain language of the Warrant Agreement . . . states that a registration statement with respect to the issue and sale of the Warrant Shares was to be filed after the closing of the Business Combination." 22-cv-8916, ECF No. 62 ("Getty Opp. to Alta Mot."), at 3; 23-cv-1074, ECF No. 37 ("Getty Opp. to CRCM Mot."), at 5. That contention is a flat misreading. Section 3 of the Warrant Agreement, which governs the "Terms and Exercise of Warrants," contains no such timing requirement. Getty points to a different part of the Agreement, governing its own obligations, which states, "The Company agrees that as soon as practicable, but in no event

later than twenty (20) Business Days after the closing of its initial Business Combination, it shall use commercially reasonable efforts to file with the Commission a registration statement for the registration, under the Securities Act, of the Ordinary Shares issuable upon exercise of the Warrants." Warrant Agreement § 7.4.1.

But that provision's reference to filing the registration statement "in no event later than twenty (20) Business Days after the closing of [the] Business Combination" sets a deadline for when the statement must be filed. Id. It does not say, as Getty suggests, that the registration statement could not have been filed before the business combination closed. In fact, the Warrant Agreement required Getty to "use commercially reasonable efforts to file" the registration statement "as soon as practicable," id., which certainly contemplates filing it before the business combination closed. Indeed, Getty itself acknowledges that "it is common for a Form S-4 registration statement to be filed before a de-SPAC business combination closes." Getty Opp. to Alta Mot. 3; Getty Opp. to CRCM Mot. 6.

Getty even concedes that "[t]here is no dispute that the Form S-4 'registered' the Warrant Shares." Getty Opp. to Alta Mot. 9; Getty Opp. to CRCM Mot. 11. Getty also agrees that the S-4 was effective as of June 30, 2022. But Getty now argues that the S-4 registered only the offer of the shares underlying the warrants, not the "issuance and sale" of those shares. That argument unravels

in several directions. For starters, the Warrant Agreement -- the source of the obligation at issue -- made no such distinction. Rather, it required only that "a registration statement under the Securities Act <u>with respect to</u> the Ordinary Shares underlying the Public Warrants is then effective." Warrant Agreement § 3.3.2 (emphasis added). Even if the Court were to accept <u>arguendo</u> that the S-4 registered only the "offer" of the warrant shares, the S-4 would still be a registration statement "with respect to" those shares. <u>Id.</u>

Getty nevertheless argues that "the Form S-4 could not be used for the issuance and sale of the Warrant Shares, and a separate registration statement (in this case, the Form S-1) was required to be declared effective before those shares could be issued and sold by Getty Images." Getty Opp. to Alta Mot. 9-10; Getty Opp. to CRCM Mot. 11. Getty offers no credible basis, factual or legal, for that assertion.

The S-1 specifically lists the 39,260,000 shares of "Class A Common Stock underlying warrants" as having been "previously registered" on the S-4 that was made effective on June 30, 2022. S-1, Ex. 107. It makes no distinction between a registration for an offer of those shares and a registration for their "issuance and sale." To the contrary, it states that "[n]o registration fee is payable in connection with the 39,260,000 shares of Class A Common Stock previously registered on Form S-4 (File No. 333-

262203), which was declared effective on June 30, 2022 (the 'Prior Registration Statement') because such shares are being transferred from the Prior Registration Statement." Id. at n.5. In other words, Getty had already paid the registration fee for the shares underlying the warrants because they had already been registered in an effective registration statement. The S-1 merely transferred the already effective registration of those shares from the S-4, "the Prior Registration Statement," to the S-1, as permitted by Rule 429(b) promulgated under the Securities Act. Id. at nn.5-6.

The kicker, though, is the S-1's express provision that "[i]f securities previously registered under the Prior Registration Statement are offered and sold before the effective date of this registration statement, the amount of previously registered securities so sold will not be included in the prospectus hereunder." Id. at n.6 (emphasis added). The only such "previously registered securities" that the S-1 mentioned were the 39,260,000 shares of Class A common stock underlying the warrants. Id. The S-1 thus clearly contemplated -- and informed shareholders and the SEC alike -- that the S-4 was effective not only for the "offer" of the shares underlying the warrants, but also for their "issuance and sale."

Further still, Getty's invented-for-litigation distinction between a registration statement for the offer of shares, and a separate registration statement for the issuance and sale of those

same shares, finds no support in the federal securities laws. Indeed, "[a] registration statement permits an issuer, or other persons, to make . . . the offers and sales described in the registration statement." SEC v. Cavanagh, 155 F.3d 129, 133 (2d Cir. 1998) (emphasis added). And the SEC's "regulations allow for delayed or continuous offering and sale of securities" under a single registration statement. Id. That is exactly what the S-4 did here. The fact that, as Getty points out, Section 2(a)(3) of the Securities Act differentiates between an "offer to sell" a security and a "sale" of that security, see 15 U.S.C. § 77b(a)(3), does not mean that a single registration statement cannot cover both. Nor does Section 5 of the Securities Act, which provides that a registration statement must be filed to offer a security and must be effective to sell that security, see 15 U.S.C. § 77e(a), (c), support Getty's assertion.

Getty is also incorrect that the instructions to the S-4 prohibit using the form to register the issuance and sale of the warrant shares. Those instructions specifically contemplate that a registration statement contained in an S-4 may "relate[] to offerings of securities pursuant to Rule 415(a)(1)(viii)."[8] SEC

---

[8] The SEC uses the term "offering" to refer to "an offer and sale of securities that has been registered under the Securities Act." SEC, Glossary, *Registered Offering*. The SEC's guidance thus contemplates a single registration for both "an offer and sale." Id.

Form S-4, Instruction H. In turn, Rule 415(a)(1)(viii) allows for "[s]ecurities which are to be issued in connection with business combination transactions" to be "registered for an offering to be made on a continuous or delayed basis in the future." 17 C.F.R. § 230.415(a)(1)(viii). Because the warrants here could only be exercised -- and the resulting shares issued -- after a business combination, the S-4 indeed registered securities "to be issued in connection with [a] business combination transaction[]." Id.; see Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit, 547 U.S. 71, 84-86 (2006) (emphasizing the "broad" meaning of the phrase "in connection with" in federal securities laws).

Indeed, both Alta and CRCM note that in another de-SPAC business combination that was structured similarly to the one between CCNB and Getty, the SEC informed the issuer, Li-Cycle, that Li-Cycle was "registering the [Li-Cycle] Shares issuable upon exercise of [Li-Cycle] Warrants in this F-4." 22-cv-8916, ECF No. 67-5, at 3. (The form used in that transaction was an F-4, not an S-4, because it was a foreign transaction.) The SEC made no distinction between registering the shares underlying the warrants only for offer, rather than for both offer and sale.[9]

---

[9] Getty also points to "extrinsic evidence" of "market practices" catalogued by one of its experts, showing that in a majority of de-SPAC transactions in a particular sample, the issuer filed both an S-4 and a later S-1, as Getty did. Getty Opp. to Alta Mot. 15-17; Getty Opp. to CRCM Mot. 18-21. Such evidence is unconvincing. First, as Getty itself acknowledges, the Court may consider such

Getty next argues that, even if the S-4 satisfied the Warrant Agreement's requirement for an effective registration statement "with respect to" the shares underlying the warrants as of June 30, 2022, the warrants still could not be exercised on August 22, 2022 -- 30 days after the business combination closed -- because the "prospectus relating" to those shares was not "current" on that date and did not become so until the updated prospectus in the S-1 became effective on September 15, 2022. Warrant Agreement § 3.3.2. The record does not support Getty's contention.

The S-4 that was declared effective on June 30, 2022 contained a prospectus with "over 800 pages of detailed information concerning Getty's business and financial condition, pro forma financial information on the post-closing company, the securities being registered, risk factors involved with the offering, the

_____

extrinsic evidence only if it "were to conclude that the reference to an 'effective' registration statement in the Warrant Agreement is ambiguous." Getty Opp. to Alta Mot. 15; Getty Opp. to CRCM Mot. 18. It is not, which Getty elsewhere concedes. See Getty Mem. against Alta 8 (heading referring to "the clear and unambiguous terms of the Warrant Agreement"); Getty Mem. against CRCM 9 (same). Second, even if the Court did consider the evidence, it is practically meaningless. The evidence says nothing about whether those other issuers permitted warrants to be exercised based on the S-4. There is nothing strange about filing an S-1 after a company is newly public, as Getty did here, to register additional shares that were not previously registered in an S-4. Such a practice does not mean that the S-4 was somehow not "effective" for selling the shares it did register.

business combination, and other matters."[10] 23-cv-1074, ECF No. 34 ("CRCM Mem."), at 17. According to Getty, that prospectus was no longer "current" after the business combination in fact closed and Getty had filed an additional quarter of financial results.

A prospectus is not current if there have been "[p]ost-effective developments which materially alter the picture presented in the registration statement." SEC v. Manor Nursing Ctrs., Inc., 458 F.2d 1082, 1095 (2d Cir. 1972), abrogated on other grounds, Liu v. SEC, 140 S. Ct. 1936 (2020). But Getty does not even attempt to explain, or mobilize evidence in the record that shows, how the post-effective disclosures were material. The prospectus had already provided "voluminous pro forma financials, extensive information on Getty's post-closing capital structure, and the maximum proceeds Getty could receive from warrant exercise." 23-cv-1074, ECF No. 48 ("CRCM Reply"), at 7. Getty does not argue, for instance, that the additional quarter of financial information materially changed the picture that a reasonable investor would have of the company or that the information in the S-4 prospectus did not adequately capture the business and financials of post-closure Getty. See Matrixx Initiatives, Inc. v. Siracusano, 563 U.S. 27, 38 (2011) (information is material "when

---

[10] Getty then issued a final prospectus for the S-4 on July 1, 2022, reflecting additional shares of Getty common stock to be issued "upon completion of the Business Combination." CRCM 56.1 Statement ¶ 41.

there is a substantial likelihood that the disclosure of [the information] would have been viewed by the reasonable investor as having significantly altered the total mix of information made available").

Unable to avoid the conclusion that it breached the Warrant Agreement, Getty disputes that Alta and CRCM can show any damages. Getty's arguments again fall short. As the parties agree, "damages for breach of contract should put the plaintiff in the same economic position he would have occupied had the breaching party performed the contract." Boyce v. Soundview Tech. Grp., Inc., 464 F.3d 376, 384 (2d Cir. 2006). As a result, under New York law, "the measure of damages" for failing to deliver a stock in accordance with an option or warrant agreement "is the difference between the option price and the market value of the stock." Id. at 385. Indeed, Getty agrees that Alta and CRCM are "entitled to market value damages to the extent that they can be proven with reasonable certainty." Getty Opp. to Alta Mot. 20; Getty Opp. to CRCM Mot. 22.

Both Alta and CRCM calculate damages "at the time of the breach" by subtracting, for each warrant they sought to exercise, the exercise price of $11.50 from the market price of a Getty share. Boyce, 464 F.3d at 384; see 22-cv-8916, ECF No. 55 ("Alta Mem."), at 18-19; CRCM Mem. 23-25. Consistent with New York law, they calculate the market price of a Getty share on the intended

exercise date as "the mean between the highest and lowest quoted selling prices." Boyce, 464 F.3d at 385. Getty does not dispute the mechanics of those calculations. Rather, Getty responds that the "market price" of a Getty share at that time did not actually represent the share's value because of its "inflated stock trading price." Getty Opp. to Alta Mot. 20-23; Getty Opp. to CRCM Mot. 21-25. As Getty emphasizes, "[t]he terms 'price' and value are not necessarily synonymous; under certain circumstances market price may not adequately reflect the true value of a security." Mathias v. Jacobs, 238 F. Supp. 2d 556, 576 (S.D.N.Y. 2002).

But Getty conflates the abstract notion of a share's intrinsic value with what is actually used to calculate damages -- "the market value of the stock." Boyce, 464 F.3d at 385. And when "dealing with a publicly traded stock," like Getty's, determining the market value is "straightforward." Id. It is "the mean between the highest and lowest quoted selling prices" on a particular date, which Alta and CRCM calculated here. Id.

Getty's rejoinder is that "[i]t is settled that when the value of securities is artificially inflated by fraud and improprieties or other relevant facts of which the marketplace did not have reasonable knowledge, the public trading price of the shares is not the measure of fair market value." Mathias, 238 F. Supp. 2d at 576. Even granting that premise arguendo, however, Getty fails to create a genuine dispute, let alone show, that any "fraud and

improprieties or other relevant facts of which the marketplace did
not have reasonable knowledge" affected its stock price. Id. All
Getty offers on that front is an opinion from its expert that "the
spike in Getty Images' stock price was due to the disclosure of
the small float and manipulation by traders (potentially due to a
short squeeze)." Getty Opp. to Alta Mot. 22; Getty Opp. to CRCM
Mot. 23. But an upward movement in share price in response to a
"disclosure" merely shows an informed market at work, not
"manipulation" or "fraud and improprieties." Moreover, even if the
Court assumes that a "short squeeze" on a stock means that its
market price cannot be considered its "market value," Getty's
expert candidly acknowledges he was referring merely to "rumors"
and "speculation over a possible short squeeze," not his own
analysis that one was occurring. 23-cv-1074, ECF No. 35-49, at 13.
Rumors and speculation are not the stuff of which genuine disputes
are made.

Getty also argues that the market price would have been
lowered by multiple holders simultaneously seeking to exercise
their warrants. That may be so. But it is not enough to conclude,
under the applicable legal standard, that Alta and CRCM are not
entitled to damages. "Where . . . the non-breaching party has
proven the fact of damages by a preponderance of the evidence, the
burden of uncertainty as to the amount of damage is upon the
wrongdoer." Process Am., Inc. v. Cynergy Holdings, LLC, 839 F.3d

125, 141 (2d Cir. 2016). "Doubts are generally resolved against the party in breach." Id. "Therefore, a plaintiff need only show a stable foundation for a reasonable estimate of the damages incurred as a result of the breach." Id. "At that point, the burden of any uncertainty as to the amount of damages is on the breaching party." Id. Getty cannot meet that burden by pointing to speculation.

Getty is right, however, that plaintiffs' damages must be limited to those for warrants they acquired before, and actually sought to exercise at the time of, Getty's breach. Although there is no suggestion that CRCM is seeking damages for warrants it did not possess at the relevant time, Alta argues that it "is also entitled to damages for the additional 11,593,149 Warrants it acquired after Getty's August 24, 2022 breach."[11] Alta Mem. 19. Even assuming arguendo that Alta is an assignee of any breach of contract claims accrued by whomever held the warrants on the date of the breach, or that those claims somehow inhere in the transfer of the warrants themselves, Alta cannot show that those prior holders ever sought to exercise their warrants. The Court agrees with Getty that "[b]ecause Alta has admitted that it does not know who the former holders were, it cannot meet its burden to prove

---

[11] Although August 22, 2022 is the date that plaintiffs argue the warrants became exercisable, August 24 is when Alta attempted to exercise its warrants and is thus the date of Getty's breach with respect to Alta. Alta 56.1 Statement ¶¶ 116-23.

that those holders performed (or would have performed) under the Warrant Agreement." Getty Opp. to Alta Mot. 19.

Aside from Getty's "market value" argument, which the Court rejects, Getty does not challenge Alta's or CRCM's damages calculations for the warrants that each acquired and sought to exercise before the breach. As a result, removing the warrants that Alta purchased after Getty's breach and before accounting for prejudgment interest, Alta has shown that it is entitled to $36,946,713 in damages and CRCM has shown that it is entitled to $51,000,000 in damages for Getty's breach of the Warrant Agreement.[12] See Alta Mem. 18-19; CRCM Mem. 23-24.

B. Getty is entitled to summary judgment on Alta's and CRCM's other claims.

_____

[12] New York law provides for prejudgment interest for "a sum awarded because of breach of performance of a contract," N.Y. C.P.L.R. § 5001(a), "at the rate of nine per centum per annum," id. § 5004. "The amount of interest shall be computed by the clerk of the court," but "[t]he date from which interest is to be computed shall be specified in the" Court's "decision." Id. § 5001(c). Prejudgment interest begins for Alta's damages on August 24, 2022. See Alta 56.1 Statement ¶¶ 116-23. Prejudgment interest begins for most of CRCM's damages -- for 2,965,141 warrants -- on August 22, 2022. See CRCM 56.1 Statement ¶¶ 73-80. However, CRCM then sought to exercise 45,623 warrants on August 23, 2022; prejudgment interest for its damages from those warrants thus begins on August 23. See CRCM Mem. 24 n.10; CRCM 56.1 Statement ¶ 81. Because CRCM's submissions do not state, either as a percentage or dollar value, how much of its damages accrued on August 22 and how much accrued on August 23, CRCM must file a supplemental submission with that information by no later than one week from the entry of this Opinion and Order.

1. Getty is entitled to summary judgment on Counts II and IV
   of Alta's Amended Complaint.

Count II of Alta's Amended Complaint alleges that Getty's forced redemption of the warrants, for $0.01 each on October 19, 2022, violated a separate provision of the Warrant Agreement. Only Getty has moved for summary judgment on that claim. Count IV of Alta's Amended Complaint alleges that Getty breached the implied covenant of good faith and fair dealing in several respects, but the only theory of liability that Alta now advances for that claim -- both in its own motion for summary judgment and in opposition to Getty's cross-motion -- is again based on Getty's forced redemption of the warrants on October 19, 2022.

Section 6.1 of the Warrant Agreement provides that, at Getty's option, "all of the outstanding Warrants may be redeemed . . . at any time while they are exercisable and prior to their expiration . . . upon notice to the Registered Holders of the Warrants . . . at the price . . . of $0.01 per Warrant; provided that the last reported sales price of the Ordinary Shares reported has been at least $18.00 per share . . . on each of twenty trading days within the thirty-day trading period ending on the third Business Day prior to the date on which notice of the redemption is given." Warrant Agreement § 6.1. Getty exercised that option on September 19, 2022, when it provided 30 days' notice of its intent to redeem all outstanding warrants. Alta 56.1 Statement ¶ 140.

Getty complied with Section 6.1's terms. Although Alta and CRCM contend that the warrants became exercisable on August 22, 2022 -- 30 days after the business combination -- there is no dispute that the warrants were exercisable by September 19, when Getty provided the redemption notice. Indeed, Getty began allowing the warrants to be exercised on September 15, when the S-1 became effective. Similarly, there is no dispute that during "the thirty-day trading period ending on the third Business Day prior to" September 19, Getty's share price was at least $18 on twenty of those trading days. Warrant Agreement § 6.1.

Count II of Alta's Amended Complaint nevertheless alleges that Getty breached Section 6.1 because that thirty-day trading period did not begin after the warrants became exercisable. See 22-cv-8916, ECF No. 18 ("Alta FAC"), ¶¶ 129-39. That position finds no support in the unambiguous terms of the contract, which includes no requirement that the thirty-day lookback period for Getty's share price begin only after the warrants are exercisable. All that is required is that the warrants be exercisable at the time of the redemption notice, which they were. The Court thus grants summary judgment for Getty dismissing Count II.

Alta fares no better by arguing that the same conduct was instead a breach of the implied covenant of good faith and fair dealing. "In New York, all contracts imply a covenant of good faith and fair dealing in the course of performance." 511 W. 232nd Owners

_Corp. v. Jennifer Realty Co._, 773 N.E.2d 496, 500 (N.Y. 2002). "This covenant embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." _Id._ A claim for breach of that covenant cannot "be used to add contract terms not bargained for." _Trustpilot Damages LLC v. Trustpilot, Inc._, 2021 WL 2667029, at *9 (S.D.N.Y. June 29, 2021). But that is just what Alta seeks to do in contending that the Warrant Agreement also contained an unwritten requirement about the start time of the 30-day trading period before a redemption notice.

Alta seeks to avail itself of Getty's statement in the S-4, more than a year after the Warrant Agreement was entered in 2020, that "[t]he redemption criteria for the [Getty] Warrants . . . have been established to prevent a redemption call unless there is at the time of the call a significant premium to the [Getty] Warrant exercise price." Alta Mem. 22 (alterations and ellipses in original). There is no basis for Alta's argument that statements Getty made about its motivation for agreeing to a certain contract term, made more than a year after the contract was formed, can supersede the plain terms of the contract itself. _See UBS Fin. Servs._, 660 F.3d at 649 ("[A] written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms."). Because Alta cannot show that

Getty's redemption notice destroyed or injured its right "to receive the fruits of the contract" as written, 511 W. 232nd Owners Corp., 773 N.E.2d at 500, the Court grants summary judgment for Getty dismissing Count IV of Alta's Amended Complaint.

2. Getty is entitled to summary judgment on Count II of CRCM's Amended Complaint.

Unlike Alta, CRCM has not moved for summary judgment on its claim that Getty breached the implied covenant of good faith and fair dealing. Getty, however, has so moved. CRCM's claim is not based on Getty's forced redemption of the warrants but instead on the same conduct as the breach of contract claim in Count I –– Getty's refusal to permit CRCM to exercise its warrants 30 days after the business combination closed. See 22-cv-8916, ECF No. 27 ("CRCM FAC"), at ¶¶ 136-42. But "New York law . . . does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based on the same facts, is also pled." Cruz v. FXDirectDealer, LLC, 720 F.3d 115, 125 (2d Cir. 2013). The Court thus grants summary judgment for Getty dismissing Count II of CRCM's Amended Complaint.

3. Getty is entitled to summary judgment on Count III of Alta's Amended Complaint and Counts III-IV of CRCM's Amended Complaint.

Count III of Alta's Amended Complaint and Counts III-IV of CRCM's Amended Complaint, which allege that Getty failed to make commercially reasonable efforts to register the warrant shares and keep a current prospectus, are pled only in the alternative to Count I. Because the Court grants summary judgment for plaintiffs on Count I, the Court grants summary judgment for Getty dismissing Count III of Alta's Amended Complaint and Counts III-IV of CRCM's Amended Complaint.

4. Getty is entitled to summary judgment on Count VI of Alta's Amended Complaint.

Getty, but not Alta, moves for summary judgment on Count VI of Alta's Amended Complaint, which asks for declaratory judgment regarding Getty's breach of contract. A "declaratory judgment claim [that] is duplicative of [a] breach of contract claim" should be "dismissed." Optanix, Inc. v. Alorica Inc., 2021 WL 2810060, at *1 (S.D.N.Y. July 6, 2021). "Declaratory judgments," like injunctions, "are remedies, not causes of action." Chiste v. Hotels.com L.P., 756 F. Supp. 2d 382, 406 (S.D.N.Y. 2010). And because "declaratory relief is intended to operate prospectively," "[t]here is no basis for declaratory relief where only past acts" -- such as a breach of contract for which damages are sought -- "are involved." Nat'l Union Fire Ins. Co. v. Int'l Wire Grp., Inc., 2003 WL 21277114, at *5 (S.D.N.Y. June 2, 2003). The Court thus

grants summary judgment for Getty dismissing Count VI of Alta's Amended Complaint.

    5. Getty is entitled to summary judgment on Count V of Alta's Amended Complaint and Counts V-VII of CRCM's Amended Complaint.

The remaining claims all feature the federal securities laws and are specifically pled in the alternative to the allegation that Getty breached the Warrant Agreement. Because the Court grants summary judgment for Alta and CRCM on Count I of their respective Amended Complaints, the federal securities claims do not apply. The Court thus grants summary judgment for Getty dismissing Count V of Alta's Amended Complaint and Counts V-VII of CRCM's Amended Complaint.

    IV.  <u>Conclusion</u>

The Court grants summary judgment for Alta and CRCM on Count I of their respective Amended Complaints. Getty is liable to Alta for $36,946,713 in damages, plus prejudgment interest to be calculated by the Clerk of 9% per annum beginning on August 24, 2022. Getty is liable to CRCM for $51,000,000 in damages, plus prejudgment interest of 9% per annum. The Court will determine the commencement date of CRCM's prejudgment interest after receiving a submission from CRCM, to be filed no later than one week after entry of this Opinion and Order, that states how much of its damages occurred on August 22, 2022 and how much of its damages

occurred on August 23, 2022. For Case Number 22-cv-8916, the Clerk is respectfully directed to close document 54 on the docket, enter final judgment, and close the case. For Case Number 23-cv-1074, the Clerk is respectfully directed to close document 32 on the docket.

    SO ORDERED.

New York, NY
October 26, 2023

JED S. RAKOFF, U.S.D.J.

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------------------------------X

ALTA PARTNERS, LLC,

                 Plaintiff,             22 **CIVIL** 8916 (JSR)

      -against-                   **<u>JUDGMENT</u>**

GETTY IMAGES HOLDINGS, INC.,

                 Defendant.

--------------------------------------------------------------------X

       It is hereby **ORDERED, ADJUDGED AND DECREED:** That for the reasons

stated in the Court's Opinion and Order dated October 26, 2023, The Court grants summary

judgment for Alta and CRCM on Count I of their respective Amended Complaints. Getty is

liable to Alta for $36,946,713 in damages, plus prejudgment interest to be calculated by the

Clerk of 9% per annum beginning on August 24, 2022 adding up to 3,908,253.67. Getty is liable

to CRCM for $51,000,000 in damages, plus prejudgment interest of 9% per annum. The Court

will determine the commencement date of CRCM's prejudgment interest after receiving a

submission from CRCM, to be filed no later than one week after entry of this Opinion and Order,

that states how much of its damages occurred on August 22, 2022 and how much of its damages

occurred on August 23, 2022. Accordingly, the case is closed.

**Dated:** New York, New York
       October 27, 2023

                          **RUBY J. KRAJICK**
                           **Clerk of Court**

              **BY:**

                         _____
                             **Deputy Clerk**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
CRCM INSTITUTIONAL MASTER
FUND (BVI) LTD., and CRCM
SPAC OPPORTUNITY FUND LP,              23-cv-1074 (JSR)

            Plaintiffs,                ORDER

      -against-

GETTY IMAGES HOLDINGS, INC.,

            Defendant.
```

JED S. RAKOFF, U.S.D.J.:

On October 26, 2023, the Court issued an Opinion and Order granting summary judgment for plaintiffs CRCM Institutional Master Fund (BVI) Ltd. and CRCM SPAC Opportunity Fund LP (collectively, "CRCM") on Count I of CRCM's Amended Complaint. ECF No. 51. In that Opinion and Order, the Court directed CRCM to file a supplemental submission stating how much of its damages accrued on August 22, 2022, and how much accrued on August 23, 2022, for an accurate calculation of prejudgment interest. Id. at 26 n.12. CRCM filed that submission on November 2, 2023, showing that CRCM incurred $50,284,826 in damages on August 22 and $682,522 in damages on August 23. ECF No. 52. Accordingly, for the reasons stated in the Court's October 26 Opinion and Order, defendant Getty Images Holdings, Inc., is liable to CRCM for $50,967,348 in

- 1 -

damages,[1] plus prejudgment interest of 9% per annum to be calculated by the Clerk of Court. Prejudgment interest begins accruing on August 22, 2022 for $50,284,826 of those damages and on August 23, 2022 for $682,522 of those damages. The Court respectfully directs the Clerk to enter final judgment and close this case.

     SO ORDERED.

New York, NY
November 6, 2023

JED S. RAKOFF, U.S.D.J.

---

[1] CRCM's summary judgment papers had "rounded this figure to $51.0 million." ECF No. 52, at 2 n.1. Although a difference of $33,000 may not seem like much in the context of a $51 million judgment, the Court expresses its disappointment at such imprecision, which no party raised before this filing.

- 2 -

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------------X
CRCM INSTITUTIONAL MASTER FUND (BVI) LTD.,
And CRCM SPAC OPPORTUNITY FUND LP,

                      Plaintiffs,                          23 **CIVIL** 1074 (JSR)

          -against-                                        **JUDGMENT**

GETTY IMAGES HOLDINGS, INC.,

                      Defendant.
------------------------------------------------------------------------X


           It is hereby **ORDERED, ADJUDGED AND DECREED:**  That for the reasons

stated in the Court's Opinion and Order dated October 26, 2023, and the Order dated November

6, 2023, defendant Getty Images Holdings, Inc., is liable to CRCM for $50,967,348 in damages,

plus prejudgment interest of 9% per annum to be calculated by the Clerk of Court. Prejudgment

interest begins accruing on August 22, 2022 for $50,284,826 of those damages totaling to

$5,467,958.20 in interest, and on August 23, 2022 for $682,522 of those damages totaling to

$74,048.96 in interest. Accordingly, the case is closed.

**Dated:**  New York, New York
           November 6, 2023


                                              **RUBY J. KRAJICK**
                                              **Clerk of Court**

                          **BY:**  _____

                                              **Deputy Clerk**

**15 U.S.C. § 77b(a). Definitions; promotion of efficiency, competition, and capital formation.**

**(a) Definitions**

When used in this subchapter, unless the context otherwise requires—

…

**(3)** The term ''sale'' or ''sell'' shall include every contract of sale or disposition of a security or interest in a security, for value. The term ''offer to sell'', ''offer for sale'', or ''offer'' shall include every attempt or offer to dispose of, or solicitation of an offer to buy, a security or interest in a security, for value. The terms defined in this paragraph and the term ''offer to buy'' as used in subsection (c) of section 77e of this title shall not include preliminary negotiations or agreements between an issuer (or any person directly or indirectly controlling or controlled by an issuer, or under direct or indirect common control with an issuer) and any underwriter or among underwriters who are or are to be in privity of contract with an issuer (or any person directly or indirectly controlling or controlled by an issuer, or under direct or indirect common control with an issuer). Any security given or delivered with, or as a bonus on account of, any purchase of securities or

any other thing, shall be conclusively presumed to constitute a part of the subject of such purchase and to have been offered and sold for value. The issue or transfer of a right or privilege, when originally issued or transferred with a security, giving the holder of such security the right to convert such security into another security of the same issuer or of another person, or giving a right to subscribe to another security of the same issuer or of another person, which right cannot be exercised until some future date, shall not be deemed to be an offer or sale of such other security; but the issue or transfer of such other security upon the exercise of such right of conversion or subscription shall be deemed a sale of such other security. Any offer or sale of a security futures product by or on behalf of the issuer of the securities underlying the security futures product, an affiliate of the issuer, or an underwriter, shall constitute a contract for sale of, sale of, offer for sale, or offer to sell the underlying securities. Any offer or sale of a security-based swap by or on behalf of the issuer of the securities upon which such security-based swap is based or is referenced, an affiliate of the issuer, or an underwriter, shall constitute a contract for sale of, sale of, offer for sale, or offer to sell such securities. The publication or

distribution by a broker or dealer of a research report about an emerging growth company that is the subject of a proposed public offering of the common equity securities of such emerging growth company pursuant to a registration statement that the issuer proposes to file, or has filed, or that is effective shall be deemed for purposes of paragraph (10) of this subsection and section 77e(c) of this title not to constitute an offer for sale or offer to sell a security, even if the broker or dealer is participating or will participate in the registered offering of the securities of the issuer. As used in this paragraph, the term ''research report'' means a written, electronic, or oral communication that includes information, opinions, or recommendations with respect to securities of an issuer or an analysis of a security or an issuer, whether or not it provides information reasonably sufficient upon which to base an investment decision.

…

**15 U.S.C. § 77e. Prohibitions relating to interstate commerce and the mails.**

### (a) Sale or delivery after sale of unregistered securities

Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly—

**(1)** to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; or

**(2)** to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale.

### (b) Necessity of prospectus meeting requirements of section 77j of this title

It shall be unlawful for any person, directly or indirectly—

**(1)** to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to carry or transmit any prospectus relating to any security with respect to which a registration statement has been filed under this subchapter, unless such prospectus meets the requirements of section 77j of this title; or

**(2)** to carry or cause to be carried through the mails or in interstate commerce any such security for the purpose of sale or for delivery after sale, unless accompanied or preceded by a prospectus that meets the requirements of subsection (a) of section 77j of this title.

**(c) Necessity of filing registration statement**

It shall be unlawful for any person, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed as to such security, or while the registration statement is the subject of a refusal order or stop order or (prior to the effective date of the registration statement) any public proceeding or examination under section 77h of this title.

**(d) Limitation**

Notwithstanding any other provision of this section, an emerging growth company or any person authorized to act on behalf of an emerging growth company may engage in oral or written communications with potential investors that are qualified institutional buyers or institutions that are accredited investors, as such terms are respectively defined in

section 230.144A and section 230.501(a) of title 17, Code of Federal Regulations, or any successor thereto, to determine whether such investors might have an interest in a contemplated securities offering, either prior to or following the date of filing of a registration statement with respect to such securities with the Commission, subject to the requirement of subsection (b)(2).

**(e) Security-based swaps**

Notwithstanding the provisions of section 77c or 77d of this title, unless a registration statement meeting the requirements of section 77j(a) of this title is in effect as to a security-based swap, it shall be unlawful for any person, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell, offer to buy or purchase or sell a security-based swap to any person who is not an eligible contract participant as defined in section 1a(18) of title 7.

**17 C.F.R. § 229.512. (Item 512) Undertakings.**

…

**(a)** *Rule 415 Offering*.[1] Include the following if the securities are registered pursuant to Rule 415 under the Securities Act (§230.415 of this chapter):

The undersigned registrant hereby undertakes:

**(1)** To file, during any period in which offers or sales are being made, a post-effective amendment to this registration statement:

**(i)** To include any prospectus required by section 10(a)(3) of the Securities Act of 1933;

**(ii)** To reflect in the prospectus any facts or events arising after the effective date of the registration statement (or the most recent post-effective amendment thereof) which, individually or in the aggregate, represent a fundamental change in the information set forth in the registration statement. Notwithstanding the foregoing, any increase or decrease in volume of securities offered (if the total dollar value of securities offered would not exceed that which was registered) and any deviation from the low or high end of the estimated maximum offering range may be reflected in the form of

---

[1] Paragraph (a) reflects proposals made in Securities Act Release No. 6334 (Aug. 6, 1981).

prospectus filed with the Commission pursuant to Rule 424(b) (§230.424(b) of this chapter) if, in the aggregate, the changes in volume and price represent no more than 20% change in the maximum aggregate offering price set forth in the ''Calculation of Registration Fee'' table in the effective registration statement.

**(iii)** To include any material information with respect to the plan of distribution not previously disclosed in the registration statement or any material change to such information in the registration statement;

*Provided, however,* That:

**(A)** Paragraphs (a)(1)(i) and (a)(1)(ii) of this section do not apply if the registration statement is on Form S–8 (§239.16b of this chapter), and the information required to be included in a post-effective amendment by those paragraphs is contained in reports filed with or furnished to the Commission by the registrant pursuant to section 13 or section 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m or 78o(d)) that are incorporated by reference in the registration statement; and

**(B)** Paragraphs (a)(1)(i), (ii), and (iii) of this section do not apply if the registration statement is on Form S–1 (§239.11 of this chapter), Form S–3 (§239.13 of this chapter), Form SF–3 (§239.45 of this chapter) or Form F–3

(§239.33 of this chapter) and the information required to be included in a post-effective amendment by those paragraphs is contained in reports filed with or furnished to the Commission by the registrant pursuant to section 13 or section 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m or 78o(d)) that are incorporated by reference in the registration statement, or, as to a registration statement on Form S–3, Form SF–3 or Form F–3, is contained in a form of prospectus filed pursuant to §230.424(b) of this chapter that is part of the registration statement.

**(C)** *Provided further, however*, that paragraphs (a)(1)(i) and (a)(1)(ii) do not apply if the registration statement is for an offering of asset-backed securities on Form SF–1 (§239.44 of this chapter) or Form SF–3 (§239.45 of this chapter), and the information required to be included in a post-effective amendment is provided pursuant to Item 1100(c) of Regulation AB (§229.1100(c)).

**17 C.F.R. § 230.145. Reclassification of securities, mergers, consolidations and acquisitions of assets.**

PRELIMINARY NOTE: Rule 145 (§230.145 of this chapter) is designed to make available the protection provided by registration under the Securities Act of 1933, as amended (Act), to persons who are offered securities in a business combination of the type described in paragraphs (a) (1), (2) and (3) of the rule. The thrust of the rule is that an *offer*, *offer to sell*, *offer for sale*, or *sale* occurs when there is submitted to security holders a plan or agreement pursuant to which such holders are required to elect, on the basis of what is in substance a new investment decision, whether to accept a new or different security in exchange for their existing security. Rule 145 embodies the Commission's determination that such transactions are subject to the registration requirements of the Act, and that the previously existing *no-sale* theory of Rule 133 is no longer consistent with the statutory purposes of the Act. See Release No. 33–5316 (October 6, 1972) [37 FR 23631]. Securities issued in transactions described in paragraph (a) of Rule 145 may be registered on Form S–4 or F–4 (§239.25 or §239.34 of this chapter) or Form N–14 (§239.23 of this chapter) under the Act.

Transactions for which statutory exemptions under the Act, including those contained in sections 3(a)(9), (10), (11) and 4(2), are otherwise available are not affected by Rule 145.

NOTE 1: Reference is made to Rule 153a (§230.153a of this chapter) describing the prospectus delivery required in a transaction of the type referred to in Rule 145.

NOTE 2: A reclassification of securities covered by Rule 145 would be exempt from registration pursuant to section 3(a)(9) or (11) of the Act if the conditions of either of these sections are satisfied.

**(a)** *Transactions within this section*. An *offer*, *offer to sell*, *offer for sale*, or *sale* shall be deemed to be involved, within the meaning of section 2(3) of the Act, so far as the security holders of a corporation or other person are concerned where, pursuant to statutory provisions of the jurisdiction under which such corporation or other person is organized, or pursuant to provisions contained in its certificate of incorporation or similar controlling instruments, or otherwise, there is submitted for the vote or consent of such security holders a plan or agreement for:

**(1)** *Reclassifications.* A reclassification of securities of such corporation or other person, other than a stock split, reverse stock split, or change in par value, which involves the substitution of a security for another security;

**(2)** *Mergers of consolidations.* A statutory merger or consolidation or similar plan or acquisition in which securities of such corporation or other person held by such security holders will become or be exchanged for securities of any person, unless the sole purpose of the transaction is to change an issuer's domicile solely within the United States; or

**(3)** *Transfers of assets.* A transfer of assets of such corporation or other person, to another person in consideration of the issuance of securities of such other person or any of its affiliates, if:

**(i)** Such plan or agreement provides for dissolution of the corporation or other person whose security holders are voting or consenting; or

**(ii)** Such plan or agreement provides for a pro rata or similar distribution of such securities to the security holders voting or consenting; or

**(iii)** The board of directors or similar representatives of such corporation or other person, adopts resolutions relative to paragraph (a)(3) (i) or (ii) of this section within 1 year after the taking of such vote or consent; or

**(iv)** The transfer of assets is a part of a preexisting plan for distribution of such securities, notwithstanding paragraph (a)(3) (i), (ii), or (iii) of this section.

**(b)** *Communications before a Registration Statement is filed.* Communications made in connection with or relating to a transaction described in paragraph (a) of this section that will be registered under the Act may be made under §230.135, §230.165 or §230.166.

**(c)** *Persons and parties deemed to be underwriters.* For purposes of this section, if any party to a transaction specified in paragraph (a) of this section is a shell company, other than a business combination related shell company, as those terms are defined in §230.405, any party to that transaction, other than the issuer, or any person who is an affiliate of such party at the time such transaction is submitted for vote or consent, who publicly offers or sells securities of the issuer acquired in connection with any such transaction, shall be deemed to be engaged in a distribution and therefore to be an underwriter thereof within the meaning of Section 2(a)(11) of the Act.

**(d)** *Resale provisions for persons and parties deemed underwriters.* Notwithstanding the provisions of paragraph (c), a person or party specified in that paragraph shall not be deemed to be engaged in a distribution and therefore

not to be an underwriter of securities acquired in a transaction specified in paragraph (a) that was registered under the Act if:

**(1)** The issuer has met the requirements applicable to an issuer of securities in paragraph (i)(2) of §230.144; and

**(2)** One of the following three conditions is met:

**(i)** Such securities are sold by such person or party in accordance with the provisions of paragraphs (c), (e), (f), and (g) of §230.144 and at least 90 days have elapsed since the date the securities were acquired from the issuer in such transaction; or

**(ii)** Such person or party is not, and has not been for at least three months, an affiliate of the issuer, and at least six months, as determined in accordance with paragraph (d) of §230.144, have elapsed since the date the securities were acquired from the issuer in such transaction, and the issuer meets the requirements of paragraph (c) of §230.144; or

**(iii)** Such person or party is not, and has not been for at least three months, an affiliate of the issuer, and at least one year, as determined in accordance with paragraph (d) of §230.144, has elapsed since the date the securities were acquired from the issuer in such transaction.

NOTE TO §230.145(c) AND (d): Paragraph (d) is not available with respect to any transaction or series of transactions that, although in technical compliance with the rule, is part of a plan or scheme to evade the registration requirements of the Act.

**(e)** *Definitions*. **(1)** The term *affiliate* as used in paragraphs (c) and (d) of this section shall have the same meaning as the definition of that term in §230.144.

**(2)** The term *party* as used in paragraphs (c) and (d) of this section shall mean the corporations, business entities, or other persons, other than the issuer, whose assets or capital structure are affected by the transactions specified in paragraph (a) of this section.

**(3)** The term *person* as used in paragraphs (c) and (d) of this section, when used in reference to a person for whose account securities are to be sold, shall have the same meaning as the definition of that term in paragraph (a)(2) of §230.144.

**17 C.F.R. § 230.424. Filing of prospectuses, number of copies.**

**(a)** Except as provided in paragraph (f) of this section, five copies of every form of prospectus sent or given to any person prior to the effective date of the registration statement which varies from the form or forms of prospectus included in the registration statement as filed pursuant to §230.402(a) of this chapter shall be filed as a part of the registration statement not later than the date such form of prospectus is first sent or given to any person: *Provided, however,* That only a form of prospectus that contains substantive changes from or additions to a prospectus previously filed with the Commission as part of a registration statement need be filed pursuant to this paragraph (a).

**(b)** Ten copies of each form of prospectus purporting to comply with section 10 of the Act, except for documents constituting a prospectus pursuant to Rule 428(a) (§230.428(a)) or free writing prospectuses pursuant to Rule 164 and Rule 433 (§230.164 and §230.433), shall be filed with the Commission in the form in which it is used after the effectiveness of the registration statement and identified as required by paragraph (e) of this section; *provided, however,* that only a form of prospectus that contains substantive changes from or additions to a previously filed prospectus is required to be filed; *Provided, further,* that this paragraph (b) shall not apply in respect of a form

of prospectus contained in a registration statement and relating solely to securities offered at competitive bidding, which prospectus is intended for use prior to the opening of bids. Ten copies of the form of prospectus shall be filed or transmitted for filing as follows:

**(1)** A form of prospectus that discloses information previously omitted from the prospectus filed as part of an effective registration statement in reliance upon Rule 430A under the Securities Act (§230.430A of this chapter) shall be filed with the commission no later than the second business day following the earlier of the date of determination of the offering price or the date it is first used after effectiveness in connection with a public offering or sales, or transmitted by a means reasonably calculated to result in filing with the Commission by that date.

**(2)** A form of prospectus that is used in connection with a primary offering of securities pursuant to Rule 415(a)(1)(x) (§230.415(a)(1)(x)) or a primary offering of securities registered for issuance on a delayed basis pursuant to Rule 415(a)(1)(vii) or (viii) (§230.415(a)(1)(vii) or (viii)) and that, in the case of Rule 415(a)(1)(viii) discloses the public offering price, description of securities or similar matters, and in the case of Rule 415(a)(1)(vii) and (x) discloses information previously omitted from the prospectus filed as part of an

effective registration statement in reliance on Rule 430B (§230.430B), or, in the case of asset-backed securities, Rule 430D (§230.430D) shall be filed with the Commission no later than the second business day following the earlier of the date of the determination of the offering price or the date it is first used after effectiveness in connection with a public offering or sales, or transmitted by a means reasonably calculated to result in filing with the Commission by that date.

**(3)** A form of prospectus that reflects facts or events other than those covered in paragraphs (b) (1), (2) and (6) of this section that constitute a substantive change from or addition to the information set forth in the last form of prospectus filed with the Commission under this section or as part of a registration statement under the Securities Act shall be filed with the Commission no later than the fifth business day after the date it is first used after effectiveness in connection with a public offering or sales, or transmitted by a means reasonably calculated to result in filing with the Commission by that date.

**(4)** A form of prospectus that discloses information, facts or events covered in both paragraphs (b) (1) and (3) shall be filed with the Commission no later than the second business day following the earlier of the date of the

determination of the offering price or the date it is first used after effectiveness in connection with a public offering or sales, or transmitted by a means reasonably calculated to result in filing with the Commission by that date.

**(5)** A form of prospectus that discloses information, facts or events covered in both paragraphs (b) (2) and (3) shall be filed with the Commission no later than the second business day following the earlier of the date of the determination of the offering price or the date it is first used after effectiveness in connection with a public offering or sales, or transmitted by a means reasonably calculated to result in filing with the Commission by that date.

**(6)** A form of prospectus used in connection with an offering of securities under Canada's National Policy Statement No. 45 pursuant to rule 415 under the Securities Act (§230.415 of this chapter) that is not made in the United States shall be filed with the Commission no later than the date it is first used in Canada, or transmitted by a means reasonably calculated to result in filing with the Commission by that date.

**(7)** A form of prospectus that identifies selling security holders and the amounts to be sold by them that was previously omitted from the registration statement and the prospectus in reliance upon Rule 430B (§230.430B) shall be filed with the Commission no later than the second business day

following the earlier of the date of sale or the date of first use or transmitted by a means reasonably calculated to result in filing with the Commission by that date.

**(8)** A form of prospectus otherwise required to be filed pursuant to paragraph (b) of this section that is not filed within the time frames specified in paragraph (b) of this section must be filed pursuant to this paragraph as soon as practicable after the discovery of such failure to file.

NOTE TO PARAGRAPH (b)(8) OF RULE 424. A form of prospectus required to be filed pursuant to another paragraph of Rule 424(b) that is filed under Rule 424(b)(8) shall nonetheless be ''required to be filed'' under such other paragraph.

*Instruction to paragraph (b):* Notwithstanding §230.424 (b)(2) and (b)(5) above, a form of prospectus or prospectus supplement relating to an offering of asset-backed securities under §230.415(a)(1)(vii) or 230.415(a)(1)(xii) that is required to be filed pursuant to paragraph (b) of this section shall be filed with the Commission no later than the second business day following the date it is first used after effectiveness in connection with a public offering or sales, or transmitted by a means reasonably calculated to result in filing with the Commission by that date.

**(c)** If a form of prospectus, other than one filed pursuant to paragraph (b)(1) or (b)(4) of this Rule, consists of a prospectus supplement attached to a form of prospectus that (1) previously had been filed or (2) was not required to be filed pursuant to paragraph (b) because it did not contain substantive changes from a prospectus that previously was filed, only the prospectus supplement need be filed under paragraph (b) of this rule, provided that the first page of each prospectus supplement includes a cross reference to the date(s) of the related prospectus and any prospectus supplements thereto that together constitute the prospectus required to be delivered by Section 5(b) of the Securities Act (15 U.S.C. 77e(b)) with respect to the securities currently being offered or sold. The cross reference may be set forth in longhand, provided it is legible.

NOTE: Any prospectus supplement being filed separately that is smaller than a prospectus page should be attached to an 8 1⁄2″ × 11″ sheet of paper.

**(d)** Every prospectus consisting of a radio or television broadcast shall be reduced to writing. Five copies of every such prospectus shall be filed with the Commission in accordance with the requirements of this section.

**(e)** Each copy of a form of prospectus filed under this rule shall contain in the upper right corner of the cover page the paragraph of this rule, including

the subparagraph if applicable, under which the filing is made, and the file number of the registration statement to which the prospectus relates. The information required by this paragraph may be set forth in longhand, provided it is legible.

**(f)** This section shall not apply with respect to prospectuses of an investment company registered under the Investment Company Act of 1940, other than a registered closed-end investment company. References to ''form of prospectus'' in paragraphs (a), (b), and (c) of this section shall be deemed also to refer to the form of Statement of Additional Information.

**(g)** A form of prospectus filed pursuant to this section must include the following information, as applicable, in a single exhibit submitted as required by §232.408 of this chapter (Rule 408 of Regulation S–T), provided, however, that if the exhibit is submitted in connection with Form SF–1 (§239.44 of this chapter) or Form SF–3 (§239.45 of this chapter), it is permitted but not required to be submitted as otherwise required by Rule 408.

**(1)** If the form of prospectus operates to reflect the payment of filing fees for an offering or offerings pursuant to §230.456(b) or (c) (Rule 456(b) or (c)), the calculation of filing fee table immediately followed by the information required by the form instructions to the registration fee table reflecting the

payment of such filing fees for the securities that are the subject of the payment; and

**(2)** The maximum aggregate amount or maximum aggregate offering price of the securities to which the final prospectus relates and indication that the final prospectus is a final prospectus for the related offering, as applicable, as required by General Instruction II.F of Form S–3 (§239.13 of this chapter), General Instruction II.G of Form F–3 (§239.33 of this chapter), General Instruction II.D of Form SF–3 (§239.45 of this chapter), General Instruction H of Form S–4 (§239.25 of this chapter), and General Instruction C.2 of Form N–2 ((§§239.14 and 274.11a–1 of this chapter).

**(h)(1)** Three copies of a form of prospectus relating to an offering of asset-backed securities pursuant to §230.415(a)(1)(vii) or §230.415(a)(1)(xii) disclosing information previously omitted from the prospectus filed as part of an effective registration statement in reliance on §230.430D shall be filed with the Commission at least three business days before the date of the first sale in the offering, or if used earlier, the earlier of:

**(i)** The applicable number of business days before the date of the first sale; or

**(ii)** The second business day after first use.

**(2)** Three copies of a prospectus supplement relating to an offering of asset-backed securities pursuant to §230.415(a)(1)(vii) or §230.415(a)(1)(xii) that reflects any material change from the information contained in a prospectus filed in accordance with §230.424(h)(1) shall be filed with the Commission at least forty-eight hours before the date and time of the first sale in the offering. The prospectus supplement must clearly delineate what material information has changed and how the information has changed from the prospectus filed in accordance with paragraph (h)(1) of this section.

*Instruction to paragraph (h)*: The filing requirements of this paragraph (h) do not apply if a filing is made solely to add fees pursuant to §230.457 and for no other purpose.

**(i)(1)** A form of prospectus filed pursuant to this section that operates to reflect the payment of filing fees for an offering of an indeterminate amount of exchange-traded vehicle securities pursuant to §§230.456(d) and 230.457(u) (Rule 456(d) and Rule 457(u)) shall be filed with the Commission within the time period set forth in Rule 456(d). The form of prospectus must be accompanied by the appropriate registration fee.

**(2)** The form of prospectus must include the following information in an exhibit submitted as required by Rule 408 of Regulation S–T:

**(i)** The name and address of issuer;

**(ii)** The name of the securities for which the prospectus is filed;

**(iii)** The Securities Act file number(s) of the registration statement(s) associated with the offering;

**(iv)** The last day of the fiscal year for the issuer for which the prospectus is filed;

**(v)** The calculation of registration fee information calculated pursuant to Rule 457(u); and

**(vi)** The total interest due pursuant to Rule 456(d)(5) and the total amount of registration fee due including any such interest, if the prospectus is being filed more than 90 days after the end of the issuer's fiscal year.

**17 C.F.R. § 230.429. Prospectus relating to several registration statements.**

(a) Where a registrant has filed two or more registration statements, it may file a single prospectus in the latest registration statement in order to satisfy the requirements of the Act and the rules and regulations thereunder for that offering and any other offering(s) registered on the earlier registration statement(s). The combined prospectus in the latest registration statement must include all of the information that currently would be required in a prospectus relating to all offering(s) that it covers. The combined prospectus may be filed as part of the initial filing of the latest registration statement, in a pre-effective amendment to it or in a post-effective amendment to it.

(b) Where a registrant relies on paragraph (a) of this section, the registration statement containing the combined prospectus shall act, upon effectiveness, as a post-effective amendment to any earlier registration statement whose prospectus has been combined in the latest registration statement. The registrant must identify any earlier registration statement to which the combined prospectus relates by setting forth the Commission file number at the bottom of the facing page of the latest registration statement.

**17 C.F.R. § 239.25. Form S-4, for the registration of securities issued in business combination transactions.**

This form may be used for registration under the Securities Act of 1933 of securities to be issued (a) in a transaction of the type specified in paragraph (a) of Rule 145 (§230.145 of this chapter); (b) in a merger in which the applicable state law would not require the solicitation of the votes or consents of all of the security holders of the company being acquired; (c) in an exchange offer for securities of the issuer or another entity; (d) in a public reoffering or resale of any such securities acquired pursuant to this registration statement; or (e) in more than one of the kinds of transactions listed in paragraphs (a) through (d) registered on one registration statement.