# 23-7876(L)

### 23-7915(CON), 23-7983(CON)

## In the United States Court of Appeals for the Second Circuit

CRCM Institutional Master Fund (BVI) Ltd.,
CRCM SPAC Opportunity Fund LP,

*Plaintiffs-Appellees*,

Alta Partners, LLC,

*Plaintiff-Appellee/Cross-Appellant*,

v.

Getty Images Holdings, Inc.,

*Defendant-Appellant/Cross-Appellee*.

On Appeal from the United States District Court
for the Southern District of New York

**BRIEF FOR PLAINTIFFS-APPELLEES CRCM
INSTITUTIONAL MASTER FUND (BVI) LTD. AND
CRCM SPAC OPPORTUNITY FUND LP**

William Savitt
Wachtell, Lipton, Rosen & Katz
51 West 52nd Street
New York, NY 10019
(212) 403-1000

*Counsel for Plaintiffs-Appellees
CRCM Institutional Master Fund
(BVI) Ltd. and CRCM SPAC
Opportunity Fund LP*

## DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, CRCM Institutional Master Fund (BVI) Ltd. and CRCM SPAC Opportunity Fund LP hereby certify that they have no parent company and no publicly held corporation owns 10% or more of their common shares.

## TABLE OF CONTENTS

INTRODUCTION ..................................................................... 1

COUNTERSTATEMENT OF ISSUES ....................................... 4

STATEMENT OF THE CASE ................................................... 5

    A.    The CCNB SPAC ................................................... 5

    B.    The Warrant Agreement ......................................... 5

    C.    CCNB agrees to combine with Getty and registers
        the warrant shares on Form S-4 ............................... 7

    D.    Getty becomes a public company through a de-
        SPAC transaction and files a Form S-1 ..................... 9

    E.    While insiders profit from Getty's rising stock
        price, Getty refuses to allow CRCM to exercise its
        warrants ............................................................. 10

    F.    Procedural history ................................................ 11

    G.    The district court grants summary judgment to
        CRCM on its primary breach of contract claim ................ 12

STANDARD OF REVIEW ..................................................... 19

SUMMARY OF ARGUMENT ................................................. 20

ARGUMENT ....................................................................... 27

I.    THE DISTRICT COURT CORRECTLY HELD AS A
    MATTER OF LAW THAT GETTY BREACHED THE
    WARRANT AGREEMENT ............................................. 27

    A.    The condition of an effective registration
        statement with respect to the warrant shares was
        satisfied as of August 22, 2022 ............................... 27

        1.    The Form S-4 was a registration statement
            "with respect to" the warrant shares ........................... 27

2.  Satisfaction of the registration condition did not require separate registration statements for the "offer" and "sale" of the warrant shares ............................................................. 31

3.  The warrant shares were properly registered on the Form S-4 ................................................ 38

4.  The Form S-1 did not make the Form S-4 "ineffective" ............................................... 40

B.  The condition of a current prospectus covering the warrant shares was satisfied as of August 22, 2022, or Getty's breach caused the failure of, and therefore excuses satisfaction of, the condition ................... 41

1.  The S-4 prospectus was current as of August 22, 2022 ................................................ 42

2.  Any failure of the prospectus condition was caused by Getty's breach and is therefore excused ........................................................... 47

II.  THE DISTRICT COURT CORRECTLY AWARDED CRCM MARKET VALUE DAMAGES CAUSED BY GETTY'S BREACH ........................................................ 52

A.  Getty's market price on the New York Stock Exchange was the appropriate measure of damages as a matter of law ................................. 53

B.  Getty does not identify any disputed issues of material fact that would preclude summary judgment ................................................... 57

CONCLUSION ................................................................ 64

# TABLE OF AUTHORITIES

**Page(s)**

### Cases

*AEP Energy Servs. Gas Holding Co.* v. *Bank of Am., N.A.*,
626 F.3d 699 (2d Cir. 2010) ................................................................ 57

*Allianz Ins. Co.* v. *Lerner*,
416 F.3d 109 (2d Cir. 2005) ................................................................ 40

*Am. Home Assurance Co.* v. *Hapag Lloyd Container Linie*,
*GmbH*, 446 F.3d 313 (2d Cir. 2006) .................................................. 27

*Blue Citi, LLC* v. *5Barz Int'l Inc.*,
338 F. Supp. 3d 326 (S.D.N.Y. 2018), *aff'd*,
802 F. App'x 28 (2d Cir. 2020) .......................................................... 55

*Boyce* v. *Soundview Tech. Grp., Inc.*,
464 F.3d 376 (2d Cir. 2006) ........................................................ *passim*

*BrandAid Mktg. Corp.* v. *Biss*,
2008 WL 190494 (S.D.N.Y. Jan. 22, 2008) .................................. 56 n.3

*Bustamante* v. *KIND, LLC*,
100 F.4th 419, 432 (2d Cir. 2024) ...................................................... 58

*Consol. Edison Inc.* v. *Ne. Utils.*,
426 F.3d 524 (2d Cir. 2005) ........................................................ 23, 48

*Cottam* v. *6D Global Technologies*,
2022 WL 16908708 (2d Cir. Nov. 14, 2022) ...................................... 55

*Cottam* v. *Global Emerging Cap. Grp., LLC*,
2021 WL 1222120 (S.D.N.Y. Mar. 31, 2021) .................................... 55

*Davidowitz* v. *Patridge*,
2010 WL 5186803 (S.D.N.Y. Dec. 7, 2010) .................................. 56 n.3

*Folger Adam Co.* v. *PMI Indus., Inc.*,
938 F.2d 1529 (2d Cir. 1991) ............................................................ 43

*Glazer* v. *Formica Corp.*,
964 F.2d 149 (2d Cir. 1992) ............................................................ 44

*Holland Loader Co., LLC* v. *FLSmidth A/S*,
313 F. Supp. 3d 447 (S.D.N.Y. 2018), *aff'd*,
769 F. App'x 40 (2d Cir. 2019) ........................................................ 51

*Hudson Bay Master Fund Ltd.* v. *Patriot Nat'l, Inc.*,
2019 WL 1649983 (S.D.N.Y. Mar. 28, 2019) .................................. 55

*In re All. Pharm. Corp. Sec. Litig.*,
279 F. Supp. 2d 171 (S.D.N.Y. 2003) .............................................. 49

*In re Metro. Sec. Litig.*,
2010 WL 537740 (E.D. Wash. Feb. 8, 2010) ................................... 50

*Kulak* v. *City of New York*,
88 F.3d 63 (2d Cir. 1996) ................................................................ 60

*LG Cap. Funding, LLC* v. *CardioGenics Holdings, Inc.*,
787 F. App'x 2 (2d Cir. 2019) .......................................................... 54

*Lloyd Cap. Corp.* v. *Pat Henchar, Inc.*,
603 N.E.2d 246 (N.Y. 1992) ........................................................... 32

*Major League Baseball Props., Inc.* v. *Salvino, Inc.*,
542 F.3d 290 (2d Cir. 2008) ............................................................ 61

*Matrixx Initiatives, Inc.* v. *Siracusano*,
563 U.S. 27 (2011) .......................................................................... 43

*Merzon* v. *Lefkowitz*,
289 A.D.2d 142 (1st Dep't 2001) ..................................................... 48

*Munoz-Gonzalez* v. *D.L.C. Limousine Serv., Inc.*,
904 F.3d 208 (2d Cir. 2018) ................................................. 19, 23, 48

*Process Am., Inc.* v. *Cynergy Holdings, LLC*,
839 F.3d 125 (2d Cir. 2016) ................................................. 53, 57, 58

*Red Tree Investments, LLC* v. *Petróleos de Venezuela, S.A.*,
82 F.4th 161 (2d Cir. 2023) ............................................................. 19

*SATCOM Int'l Grp. PLC* v. *ORBCOMM Int'l Partners, L.P.*,
2000 WL 729110 (S.D.N.Y. June 6, 2000) ........................................... 52

*SEC* v. *Cavanagh*,
155 F.3d 129 (2d Cir. 1998) ..................................................... 15, 35, 36

*SEC* v. *Manor Nursing Centers, Inc.*,
458 F.2d 1082 (2d Cir. 1972), *abrogated on other grounds by*
*Liu* v. *SEC*, 591 U.S. 71 (2020) ..................................................... *passim*

*SEC* v. *Universal Express, Inc.*,
475 F. Supp. 2d 412 (S.D.N.Y. 2007) ......................................... 35

*St. Christopher's, Inc.* v. *JMF Acquisitions, LLC*,
2021 WL 6122674 (2d Cir. 2021) ............................................... 48

*Tang Cap. Partners, LP* v. *BRC Inc.*,
661 F. Supp. 3d 48 (S.D.N.Y. 2023) ..................................... 33, 37

*United States* v. *Cartwright*,
411 U.S. 546 (1973) ............................................................... 54

## Statutes, Regulations and Rules

15 U.S.C. § 77e ....................................................................... 34

17 C.F.R. § 229.512(a)(1)(ii) ............................................... 50

17 C.F.R. § 229.601(b)(5) ................................................... 29

17 C.F.R. § 230.401(g)(1) .................................................. 39

17 C.F.R. § 230.415(a) ....................................................... 39

17 C.F.R. § 230.424(b) ....................................................... 49

17 C.F.R. § 230.429 ....................................................... 40, 41

## Other Authorities

1 Loss, *Securities Regulation* 293 (2d ed. 1961, Supp. 1969) ................. 49

Adoption of Integrated Disclosure System, SEC Release No. 33-6383, 47 Fed. Reg. 11,380 (Mar. 16, 1982) ................................... 50

Delayed or Continuous Offering and Sale of Securities, 46 Fed. Reg. 42,001 (Aug. 18, 1981) .............................................. 50, 51

Thomas Lee Hazen, *Treatise on the L. of Secs. Regul.*, Section 5–Overview of the Basic Prohibitions of the Pre-Filing, Waiting, and Post-Effective Periods, § 2:16 (2023) ............... 35

Daniel R. Fischel, *Market Evidence in Corporate Law*, 69 U. Chi. L. Rev. 941 (2002) ................................................................. 64

SEC, Div. of Corp. Fin., Securities Act Rules, C&DI 139.01 ................................................................ 30, 31 n.1, 36, 37

SEC, Glossary, *Registered Offering* ......................................................... 36

Joel Seligman, et al., *Fundamentals of Secs. Regul.*, The Statutory Pattern, § 2.B.1 (7th ed. 2023) ............................... 34-35

## INTRODUCTION

Getty Images Holdings, Inc., defendant below, seeks the reversal of summary judgment to plaintiff CRCM on its breach of contract claim arising out of Getty's refusal to permit its exercise of Getty warrants. The terms of the contract governing the warrants are plain, and the calculation of CRCM's damages is straightforward. Getty identifies no contractual ambiguity, legal authority, or material factual dispute that shows CRCM is not entitled to judgment as a matter of law.

After merging with a special purpose acquisition company in July 2022, Getty became a public company. Getty shares and warrants then began trading on the New York Stock Exchange. CRCM held 3,010,764 warrants entitling it to purchase Getty shares at an exercise price of $11.50. The agreement governing the warrants provided that they could be exercised on August 22, 2022 so long as (1) a registration statement under the Securities Act of 1933 "with respect to" the Getty shares issuable upon exercise of the warrants was "then effective"; and (2) a prospectus "relating thereto" was "current." JA25-26 (§§ 3.2, 3.3.2).

On August 22, 2022, Getty's stock price was $30.63, well above the warrant exercise price. CRCM accordingly sought to exercise all of its

warrants. But Getty denied the exercise, asserting that both conditions for exercise had not been met.

The district court held that, as a matter of law, the contractual conditions for warrant exercise were met on August 22, 2022. And the district court held that, as a matter of law, CRCM was entitled to damages of $51 million. There was no error in either determination.

(1) The registration condition for warrant exercise was satisfied by Getty's Form S-4. The S-4 "registered" the warrant shares and was declared effective on June 30, 2022—before August 22, 2022. Getty argues that the condition was not satisfied because the S-4 registered only the "offer" of the warrant shares, not their subsequent "issuance and sale" upon exercise. The district court correctly rejected that argument as contrary to the plain language of the agreement, inconsistent with Getty's own statements in the S-4 and a later-filed S-1, and without support in federal securities law.

The prospectus condition for warrant exercise was also satisfied by Getty's Form S-4. The S-4 contained a prospectus disclosing more than 800 pages of information concerning Getty's business. Getty fails to show that any material changes to Getty's business occurred after the S-4 was

effective that rendered the prospectus in the S-4 no longer "current" as of August 22, 2022.

(2) CRCM is entitled to damages of $51 million as a result of Getty's breach. But for Getty's breach, CRCM would have exercised its warrants to purchase Getty shares—shares that traded freely on the New York Stock Exchange. As this Court has long recognized, damages for a breaching party's failure to deliver publicly traded stock are calculated by reference to the stock's trading price on the date of the breach. Accordingly, CRCM is entitled to recover the difference between the $11.50 strike price of its warrants and the market price of the Getty shares it would have received. Getty's only argument for disregarding the market price—that it was supposedly "inflated" by a purported "short squeeze"—rests entirely on the speculation of its expert.

The judgment of the district court should therefore be affirmed.

## COUNTERSTATEMENT OF ISSUES

1.      Whether, in granting summary judgment to CRCM on its claim for breach of the Warrant Agreement, the district court correctly held that Getty breached that agreement as a matter of law because Getty refused to allow CRCM to exercise its warrants when the contractual conditions for exercise were satisfied.

2.      Whether, in granting summary judgment to CRCM on its claim for breach of the Warrant Agreement, the district court correctly held that CRCM was entitled to damages as a matter of law based on the difference between the warrant exercise price and the market price of Getty's publicly traded stock at the time of CRCM's attempted exercise.

## STATEMENT OF THE CASE

### A.    The CCNB SPAC

CC Neuberger Principal Holdings II ("CCNB") was formed by its sponsor, CC Neuberger Principal Holdings II Sponsor LLC, as a special purpose acquisition company ("SPAC"). JA2734 (¶¶ 5-6). Like other SPACs, the purpose of CCNB was to raise cash from public investors through an IPO and to then identify and merge with a private company through a business combination, commonly called a "de-SPAC" merger. Following its de-SPAC merger, CCNB would cease to exist and the target company would be public, bypassing the typical initial public offering ("IPO") process.

CCNB made its IPO on August 4, 2020, issuing 82,800,000 "units" at a price of $10 per unit. JA2735 (¶ 9). Each unit comprised, and was separable into, one Class A ordinary share of CCNB and one-fourth of one CCNB warrant. JA2735 (¶¶ 10-11). In connection with the offering, CCNB also issued private warrants to its sponsor. JA2735 (¶ 12).

### B.    The Warrant Agreement

The terms governing exercise of the CCNB warrants were set forth in a Warrant Agreement between CCNB and a transfer agent governed by New York law. JA36 (§ 9.3); JA2736 (¶ 14). The Warrant Agreement

allowed each warrant holder to purchase a CCNB share at an exercise price of $11.50 per share. JA25 (§ 3.1).

The Warrant Agreement provided that the warrants could be exercised beginning "thirty days after the first date on which the Company complete[d] a [de-SPAC business combination]" if two "conditions" were met: (1) "a registration statement under the Securities Act of 1933 with respect to the . . . Shares underlying the . . . Warrants is then effective," and (2) "a prospectus relating thereto is current, subject to the Company's satisfying its obligations under Section 7.4." JA25-26 (§§ 3.2, 3.3.2). Section 7.4 in turn required "that as soon as practicable . . . [the Company] shall use commercially reasonable efforts to file . . . a registration statement for the registration, under the Securities Act, of the Ordinary Shares issuable upon exercise of the Warrants." JA33. Section 7.4 further required that "[t]he Company shall use commercially reasonable efforts . . . to maintain a current prospectus relating thereto." *Id.*

## C.    CCNB agrees to combine with Getty and registers the warrant shares on Form S-4

On December 9, 2021, CCNB agreed to combine with Getty's holding company, with Getty surviving as a public company following the de-SPAC merger. JA2738-39 (¶¶ 24-25).

CCNB (through a subsidiary) filed a registration statement under the Securities Act of 1933 on Form S-4 on January 18, 2022. JA2740 (¶ 30). The S-4 included a proxy statement for CCNB stockholders to use in voting on the business combination and a prospectus for the shares to be registered. JA2743 (¶ 39); *see also* JA231. The S-4 referred to Getty as "New CCNB." JA2741-42 (¶ 34); JA229.

The table on the cover page of the S-4 set forth "Each Class of Securities to be Registered." JA229. Those securities included the shares underlying the private and public warrants issued in the IPO, referred to as "New CCNB Class A Common Stock underlying warrants":

**CALCULATION OF REGISTRATION FEE**

| Title of Each Class of Securities to be Registered[(1)] | Amount to be Registered[(7)] | Proposed Maximum Offering Price Per Security | Proposed Maximum Aggregate Offering Price | Amount of Registration Fee |
|---|---|---|---|---|
| New CCNB Class A Common Stock, par value $0.0001 per share[(2)] | 150,475,093 | $9.885 | $1,487,446,294.31 | $137,886.27 |
| New CCNB Series B-1 Common Stock, par value $0.0001 per share[(3)] | 2,570,000 | — | — | — |
| New CCNB Series B-2 Common Stock, par value $0.0001 per share[(4)] | 2,570,000 | — | — | — |
| New CCNB Warrants to purchase common stock[(5)] | 39,260,000 | — | — | — |
| New CCNB Class A Common stock underlying warrants[(6)] | 39,260,000 | 11.50 | 451,490,000 | 41,853.12 |
| Total | | | $1,938,936,294.31 | $    179,740 |

JA229-30.

In the notes accompanying the table, CCNB reiterated that the common stock "underlying the warrants" "[r]epresent[ed] 39,260,000 shares of New CCNB Class A Common Stock, issuable upon exercise by holders of New CCNB Warrants following the completion of the Business Combination." JA230.

On June 27, 2022, CCNB filed an amended S-4 in response to SEC staff comments. The amended S-4 included an opinion rendered by CCNB's counsel of the legality and validity of the registration. JA2742 (¶ 36); JA2361. That opinion stated that it was "being rendered in connection with the registration under the above-referenced Registration Statement [the Form S-4] of . . . 39,260,000 Warrant Shares." JA2361.

The S-4 also included "a prospectus for 189,735,093 shares of class A common stock," which included 39,260,000 shares underlying the public and private warrants. JA1817. The prospectus provided over 800 pages of detailed information concerning Getty's business and financial condition, the post-closing company, the securities being registered, and risk factors relating to the offering, the business combination, and other matters. *See* JA1817-38; *see also* JA1841-1944.

The SEC declared the S-4 effective on June 30, 2022. JA2744 (¶ 40).

### D. Getty becomes a public company through a de-SPAC transaction and files a Form S-1

Getty's de-SPAC merger with CCNB closed on July 22, 2022. JA2744 (¶ 42). Getty then assumed all of CCNB's rights, liabilities, and obligations under the Warrant Agreement, and the warrants issued by CCNB became exercisable for shares of Getty, rather than CCNB, stock. JA2744-45 (¶¶ 43-44).

On August 9, 2022, Getty filed a registration statement on Form S-1, registering new securities that had not been included on the S-4. JA2749 (¶ 55). The S-1 also listed the 39,260,000 shares of "Class A Common Stock underlying warrants" as "previously registered" on the S-4 that was declared effective on June 30, 2022. JA2475-76; JA991-92. The S-1 stated that "[n]o registration fee is payable in connection with the 39,260,000 shares of Class A Common Stock previously registered on a registration statement on Form S-4 . . . which was declared effective on June 30, 2022 (the 'Prior Registration Statement') because such shares are being transferred from the Prior Registration Statement pursuant to Rule 429(b) under the Securities Act." JA2476; JA992.

So, the S-1 went on, "[i]f securities previously registered under the Prior Registration Statement are offered and sold before the effective

date of this registration statement, the amount of previously registered securities so sold will not be included in the prospectus hereunder." JA2476; JA992. The prospectus in the S-1 thus related to both the newly registered securities as well as the shares underlying the warrants that had been "previously registered" on the S-4. *See* JA2460; JA1959.

### E. While insiders profit from Getty's rising stock price, Getty refuses to allow CRCM to exercise its warrants

On August 22, 2022, 30 days after the de-SPAC merger closed, Getty's stock opened at $30.63. JA2753 (¶ 72). CRCM had been acquiring warrants since the announcement of the Getty transaction in December 2021, JA2740 (¶ 29), and as of August 22 held 2,965,141 warrants, JA2756 (¶¶ 73-74). CRCM instructed its broker to exercise CRCM's warrants, but Getty's warrant agent denied the exercise. JA2757 (¶¶ 77-78).

By August 25, Getty's stock price had traded above $17.50 for 20 consecutive trading days. JA2759 (¶ 84). This triggered a provision in the business combination agreement entitling certain Getty insiders—including Getty's founder, Mark Getty, and entities affiliated with his family—to receive tens of millions of additional "earnout" shares of Getty stock. *See* JA2740, 2759 (¶¶ 28, 84). In total, Getty issued 59,000,000

shares, with a market value of more than $1.5 billion, to Getty insiders. *See* JA2759 (¶¶ 84-85).

CCNB's sponsor also took advantage of Getty's prevailing market price. On August 29, 2022, it exercised all of the private placement warrants it had been issued in connection with CCNB's IPO. JA2760 (¶ 86).

Shortly afterward, Getty's stock price began declining. *Id.* (¶ 88). Unable to exercise its warrants, CRCM sold most of them over the subsequent days at prices ranging from $.48 to $1.24, suffering a large investment loss. JA2760-61 (¶ 90).

## F.   Procedural history

CRCM sued Getty in the U.S. District Court for the Southern District of New York, claiming breach of the Warrant Agreement. No. 23-cv-01074, Dkt. 1. The district court consolidated CRCM's action with a similar suit brought by another Getty warrant holder, Alta Partners, LLC, through the close of discovery. JA8 (Dkt. 19).

CRCM's amended complaint, JA8 (Dkt. 27) asserted seven claims against Getty: breach of the Warrant Agreement by denying CRCM's exercise of its warrants (Count I); breach of the implied covenant of good

faith and fair dealing (Count II); in the alternative to Count I, breach of the Warrant Agreement by failing to properly and timely register the warrant shares on the S-4 (Count III) and failing to keep the prospectus in the S-4 current (Count IV); and, also in the alternative to Count I, violations of the federal securities laws (Counts V, VI, and VII). *See* JA1732-46.

### G. The district court grants summary judgment to CRCM on its primary breach of contract claim

All parties moved for summary judgment. The district court granted CRCM summary judgment on its claim that Getty had breached the Warrant Agreement by denying exercise of its warrants (Count I).

The district court rejected Getty's argument that it had not breached the Warrant Agreement because the conditions for exercise had not been satisfied as of August 22, 2022. SA12-22. The district court held that the condition of an effective registration statement "with respect to" the warrant shares was "plainly met by June 30, 2022, when the S-4 that registered the '39,260,000 shares of New CCNB Class A Common Stock, issuable upon exercise by holders of New CCNB Warrants following the completion of the Business Combination,' was made effective by the SEC." SA13. The court found that "Getty itself confirmed as much" in the

S-1, when it listed "the 39,260,000 shares of 'Class A Common Stock underlying warrants' as having been 'previously registered' on the S-4 that was made effective on June 30, 2022." *Id.*

In the district court's view, "Getty's arguments to the contrary distort[ed] the text of the Warrant Agreement, federal securities law, and Getty's own contemporaneous representations." SA14.

The district court then addressed, and rejected, Getty's principal argument against the satisfaction of the condition—that only the "offer" of the warrant shares could be registered on the S-4, and that the subsequent "issuance and sale" of those shares upon exercise had to be registered on a later S-1. SA15-16. "For starters," the district court explained, "the Warrant Agreement—the source of the obligation at issue—made no such distinction." The agreement, the district court observed, "required only that 'a registration statement under the Securities Act *with respect to* the Ordinary Shares underlying the Public Warrants is then effective.'" SA16 (court's emphasis). So, the district court determined, even assuming that the S-4 could register only the "offer" of the warrant shares, "the S-4 would still be a registration

statement 'with respect to' those shares" and satisfy the contractual condition. *Id.*

At any rate, the district court concluded, Getty's claim that one registration statement was required for the "offer" of the warrant shares and another for their "sale" was an "invented-for-litigation distinction" that had "no credible basis, factual or legal." SA16-17. The court noted that, in the S-1, Getty "specifically list[ed]" the warrant shares as "having been 'previously registered' on the S-4 that was made effective on June 30, 2022." SA16. And, the court emphasized, the S-1 made "no distinction between a registration for an offer of [the warrant] shares and a registration for their 'issuance and sale.'" *Id.* The "kicker," the court found, was "the S-1's express provision that '[i]f securities previously registered under the Prior Registration Statement *are offered and sold* before the effective date of this registration statement, the amount of *previously registered securities so sold* will not be included in the prospectus hereunder.'" SA17 (court's emphasis). The S-1 thus "informed shareholders and the SEC alike" that "the S-4 was effective not only for the 'offer' of the shares underlying the warrants, but also for their 'issuance and sale.'" *Id.*

-14-

Getty's position, the district court held, also had "no support in the federal securities laws." SA18. As the court explained, a registration statement allows the registrant to make the "offers *and sales*" described in the statement. *Id.* (court's emphasis) (quoting *SEC* v. *Cavanagh*, 155 F.3d 129, 133 (2d Cir. 1998)). As the court also explained, SEC regulations "allow for a 'delayed or continuous offering and sale of securities' under a single registration statement,"—"exactly what the S-4 did here." *Id.* And, the court held, the fact that the Securities Act at times separately referred to "offers to sell" a security and a "sale" of a security "does not mean that a single registration statement cannot cover both." *Id.*

The district court next held that the condition of a current prospectus was also satisfied, as a matter of law, as of August 22, 2022. SA20-22. The prospectus in the S-4 declared effective on June 30, 2022 provided "voluminous" information concerning Getty's business and financial condition, the court held. SA21. The court found that "the record does not support Getty's contention" that the S-4 prospectus was no longer "current" after the de-SPAC merger closed on July 22, 2022 and that warrant exercise was not permissible until the S-1, with its updated

prospectus, became effective on September 15, 2022. SA20. "Getty," the court found, "does not even attempt to explain, or mobilize evidence in the record that shows" how any of the disclosures in the S-1 "were material" to warrant holders in light of the extensive information contained in the S-4 prospectus. SA21.

The district court then addressed the issue of damages for Getty's breach. As the court recognized, under New York law, the "'measure of damages' for failing to deliver a stock in accordance with an option or warrant agreement 'is the difference between the option price and the market value of the stock.'" SA22. By that measure, the court found, CRCM was entitled to approximately $51 million in damages, based on the public trading price of Getty's stock on the date of the breach. SA22-25; SA35-36.

The court rejected Getty's argument that the market trading price of its stock should not be used to calculate damages because it was "inflated" on August 22, 2022 and did not reflect the stock's "value." SA23. That argument, the court explained, "conflate[d] the abstract notion of a share's intrinsic value with what is actually used to calculate damages—the market value of the stock." *Id.* (internal quotations and

emphasis omitted). And even if, as Getty argued, the market price may sometimes be disregarded when it was affected by "fraud or improprieties" or when "relevant facts" were unknown to the marketplace, the court found that Getty had made no such showing. SA23-24. Getty's contention that its disclosure of the "small float" of its stock led to a run-up in the stock price by short-sellers searching for shares to fulfill their short-contract obligations "merely shows an informed market at work," the court held. SA24. At any rate, the court found, Getty had not introduced evidence that its stock was in a "short squeeze" on August 22, 2022. Getty's expert, the court noted, "candidly acknowledge[d] that he was referring merely to 'rumors' and 'speculation over a possible short squeeze,' not his own analysis that one was occurring." SA24. "Rumors and speculation," the court noted, "are not the stuff of which genuine disputes are made." *Id.*

The district court granted summary judgment to Getty on CRCM's implied covenant claim (Count II) on the ground that it was based on the same alleged breach as CRCM's primary breach of contract claim. SA30. The district court also granted summary judgment to Getty on CRCM's remaining claims without addressing their merits, on the ground that

they had been "pled only in the alternative" and thus did "not apply" in

light of the grant of summary judgment to CRCM on its first claim. SA31-

32.

## STANDARD OF REVIEW

This Court reviews "the district court's grant of summary judgment *de novo*" and will affirm where "there is no genuine issue as to any material fact," such that "judgment was warranted as a matter of law." *Red Tree Investments, LLC* v. *Petróleos de Venezuela, S.A.*, 82 F.4th 161, 170 (2d Cir. 2023) (cleaned up). The Court "may affirm on any ground the record supports, and [is] not limited to the reasons expressed by the district court." *Munoz-Gonzalez* v. *D.L.C. Limousine Serv., Inc.*, 904 F.3d 208, 212 (2d Cir. 2018).

## SUMMARY OF ARGUMENT

The district court properly granted summary judgment to CRCM on its claim for breach of the Warrant Agreement (Count I), and the court's judgment should be affirmed.

I.   The district court correctly held as a matter of law that Getty breached the Warrant Agreement.

The Warrant Agreement gave CRCM a contractual right to exercise its warrants on August 22, 2022 so long as two conditions were satisfied: (1) the existence of an "effective" "registration statement under the Securities Act" "with respect to" the shares underlying the warrants, and (2) a "current" prospectus relating to those shares. JA25-26 (§§ 3.2, 3.3.2). The district court correctly held that both conditions were met as of August 22 and that Getty therefore breached the Warrant Agreement by refusing to permit CRCM to exercise its warrants on that date. The district court correctly held as a matter of law that both conditions were satisfied.

Applying the plain language of the Warrant Agreement to the undisputed facts, Getty's Form S-4 satisfied the registration condition. SA11-19. The S-4 itself provided that it was a "registration statement

-20-

under the Securities Act." JA2740 (¶ 31); JA229. It was declared "effective" by the SEC as of June 30, 2022. JA2744 (¶ 40). And the cover page of the S-4 expressly stated that the "securities to be registered" included the 39,260,000 shares of Getty stock "underlying the warrants." JA229. Getty itself stated in its later filed Form S-1 that the warrant shares had been "previously registered" on the Form S-4. JA2475-76; JA991-92.

Getty nevertheless contends that the registration condition was not satisfied because the S-4 registered only the "offer" of the warrant shares, not their subsequent "sale" upon exercise of the warrants. Br. 32-33. That argument ignores the words of the Warrant Agreement, which, as the district court correctly observed, "made no such distinction" between "offers" and "sales," and required only an effective registration statement "*with respect to*" the shares underlying the warrants. SA16.

In any event, nothing in the securities laws, or their interpretation by courts or by the SEC, required separate registration statements for the offer and sale of the warrant shares. And the S-4 nowhere stated that it was only registering the "offer," but not the "sale," of the warrant shares. To the contrary, it explicitly stated that it was registering the

shares "*issuable upon exercise*" of the Warrants—*i.e.*, their "sale." JA229-30 (emphasis added). And Getty expressly acknowledged in its later-filed S-1 that the warrant shares could be both "offered and sold" based on the S-4. JA2476; JA992.

The prospectus covering the warrant shares, filed in the S-4, was still "current" as of August 22, 2022 and therefore satisfied the prospectus condition. SA20-22. The S-4 prospectus contained over 800 pages of detailed information concerning Getty's business and financial condition. *See* SA21. A prospectus must be updated only as "necessary to keep the prospectus from being misleading in any material respect." *SEC* v. *Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1095-96 (2d Cir. 1972), *abrogated on other grounds by Liu* v. *SEC*, 591 U.S. 71 (2020) (internal quotation marks omitted). As the district court correctly held, "Getty [did] not even attempt to explain, or mobilize evidence in the record that show[ed]," how any developments rendered the S-4 prospectus "materially misleading" as of August 22, 2022. SA20-21.

Even assuming that the S-4 prospectus was no longer "current" as of August 22, 2022, Getty would still be liable for breaching the Warrant Agreement by denying the exercise of CRCM's warrants. The Warrant

Agreement required Getty to use "commercially reasonable efforts" to keep the prospectus "current." JA33 (§ 7.4.1). And it is well-settled that "a party may not avoid performance of a contractual duty by preventing the occurrence of a condition precedent." *Consol. Edison Inc.* v. *Ne. Utils.*, 426 F.3d 524, 528 (2d Cir. 2005). Any failure of the prospectus condition is thus chargeable to Getty. Because the district court held that the S-4 prospectus was "current" as of August 22, 2022, it did not reach the issue whether a failure of the prospectus condition was excused. But this Court may affirm for any reason supported by the record. *Munoz-Gonzalez*, 904 F.3d at 212.

II.     The district court correctly awarded CRCM damages based on the market value of Getty's stock on the NYSE.

As the district court held, under New York law, "'the measure of damages' for failing to deliver a stock in accordance with an option or warrant agreement 'is the difference between the option price and the market value of the stock.'" SA22 (quoting *Boyce* v. *Soundview Tech. Grp.*, 464 F.3d 376, 385 (2d Cir. 2006)). And under *Boyce*, the market value of a Getty share on August 22, 2022 equaled "'the mean between the highest and lowest quoted selling prices'" on the NYSE. SA23

(quoting *Boyce*, 464 F.3d at 385). Applying these principles, the district court correctly awarded CRCM approximately $51 million in damages. SA22-25; SA35-36.

Getty does not dispute the district court's calculations. Getty instead argues that its market price on the NYSE was "inflated" by a potential "short squeeze." Br. 48, 54-60. But whether Getty's stock price was "inflated" is legally irrelevant. Damages are meant to put the "plaintiff in the same economic position he would have occupied had the breaching party performed the contract." *Boyce*, 464 F.3d at 384. And it is undisputed that Getty's shares were trading at $28.98 when CRCM was wrongfully deprived of them.

In any event, Getty's argument rests entirely on the unfounded speculation of its expert, Dan Fischel. In suggesting the possibility of a "short squeeze" in Getty stock, Fischel relied on a random assortment of Reddit and Twitter posts. But Fischel acknowledged that the only reliable way to measure the impact of a rumored "short squeeze" is to conduct a regression analysis or event study, neither of which he did. *See* JA2954-55.

Moreover, Fischel's entire analysis rests on the further unsupported assumption that, had the market known that warrants could be exercised on August 22, the supposed inflation would have dissipated and Getty's market price would have fallen below the warrants' $11.50 per share exercise price. But Fischel ignored that the market *did* know that warrants could be exercised—the Warrant Agreement itself was public, and market analysts publicly reported on August 17 that warrants would become exercisable on August 22. In other words, Getty's market price on August 22 already reflected the information that Fischel and Getty claim would have caused the price to plummet.

To the extent Getty argues that there would have been some further disclosure of warrant exercises on August 22, it cites no authority for that proposition. And even assuming that Getty's stock price was "inflated" as of August 22, Fischel offered no economic model or methodology to demonstrate how the mere exercisability of the warrants on August 22 would have caused Getty's stock price to fall more than 60%—from $29 to below $11.50—in a single day.

Accordingly, the district court correctly held that Fischel's speculative opinion did not create any genuine factual dispute precluding summary judgment. SA24.

ARGUMENT

## I. THE DISTRICT COURT CORRECTLY HELD AS A MATTER OF LAW THAT GETTY BREACHED THE WARRANT AGREEMENT

CRCM had a contractual right to exercise its warrants on August 22, 2022 so long as: (1) a registration statement "with respect to" the shares underlying the warrants was effective as of that date, and (2) the prospectus relating to the warrant shares was "current." JA25-26 (§§ 3.2, 3.3.2). In a breach of contract action, where "the court determines that the language of the contract is clear and unambiguous, the contract is to be given effect according to its terms, and those terms may be the basis for summary judgment." *Am. Home Assurance Co.* v. *Hapag Lloyd Container Linie, GmbH*, 446 F.3d 313, 316 (2d Cir. 2006) (internal quotation marks omitted). The district court correctly held as a matter of law that both conditions to exercise had been met as of August 22 under the plain terms of the Warrant Agreement.

### A. The condition of an effective registration statement with respect to the warrant shares was satisfied as of August 22, 2022

#### 1. The Form S-4 was a registration statement "with respect to" the warrant shares

The first condition to CRCM's right to exercise its warrants on August 22, 2022 was the existence of an "effective" "registration

statement under the Securities Act" "with respect to" the shares underlying the warrants. JA26 (§ 3.3.2). Getty's Form S-4 plainly satisfied this condition: it was "a registration statement under the Securities Act," JA229, that was "effective" as of June 30, 2022, JA2744 (¶ 40), "with respect to" the shares underlying the warrants, JA229-30.

The Court need look no further than the S-4's cover page for confirmation. At the top of the page, the S-4 stated: "Registration Statement under the Securities Act of 1933." Then, at the bottom of the page, the S-4 features a table setting forth the "Class" and "Amount" of "Securities to be Registered." JA229. The "securities to be registered" include the 39,260,000 shares of Getty Class A Common stock underlying the warrants, identified as "New CCNB Class A common stock underlying warrants." *Id.* The table further disclosed that Getty paid a registration fee of $41,853.12 to the SEC to register those warrant shares on the S-4. *Id.*

| CALCULATION OF REGISTRATION FEE | | | | |
|---|---|---|---|---|
| Title of Each Class of Securities to be Registered[1] | Amount to be Registered[7] | Proposed Maximum Offering Price Per Security | Proposed Maximum Aggregate Offering Price | Amount of Registration Fee |
| New CCNB Class A Common Stock, par value $0.0001 per share[2] | 150,475,093 | $9.885 | $1,487,446,294.31 | $137,886.27 |
| New CCNB Series B-1 Common Stock, par value $0.0001 per share[3] | 2,570,000 | — | — | — |
| New CCNB Series B-2 Common Stock, par value $0.0001 per share[4] | 2,570,000 | — | — | — |
| New CCNB Warrants to purchase common stock[5] | 39,260,000 | — | — | — |
| New CCNB Class A Common stock underlying warrants[6] | 39,260,000 | 11.50 | 451,490,000 | 41,853.12 |
| Total | | | $1,938,936,294.31 | $ 179,740 |

The footnotes to the table call out that the shares being registered include "39,260,000 shares of New CCNB Class A Common Stock *issuable upon exercise* by holders of New CCNB Warrants following the completion of the Business Combination." JA230 (emphasis added). This language tracks the Warrant Agreement word-for-word. Under § 7.4.1, Getty was required to promptly file "a registration statement for the registration, under the Securities Act, of the Ordinary Shares *issuable upon exercise* of the Warrants." JA33 (§ 7.4.1) (emphasis added). The S-4 is that registration statement, as it discloses in plain English.

That the S-4 registered the warrant shares is confirmed by the opinion letter provided by the SPAC's counsel, Kirkland & Ellis. Item 601(b)(5) of Regulation S-K requires that a Form S-4 registration statement include an "opinion of counsel as to the legality of the securities being registered." 17 C.F.R. § 229.601(b)(5). Kirkland & Ellis confirmed that its opinion was "being rendered in connection with the registration under the above-referenced Registration Statement [the Form S-4] of . . . 39,260,000 Warrant Shares." JA2361; JA2742 (¶ 36).

Getty itself later affirmed that the S-4 had registered the warrant shares. In its subsequently filed S-1, to which Getty transferred the

registration of the warrant shares under SEC Rule 429, Getty explained that "[n]o registration fee [was] payable in connection with" the transfer of the "[c]ommon [s]tock underlying [the] Warrants" because those shares had been "*previously registered on a registration statement on Form S-4.*" JA2475-76 (emphasis added); *see also id.* ("39,260,000 shares of Class A Common stock [the warrant shares] *registered under the Prior Registration Statement* [defined as the Getty S-4] are included [in] this registration statement."); JA991-92.

Getty's registration of the warrant shares on the Form S-4 was no coincidence: As Getty acknowledges, because the warrants were exercisable within one year of the Form S-4's filing, the warrants *and* warrant shares were required to be registered on the Form S-4. *See* Br. 32. Where, as here, warrants "are . . . exercisable within one year," "an offering of *both* the overlying security"—the warrants—"and [the] underlying security"—the warrant shares—"is deemed to be taking place"—and so *both* must be registered at the same time. SEC, Div. of Corp. Fin., Securities Act Sections, C&DI 139.01 (JA2809) (emphasis

added). The SEC staff has required warrant shares to be registered in precisely these circumstances.[1]

### 2. Satisfaction of the registration condition did not require separate registration statements for the "offer" and "sale" of the warrant shares

Faced with this undisputed evidence and authority, Getty does not dispute that the S-4 registered the warrant shares. Getty nonetheless contends that the S-4 did not satisfy the registration condition of § 3.3.2 because the S-4 supposedly was a registration statement only for the "offer" of the shares underlying the warrants, not for the "sale" of those shares. Br. 29-33. Getty's argument fails on multiple grounds, beginning with the plain language of § 3.3.2.

Contrary to Getty's argument, as the district court held, § 3.3.2 "made no such distinction" between the registration of the "offer" and the "sale" of the warrant shares. SA16. Rather, the Warrant Agreement requires only an effective registration statement "*with respect to* the

---

[1] *See, e.g.*, JA2631 ("We note that you have now included the warrants in the registration statement in response to our prior comment 3. However, because the warrants are exercisable within one year it appears the shares underlying the warrants must be registered at this time as well. Please revise the registration statement to include these shares. See Securities Act Sections C&DI Question 139.01."); *accord* JA2660, 2665, 2668.

Ordinary Shares underlying the Public Warrants." JA26 (§ 3.3.2) (emphasis added). By its own terms, the S-4 was such a registration statement. Thus, as the district court correctly held, assuming "*arguendo* that the S-4 registered only the 'offer' of the warrant shares, the S-4 would still be a registration statement 'with respect to' those shares." SA16.

Getty suggests that this reading must be wrong because it would require Getty to issue the warrant shares "without an effective registration statement for [their] sale" and thus to act illegally. Br. 34. Getty's reading of the securities laws is wrong, but even were it correct, that would not absolve Getty of liability. As Getty's own authority makes clear, the rule against the enforceability of illegal contracts generally applies to a contract that is "*malum in se*, or evil in itself." *Lloyd Cap. Corp.* v. *Pat Henchar, Inc.*, 603 N.E.2d 246, 248 (N.Y. 1992) (*cited in* Br. 34). "[C]ontracts which violate statutory provisions are merely *malum prohibitum*" and are generally still enforceable. *Id.* at 247. Under Getty's misguided theory, the Warrant Agreement would only violate a statutory prohibition and would remain enforceable. Moreover, Getty invokes this rule in an attempt to escape contractual liability, not to serve the

interests of the securities laws' intended beneficiaries—investors. It is well established that a breaching party may not "raise illegality as a sword for personal gain rather than a shield for the public good." *Id.* at 248 (internal quotations omitted). That would "result in an undeserved windfall to defendants." *Id.*

In any event, even if—contrary to the plain language of the Warrant Agreement—an effective registration statement for the *sale* of the warrant shares was a condition to Getty's obligation to settle the warrants, the S-4 satisfied that condition. The S-4 nowhere indicated that it was registering only the "offer" but not the "sale" of the warrant shares. *See* JA229. As a court in this Circuit recently put it in a nearly identical case, "for what purpose" could "the shares underlying the warrants . . . be registered except to issue when warrants are exercised." *Tang Cap. Partners, LP* v. *BRC Inc.*, 661 F. Supp. 3d 48, 69 (S.D.N.Y. 2023).

Indeed, the S-4 explicitly stated that it was registering the shares "*issuable upon exercise*" of the Warrants. JA229-30 (emphasis added). And the "kicker," as the district court called it, SA17, is that the S-1 Getty filed in August 2022 itself acknowledged that the earlier-filed S-4

registered both the offer and sale of the warrant shares: "If securities previously registered under the Prior Registration Statement [the S-4] *are offered and sold* before the effective date of this registration statement, the amount of previously registered securities so sold will not be included in the prospectus hereunder." JA2476 (emphasis added); JA992.

Nor does Getty's unsupported contention that it was legally required to file a separate registration statement for the "offer" and the "sale" of the warrant shares, Br. 29, find any support in the securities laws—or their interpretation by the courts or the SEC. To the contrary, § 5 of the Securities Act does not require separate registration statements for the "offer" and "sale" of a security. Rather, it prohibits an "offer to sell" any security "unless a registration statement has been filed as to such security" and prohibits the "sale or delivery" of any security "[u]nless a registration statement is in effect as to a security." 15 U.S.C. § 77e. Thus, a party can freely *offer* a security once a registration statement registering that security has been filed, and the party can complete sales of that security when that registration statement has become effective. *See* JA2783-88 (Joel Seligman, et al., *Fundamentals of Secs. Regul.*, The

Statutory Pattern, § 2.B.1 (7th ed. 2023)) ("*After the effective date*, sales may be freely made."). As the district court correctly noted, nothing in the text of § 5 precludes the same registration statement from applying to both an offer to sell a security and the sale of a security. *See* SA18; JA2790-97 (Thomas Lee Hazen, *Treatise on the L. of Secs. Regul.*, Section 5—Overview of the Basic Prohibitions of the Pre-Filing, Waiting, and Post-Effective Periods, § 2:16 (2023)) (discussing the § 5 registration process, which contemplates one registration statement for a single securities offering).

Neither of the two cases Getty cites supports its argument that "the sale of a security generally need not be registered with its offer." Br. 29 (citing *SEC* v. *Universal Express, Inc.*, 475 F. Supp. 2d 412 (S.D.N.Y. 2007) and *SEC* v. *Cavanagh*, 155 F.3d 129 (2d Cir. 1998)). In *Universal Express*, the shares at issue were *never* registered—the case did not involve separate registration statements for the offer and sale of the subject securities. 475 F. Supp. 2d at 424. And *Cavanagh* involved two separate offerings: an offer and sale of stock to management and company consultants as part of an employee benefit plan, registered on Form S-8, and a subsequent offer and re-sale of that stock to third parties

without the filing of another registration statement. The court did not find unlawful the offers and sales pursuant to the single Form S-8. Rather, the court held only that the *unregistered re-sales* were unlawful. 155 F.3d at 133. That uncontroversial holding does nothing to establish that separate registration statements are required for the single offering—the offer and sale of Getty warrant shares—at issue here. As the *Cavanagh* court noted, "[a] registration statement permits an issuer, or other persons, to make . . . the offers and sales described in the registration statement." *Id.* (*cited in* SA18).

Getty's reliance on CD&I 139.01 is similarly misplaced. Getty does not dispute that the SEC guidance requires registration of the "offering" of warrant shares at the same time as registration of the "offering" of the warrants. Br. 30. Getty argues, however, that "offering" means only "offer," and that CD&I 139.01 thus required it to register only the "offer" of the warrant shares in the S-4, "not their sale." Br. 30-31. But the term "offering" "refer[s] to 'an offer *and sale of securities.*'" SA18 n.8 (quoting SEC, Glossary, *Registered Offering*) (emphasis added). And "one would imagine that if a separate registration were required in order for warrants such as those at issue here to actually be exercised that the

SEC would have explained so in [C&DI 139.01]." *Tang*, 661 F. Supp. 3d at 68.

Consistent with its guidance, the SEC has expressly rejected the position Getty advances here—that the inclusion of SPAC warrants and warrant shares on a single Form S-4 is insufficient to register the warrant shares for the purpose of exercising the warrants. In connection with a de-SPAC involving Peridot Acquisition Corp., Li-Cycle, Corp., and Li-Cycle Holdings, Corp. (referred to as "Amalco"), the SPAC included warrants and their underlying shares on a Form F-4 (the S-4 equivalent for foreign issuers). *See* JA2633. The SPAC tried to warn investors through a risk factor that sales of its warrant shares were not being registered on the F-4 and thus the warrants could not be exercised until a second registration statement had been filed:

> Peridot has not registered the Class A Shares issuable upon exercise of the warrants under the Securities Act or any state securities laws at this time, and such registration may not be in place when an investor desires to exercise warrants, thus precluding such investor from being able to exercise its warrants except on a cashless basis and potentially causing such warrants to expire worthless.

JA2643 (emphasis omitted).

During the comment process, the SEC staff directed the SPAC to "revise this risk factor to address that you *are* registering the Amalco Shares issuable upon exercise of Amalco Warrants in this F-4." JA2647 (emphasis added). The SEC staff thus expressly *rejected* the SPAC's position that the F-4 did not register the shares issuable upon exercise of the warrants. In response, the SPAC removed the risk factor from the F-4. JA2654. And when Li-Cycle filed a post-business combination F-1 on September 29, 2021, it expressly stated that the SPAC warrants had become exercisable three weeks earlier, on September 9, confirming that the F-4, not the F-1, satisfied the registration statement condition for exercise of the warrants. JA2827.

### 3. The warrant shares were properly registered on the Form S-4

Getty also suggests that the S-4 was the wrong form on which to register the offer and sale of the warrant shares because there was a delay between the offer of the warrant shares at the time of the business combination and the sale of the warrant shares when they became exercisable a month later, post-close. Br. 32-33. But as the district court noted, a registration statement on Form S-4 may "relate[] to offerings of securities pursuant to Rule 415(a)(1)(viii)." SA18 (quoting SEC Form S-4,

Instr. H). Rule 415(a) in turn expressly provides that "[s]ecurities may be registered for an offering to be made on a continuous or delayed basis in the future," including "[s]ecurities which are to be issued in connection with business combination transactions," such as the de-SPAC merger here. 17 C.F.R. §§ 230.415(a) & (a)(1)(viii). Consistent with Rule 415, the S-4 here registered the delayed and continuous offering of the warrant shares, to be issued upon the exercise of the warrants.

Regardless, under SEC rules, once the SEC declared the S-4 effective, the warrant shares were deemed to be properly registered. Under Rule 401(g)(1), "a registration statement or any amendment thereto is deemed filed on the proper registration form unless the Commission objects to the registration form before the effective date." 17 C.F.R. § 230.401(g)(1). It is thus the *SEC* that determines whether an issuer has registered shares on the proper registration form in accordance with the form's instructions. And the SEC makes that determination *before* declaring a registration statement effective. Once the SEC has approved the registration of securities on a particular form, as it did here on June 30, 2022, those securities are "*deemed filed on the proper registration form.*" *Id.* (emphasis added).

### 4. The Form S-1 did not make the Form S-4 "ineffective"

Getty contends that even if the S-4 initially registered both the offer and sale of the warrant shares, the subsequent filing of the S-1 made the S-4 ineffective for the sale of those shares. Br. 35-36. This is so, Getty argues, because the registration of the warrant shares was transferred from the S-4 to the S-1 under Rule 429 and, as a result, the filing of the S-1 acted as a post-effective amendment to the S-4, requiring sales of the warrant shares to be halted. *Id.* This argument fails on multiple grounds.

First, the argument is forfeited because Getty never raised it to the district court. *See Allianz Ins. Co.* v. *Lerner*, 416 F.3d 109, 114 (2d Cir. 2005). In any event, the argument is meritless. Under Rule 429, where a registrant has registered securities on two or more registration statements, it can file a single prospectus to satisfy the requirements of the Securities Act with respect to all of the registered securities. 17 C.F.R. § 230.429(a). In that circumstance, "the registration statement containing the combined prospectus shall act, *upon effectiveness*, as a post-effective amendment to any earlier registration statement whose prospectus has been combined in the latest registration statement." *Id.* § 230.429(b) (emphasis added).

Here, Getty's S-1 invoked Rule 429 to transfer the registration of the warrant shares from the S-4 to the S-1. JA992. Under Rule 429, the transfer of the registration of the warrant shares resulted in a post-effective amendment only "upon effectiveness" of the S-1—that is, on September 15, 2022, *not* when the S-1 was first filed on August 9, 2022. 17 C.F.R. § 230.429(b); *see also* JA2749, 2761 (¶¶ 55, 91). The filing of the S-1 therefore did not constitute a post-effective amendment and required no halting of sales of the warrant shares.

This is confirmed by the S-1 itself. As noted above, the S-1 expressly contemplated that there might be offers and sales of the warrant shares subsequent to the S-1's filing but before the S-1 became effective. *Supra* pp. 9-10; JA2476; JA992.

**B.    The condition of a current prospectus covering the warrant shares was satisfied as of August 22, 2022, or Getty's breach caused the failure of, and therefore excuses satisfaction of, the condition**

The second and final condition to CRCM's right to exercise its warrants on August 22, 2022 was that a "prospectus" covering those shares be "current" as of that date. JA26 (§ 3.3.2). The district court correctly held that the prospectus included with the S-4 and filed in final form on July 1 remained current as of August 22. SA20-22. Even if this

Court disagrees, the judgment should still be affirmed because any failure of the prospectus to be current was the result of a breach of Getty's obligations under the Warrant Agreement and is therefore excused.[2]

### 1. The S-4 prospectus was current as of August 22, 2022

As part of a public offering, a company is required to file a prospectus with the SEC to inform potential investors about its business and the securities being offered for sale. *See SEC* v. *Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1098 (2d Cir. 1972). To that end, the prospectus must contain, with certain exceptions, all of "the information contained in the registration statement." *Id.* Getty does not contend that any of this information was missing from the prospectus Getty filed with the S-4.

After a registration statement and accompanying prospectus have gone effective, issuers have a duty to update "the prospectus to reflect any post-effective changes necessary to keep the prospectus from being misleading in any material respect." *Id.* at 1096. Getty agrees that this standard governs the "current" prospectus condition of the Warrant

---

[2] The district court did not need to reach this issue in light of its holding that the prospectus remained current as of August 22, 2022.

Agreement—that is, that the prospectus at issue here remained "current" so long as post-effective developments did not render it materially misleading at the time CRCM sought to exercise its warrants on August 22, 2022. Br. 37 (citing *Manor*, 458 F.2d at 1095).

To survive summary judgment, Getty therefore had to show "a *substantial* likelihood" that new developments in the seven weeks between July 1 (when the final prospectus was filed) and August 22 "*significantly* altered the total mix of information" already contained in the S-4. *Matrixx Initiatives, Inc.* v. *Siracusano*, 563 U.S. 27, 38 (2011) (internal quotation marks omitted and emphases added). Put differently, Getty was required to show that any new developments were "important enough" to "have assumed actual significance in the deliberations" of a reasonable investor deciding whether to exchange his or her warrants for shares of Getty stock. *Folger Adam Co.* v. *PMI Indus., Inc.*, 938 F.2d 1529, 1533 (2d Cir. 1991) (internal quotation marks omitted) (*cited in* Br. 38).

Getty made no such showing in the district court. To the contrary, Getty argued only that the purportedly new information it pointed to was "*potentially* material," No. 23-cv-01074, Dkt. 29 at 16 (emphasis added); No. 23-cv-01074, Dkt. 37 at 16. And Getty never explained why omitting

any of this information from the prospectus rendered it "materially false or misleading" to investors, as *Manor* requires. 458 F.2d at 1098. In the words of the district court, "Getty [did] not even attempt to explain, or mobilize evidence in the record that show[ed], how the post-effective disclosures were material." SA21. Because "[t]he record in the present case did not disclose any genuine issue to be tried as to whether" the prospectus "omitted any information that was material," summary judgment was warranted. *Glazer* v. *Formica Corp.*, 964 F.2d 149, 155 (2d Cir. 1992).

Getty does nothing different on appeal. Getty again contends that the 800-page prospectus was not current because it did not include various bits of information concerning the closing of the business combination and other developments. Br. 41-42. But Getty never explains why the prospectus was materially misleading in the absence of this information.

**Pro forma financial information.** Getty emphasizes that its later filed S-1 included pro forma financials with an additional quarter of financial information not included in the S-4. Br. 42. Getty does not explain why any warrant holder would have considered one additional

quarter of financial information—which Getty had already disclosed in an August 12, 2022 Form 10-Q—material to its exercise decision. *See* JA2478-84. Nor does Getty explain how or why the failure to update the prospectus's already voluminous pro forma financials to reflect an additional quarter of publicly available data was materially misleading.

**Redemptions and post-closing capital structure.** Getty also suggests that the prospectus was not current because it did not disclose certain unspecified changes to Getty's post-closing capital structure and the actual number of CCNB shares redeemed in the de-SPAC merger. *See* Br. 42-43. But the prospectus already included detailed pro forma information under various redemption scenarios, giving investors a detailed picture of the potential financial impact of redemptions in a range of circumstances. JA2397-98; JA2856 (¶ 68). Getty never explains how actual redemptions would have "materially altered the picture presented in the [S-4]," given that the S-4 already disclosed the impact of redemptions.

Getty instead contends that the actual number of redemptions must have been material because Getty previously disclosed that information on a Form 8-K, an SEC form used to disclose material information to

investors. Br. 42-43. Getty's argument is misplaced. The question is not whether the information was material in the abstract, but whether it needed to be included in the *prospectus* to keep the prospectus from being "materially false or misleading," taking account of all of the information regarding redemptions the prospectus already disclosed. *Manor*, F.2d at 1098. On that question, Getty is silent.

**Tax consequences.** Getty contends that the S-4 prospectus was not current because, unlike the S-1, it did not disclose the "tax consequences" of "buying, owning, or selling" the warrants or Getty Images shares. Br. 42. The S-1 disclosed that warrant holders would "not recognize taxable gain or loss on the acquisition of [Getty] Class A Common Stock upon exercise of a Warrant for cash." JA2006. But this wasn't new information. CCNB disclosed the exact same information more than two years earlier in its own Form S-1. JA2857 (¶ 69). And it wasn't material, either. Getty itself told investors that they should *not* rely on this tax disclosure. *Id.*

*     *     *     *     *

Getty's efforts to avoid liability by invoking the "current" prospectus condition are a made-for-litigation fiction. It is undisputed that Getty never invoked the prospectus condition contemporaneously as

a basis for refusing to permit warrant exercises on August 22. And there is no evidence in the record suggesting that anyone at Getty believed at the time that the prospectus was stale, or even considered the issue. The securities laws are designed to ensure that investors can act in their interest on the basis of adequate information—not, as Getty urges here, as a tool of delay to deprive security holders their contractual rights.

### 2. Any failure of the prospectus condition was caused by Getty's breach and is therefore excused

Even assuming that the S-4 prospectus was no longer "current" as of August 22, 2022, Getty would still be liable for breaching the Warrant Agreement by denying the exercise of CRCM's warrants. Section 7.4.1 of the Warrant Agreement obligated Getty to use "commercially reasonable efforts" to "maintain" as "current" a prospectus with respect to the warrant shares until all warrants were exercised, redeemed, or expired. JA33 (§ 7.4.1). Thus, a failure of the current prospectus condition would be excused because it was caused by Getty's own failure to satisfy its obligations under § 7.4.1.

Because the district court held that the S-4 prospectus was "current" as of August 22, 2022, it did not reach the issue whether a failure of the prospectus condition was excused. But this Court may

affirm for any reason supported by the record. *Munoz-Gonzalez* v. *D.L.C. Limousine Service, Inc.*, 904 F.3d 208, 212 (2d Cir. 2018).

Under the well-established prevention doctrine, "a party may not avoid performance of a contractual duty by preventing the occurrence of a condition precedent." *Consol. Edison, Inc.*, 426 F.3d at 528. "The prevention doctrine excuses the non-occurrence of a condition precedent if the party seeking to invoke that condition 'was instrumental in preventing or frustrating its occurrence.'" *St. Christopher's, Inc.* v. *JMF Acquisitions, LLC*, 2021 WL 6122674, at *4 (2d Cir. 2021) (summary order) (quoting *Merzon* v. *Lefkowitz*, 289 A.D.2d 142, 143 (1st Dep't 2001)).

Getty does not dispute that, if its breach caused the failure of the current prospectus condition, the condition is excused. Instead, Getty contends that the only way it could have updated the S-4 prospectus was by filing "a post-effective amendment" in the S-1 and that amendment could be effective no earlier than September 15, 2022, when the S-1 was declared effective. Br. 36-37. So, Getty argues, any failure of the prospectus condition on August 22, 2022 was not due to its breach of § 7.4.1. *Id.* at 44-47.

But "a duty to update information in a registration statement does not itself create a duty to amend the registration statement." *In re All. Pharm. Corp. Sec. Litig.,* 279 F. Supp. 2d 171, 184 (S.D.N.Y. 2003). Getty could have easily updated the S-4 prospectus by August 22, 2022 by filing one or more "prospectus supplements." Rule 424(b)(3) expressly permits such supplements—historically referred to as "stickers." 17 C.F.R. § 230.424(b)(3); *see also* JA2564 (n.70). And they are commonly used. *See Manor*, 458 F.2d at 1095 n.14 (in general, "[t]he way . . . new facts . . . are brought to the attention of offerees as a matter of mechanics is by putting a sticker on the prospectus or supplementing it otherwise, not by amending the registration statement" (quoting 1 Loss, *Securities Regulation* 293 (2d ed. 1961, Supp. 1969)); JA2568-70 (¶¶ 40-41). Indeed, Getty itself used a sticker to update the prospectus in the S-1 declared effective on September 15, 2022. *See, e.g.*, JA2493-98; *see also* JA2670-713 (example of another de-SPAC issuer updating S-4 prospectus with supplement).

A post-effective amendment to a registration statement, as opposed to a prospectus supplement, is required only when there has been a "fundamental change in the information set forth in the registration

statement." 17 C.F.R. § 229.512(a)(1)(ii). A "fundamental" change is not merely a "material" one. Rather, fundamental changes must be "*major changes* in the issuer's operations, such as significant acquisitions or dispositions" or "any change in the business or operations of the registrant that would necessitate a restatement of the financial statements." *In re Metro. Sec. Litig.*, 2010 WL 537740, at *2 (E.D. Wash. Feb. 8, 2010) (emphasis added) (quoting *Delayed or Continuous Offering and Sale of Securities*, 46 Fed. Reg. 42,001, *42,007-08 (Aug. 18, 1981)). As the SEC has explained, "many variations in matters such as operating results, properties, business, product development, backlog, management and litigation ordinarily would not be fundamental," but merely material, and thus could be reflected in a prospectus supplement rather than a post-effective amendment to the registration statement. Adoption of Integrated Disclosure System, SEC Release No. 33-6383, 47 Fed. Reg. 11380, 11395-96 (Mar. 3, 1982).

Getty experienced nothing even remotely resembling a "major" change in its operations in the period between the effectiveness of the S-4 and August 22, 2022, when CRCM sought to exercise its warrants. As Getty does not dispute, it undertook no major acquisition, no change in

business line, no restatement of any financial statements. And Getty fails to show that any of the updates contained in the S-1 prospectus concerned "fundamental" rather than merely "material" changes. The updates it points to, such as "updates on share redemption during the Business Combination," do not concern matters that are comparable to the SEC's example "fundamental" business changes. *See Delayed or Continuous Offering and Sale of Securities*, 46 Fed. Reg. at *42,007-08.

Getty's contention that it had to file a post-effective amendment, rather than a supplement, was manufactured to defend this litigation. There is zero evidence in the record that Getty identified any change in its business after the S-4 went effective as "fundamental" and so concluded that a post-effective amendment was required. To the contrary, Getty's CEO could not identify any action that Getty even considered taking to maintain the S-4 prospectus as current after the S-4 was declared effective. JA2762 (¶ 98). Whatever the threshold of "commercially reasonable efforts" might be, making no effort at all fails to meet it. *See, e.g.*, *Holland Loader Co., LLC* v. *FLSmidth A/S*, 313 F. Supp. 3d 447, 473 (S.D.N.Y. 2018), *aff'd*, 769 F. App'x 40 (2d Cir. 2019) ("compliance with a 'commercially reasonable efforts' clause requires at

the very least some conscious exertion to accomplish the agreed goal"); *SATCOM Int'l Grp. PLC* v. *ORBCOMM Int'l Partners, L.P.*, 2000 WL 729110, at *17 (S.D.N.Y. June 6, 2000) (breach of "commercially reasonable efforts" clause where defendant "made no effort to obtain the necessary permits").

Accordingly, even assuming that the prospectus condition was not met as of August 22, 2022, satisfaction of that condition was excused under the prevention doctrine because Getty breached its obligation under §7.4.1 to maintain a current prospectus as to the warrant shares.

## II. THE DISTRICT COURT CORRECTLY AWARDED CRCM MARKET VALUE DAMAGES CAUSED BY GETTY'S BREACH

Applying settled principles of New York law, the district court held that, as a matter of law, CRCM was entitled to $51 million in damages based on the trading price of Getty stock on the New York Stock Exchange on the date of the breach. SA22-23; SA35-36. Getty's contention that the district court erred in that determination is contrary to this Court's decisions regarding the proper calculation of damages for a failure to deliver publicly traded stock. And it is based entirely on the speculation of Getty's expert, which cannot create a genuine factual dispute. *See* SA24.

## A. Getty's market price on the New York Stock Exchange was the appropriate measure of damages as a matter of law

Under New York law, the non-breaching party to a contract—here CRCM—"is entitled, as a matter of law, to recover market value damages to the extent that they can be proven with reasonable certainty." *Process Am., Inc.* v. *Cynergy Holdings, LLC*, 839 F.3d 125, 141 (2d Cir. 2016) (internal quotation marks omitted). Once "the non-breaching party has proven the *fact* of damages by a preponderance of the evidence, the burden of uncertainty as to the amount of damage is upon the wrongdoer," and "[d]oubts are generally resolved against the party in breach." *Id.* (internal quotation marks omitted). Accordingly, "a plaintiff need only show a stable foundation for a reasonable estimate of the damages incurred as a result of the breach." *Id.* (internal quotation marks omitted); *see also Boyce*, 464 F.3d at 392.

The district court held that, as a matter of law, CRCM showed a "stable foundation" for a reasonable damages estimate by calculating its damages based on the difference between the warrant exercise price—$11.50—and the market trading price of Getty shares on August 22, 2022, the date on which it would been able to exercise its warrants if

Getty had not breached. SA22-25. That calculation yields damages of approximately $51 million. SA22-23; SA35-36.

Getty does not dispute the accuracy of the calculation. It argues, instead, that the market trading price of Getty shares on August 22, 2022 does not provide the requisite "stable foundation" for a reasonable damages estimate. *See* Br. 63-65. A wall of authority refutes that argument.

To begin, CRCM's showing was consistent with this Court's express instructions for determining damages due to a contractual failure to deliver "publicly traded stock." *Boyce*, 464 F.3d at 385. In such a case, determining the amount of damages is "straightforward." *Id.* To assess the value of the stock that was supposed to be delivered, but was not, the court calculates "'the mean between the highest and lowest quoted selling prices' . . . as provided by the public exchange upon which the stock traded." *Boyce*, 464 F.3d at 385 (quoting *United States* v. *Cartwright*, 411 U.S. 546, 551 (1973)); *see also LG Cap. Funding, LLC* v. *CardioGenics Holdings, Inc.*, 787 F. App'x 2, 4 (2d Cir. 2019) (summary order) (same). Following this Court's precedents, district courts in this Circuit regularly award damages on summary judgment based on the market price of

publicly traded stock. *See, e.g.*, *Blue Citi, LLC* v. *5Barz Int'l Inc.*, 338 F. Supp. 3d 326, 338-39 (S.D.N.Y. 2018), *aff'd*, 802 F. App'x 28 (2d Cir. 2020) (summary judgment based on the "volume weighted average price of a share of Defendant's common stock"); *Hudson Bay Master Fund Ltd.* v. *Patriot Nat'l, Inc.*, 2019 WL 1649983, at *11 (S.D.N.Y. Mar. 28, 2019) (summary judgment based on public market trading prices for shares that should have been provided upon exercise of warrants).

Getty does not cite a single decision holding that the market price of a publicly traded stock did not satisfy the plaintiff's burden to provide "a stable foundation" for a reasonable damages estimate. Getty suggests that this Court's summary order in *Cottam* v. *6D Global Technologies*, 2022 WL 16908708 (2d Cir. Nov. 14, 2022), which Getty never cited to the court below, is such a decision. *See* Br. 54, 65. But *Cottam* did not involve publicly traded stock. At issue in *Cottam* was the value of *restricted* stock that could not be sold by the plaintiff at the time of breach on the public exchange. 2022 WL 16908708, at *2. And the company's stock was on the verge of being delisted, with only 309 shares trading on the date of the breach. *See Cottam* v. *Global Emerging Cap. Grp., LLC*, 2021 WL 1222120, at *3 (S.D.N.Y. Mar. 31, 2021). By contrast, Getty

stock traded freely on the New York Stock Exchange, one of the most efficient and established public securities markets in the world, with an average daily trading volume of more than 1.5 million shares in the summer of 2022.[3] *See* JA2031.

Getty itself represented in its contemporaneous securities filings that the "fair value of our Class A Common Stock is determined based on the quoted market price on the New York Stock Exchange." JA2906; JA2917 (¶ 119). And the Warrant Agreement repeatedly defines "Fair Market Value" for purposes of a cashless exercise or redemption of the warrants by reference to Getty's public market price. *See* JA25 (§ 3.3.1(b)); JA26 (§ 3.3.1(c)); JA33 (§ 7.4.1).

Getty's contention that the market trading price of its stock was too unreliable to provide even "a stable foundation" for a reasonable estimate of CRCM's damages is rich, given the reliance of its own insiders on that price to rack up investment gains of more than a billion dollars. Based on

---

[3] The cases cited in *Cottam* likewise involve restricted stock, *see BrandAid Marketing Corp.* v. *Biss*, 2008 WL 190494 (S.D.N.Y. Jan. 22, 2008), or other unique securities that could not readily be sold on a public exchange, *see Davidowitz* v. *Patridge,* 2010 WL 5186803 (S.D.N.Y. Dec. 7, 2010) (thinly traded penny stock subject to trading restrictions that would have necessitated block sale to private investor).

Getty's market price in August 2022, Getty insiders awarded themselves an "earn-out" of 59 million shares of common stock, with a market value at the time of approximately $1.5 billion. JA2759 (¶ 85). At the same time, the SPAC's sponsor was able to exercise more than 18.5 million "private" warrants on a "cashless" basis, again using Getty's market price in August 2022 as a measure of fair value. JA2760 (¶¶ 86-87); *see* JA26 (§ 3.3.1(c)).

In these circumstances, the district court was thus correct to find that, as a matter of law, CRCM had shown to a reasonable certainty that it had sustained damages of $51 million. *See AEP Energy Servs. Gas Holding Co.* v. *Bank of Am., N.A.*, 626 F.3d 699, 750 (2d Cir. 2010) (affirming summary judgment where the "fair market value" of the property at issue was ascertainable based on its public trading price and cross-defendant "d[id] not dispute [the damages] calculation"); *see also Process Am.*, 839 F.3d at 141.

## B.   Getty does not identify any disputed issues of material fact that would preclude summary judgment

The district court was also correct to find that Getty had failed to introduce evidence to carry its burden of showing "uncertainty" as to the

reasonable estimate of damages established by CRCM. SA22-25; *Process Am.*, 839 F.3d at 141. Getty fails to show otherwise.

Getty argues that the district court erred in taking into account, on a summary judgment motion, that "the burden of uncertainty as to the amount of damage is upon the wrongdoer." *See* SA24 (quoting *Process Am.*, 839 F.3d at 141); *see also* Br. 67-68. But a district court may take into account which party will bear the burden of proof on an issue at trial in evaluating a summary judgment motion. *See Bustamante* v. *KIND, LLC*, 100 F.4th 419, 432 (2d Cir. 2024) ("The party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists, but when the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to an absence of evidence on an essential element of the nonmovant's claim." (internal quotation marks omitted)). The ultimate question is whether the movant is entitled to "judgment as a matter of law." Fed. R. Civ. P. 56(a). Once CRCM made a showing sufficient to establish the fact of damages and a reasonable estimate of their amount, it was up to Getty to point to evidence sufficient to support a finding that CRCM's damages

estimate was not reasonably certain. But as the district court found, Getty pointed only to "speculation." SA24.

Getty's argument that CRCM failed to provide a stable foundation for its damages estimate goes as follows: In July 2022, after the de-SPAC merger closed, most Getty stockholders chose to redeem their shares for cash (an option available after a de-SPAC merger), leaving only about 500,000 Getty shares available in the "public float." Br. 55. Short-sellers needed many more shares than that to satisfy their contractual obligations to return Getty stock they had borrowed. *Id.* at 56. That led to a "short squeeze" in which Getty's stock price was "inflated" by short-sellers scrambling to buy Getty stock. *Id.* If the market had known that the warrants were exercisable on August 22, the "inflation" in Getty's stock price would have dissipated, and Getty's stock price would have fallen below the $11.50 warrant exercise price. *Id.* at 58.

The problem with this argument is that it is unsupported by any evidence. Getty is thus wrong that genuine issues of material fact require reversal of the damages award to CRCM.

Fischel provided no credible analysis evidencing a short squeeze. As the district court recognized, Fischel "candidly acknowledges he was

referring merely to 'rumors' and 'speculation over a possible short squeeze,' not his own analysis that one was occurring." SA24 (citing ECF No. 35-49, at 13, available at JA385). Getty suggests, citing Fischel's report, that "[m]arket commentators" contemporaneously identified a "short squeeze" in its stock. *See* Br. 57. But the only "commentary" Fischel's report identifies consists of cherry-picked excerpts from Twitter and Reddit posts by the likes of "pickitNclickit," "SCrusher5000," and "wallstreetbets" merely speculating about the possibility of a "short squeeze" on Getty stock. *See* JA386-90. And Fischel testified that the only reliable way to measure the impact of a rumored "short squeeze" is to conduct a regression analysis or event study. JA2954-55. Getty does not dispute that Fischel did neither.

The district court correctly held that Fischel's "speculation," drawn from "rumors" in social media posts of a "short squeeze" in Getty stock is "not the stuff of which genuine disputes are made." SA24. "[C]onclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment." *Kulak* v. *City of New York*, 88 F.3d 63, 71 (2d Cir. 1996). And "[a]n expert's opinions that are without factual basis and are based on speculation or conjecture are similarly

inappropriate material for consideration on a motion for summary judgment." *Major League Baseball Props., Inc.* v. *Salvino, Inc.*, 542 F.3d 290, 311-12 (2d Cir. 2008).

Nor did Fischel provide any evidence for the notion that the market was unaware that Getty warrants could be exercised on August 22, 2022 and that Getty's trading price therefore did not reflect the anticipated effect of warrant exercises making more shares available. He simply assumed that the market did not know of the warrants' potential exercise. But the record evidence shows that the market *did* know of the possibility of warrant exercise on that date. The Warrant Agreement was publicly available before August 22, 2022 and provided that warrants could be exercised thirty days after the de-SPAC merger closed—a public fact. Indeed, based on that publicly available information, Citibank published an analyst report on August 17, 2022 expressly recognizing that Getty warrants could be exercised beginning on August 22.[4] *See* No. 23-cv-01074, Dkt. 39-17 at *2 ("We also note Getty's ~43 million warrants

---

[4] Getty asserts that "J.P. Morgan, Kroll, and other respected analysts assessed Getty Images stock at under $11.50 per share." Br. 60 (citing JA2936-39). But the citations to J.P. Morgan and Kroll are not to any analyst reports, but e-mails in June and July 2020 by their employees, while working on an engagement for Getty. *See* JA2938-39.

with a price of $11.50 / share are exercisable on August 22"). In other words, the very information Fischel opined would cause Getty's stock price to tank had it been disclosed on August 22 had already been disclosed—days, if not months before—and Getty's stock price remained "inflated" on August 22.

Even accepting as true all of Fischel's speculation of a "short squeeze" and the market's belief that the Getty warrants could not be exercised on August 22, 2022, Getty has still failed to identify evidence justifying the reversal of the damages award. That is because Fischel offered no criteria, no calculations, and no economic model to demonstrate how the mere exercisability of the warrants on August 22 would have caused Getty's stock price to fall at all, let alone more than 60%—from $29 to below $11.50—in a single day.

Instead, Fischel, and Getty on this appeal, point to Getty's price performance on September 16—three weeks *after* the breach—when Getty's Form S-1 was declared effective. Br. 56. On that date, all of the securities newly registered on the S-1 and, unlike the warrant shares, never registered on the S-4, became freely tradeable. That meant that more than 86 million new Getty shares—nearly 30 times the number of

shares CRCM would have received on August 22—entered the market for Getty stock. By the end of the day, Getty's stock price had declined only $2.76 per share (to $8.49). *See* JA2452; Br. 16.

How Getty's stock traded on September 16, 2022, weeks after the date of Getty's breach, in response to the issuance of a massive number of Getty shares, wildly in excess of the number of warrants CRCM sought to exercise on August 22, 2022, is plainly irrelevant to the question of what Getty's stock price would have been on August 22, 2022 if Getty had performed and permitted CRCM's warrant exercise. And on that question—the question that Getty spends pages explaining is the one that matters—Getty offers zero evidence.

Getty's other efforts to point to "evidence" that supposedly preclude summary judgment on the amount of damages suffer from the same flaw. *See* Br. 60-61. What some investors may have believed about the value of Getty stock in between June and September of 2022 is not evidence of what the market price of Getty stock would have been on August 22, 2022 if Getty had not breached the Warrant Agreement. As Getty's own expert opined, the only reliable way to attempt to answer that question would have been to conduct a regression analysis or event study. JA2954-55.

Indeed, Fischel himself has explained—in an academic article, not paid expert work—that supposed "bubbles and other departures from pricing based on the underlying value of assets" do not justify disregarding market trading prices in assessing the value of "publicly traded securities." Daniel R. Fischel, *Market Evidence in Corporate Law*, 69 U. Chi. L. Rev. 941, 944 (2002). In the article, he queried: "Would it then make less sense to rely on market prices to resolve valuation disputes?" *Id.* His conclusion was unequivocal: "The answer is no." *Id.*

## CONCLUSION

The judgment of the district court should be affirmed.


Dated: June 5, 2024                     Respectfully submitted,

                                        */s/ William Savitt*
                                        William Savitt
                                        WACHTELL, LIPTON, ROSEN & KATZ
                                        51 West 52nd Street
                                        New York, NY 10019
                                        (212) 403-1000
                                        wdsavitt@wlrk.com

                                        *Counsel for Plaintiffs-Appellees*
                                        *CRCM Institutional Master Fund*
                                        *(BVI) Ltd. and CRCM SPAC*
                                        *Opportunity Fund LP*

## CERTIFICATE OF SERVICE

Pursuant to Federal Rule of Appellate Procedure 25(b) and Local Rule 25.1, I certify that I caused the foregoing to be electronically filed with the Clerk of Court for the United States Court of Appeals for the Second Circuit on June 5, 2024, by using the ACMS system, and service was accomplished on all counsel of record through the ACMS system.

Dated: June 5, 2024

*/s/ William Savitt*
William Savitt
WACHTELL, LIPTON, ROSEN & KATZ
51 West 52nd Street
New York, NY 10019
(212) 403-1000
wdsavitt@wlrk.com

*Counsel for Plaintiffs-Appellees
CRCM Institutional Master Fund
(BVI) Ltd. and CRCM SPAC
Opportunity Fund LP*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this motion complies with the type-volume limitation of Federal Rule of Appellate Procedure 27(d)(2)(A) because, as calculated by Microsoft Word, it contains 12,234 words, excluding the parts of the motion exempted by Federal Rule of Appellate Procedure 32(f). I further certify that this motion complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface in a 14-point Century Schoolbook font.

Dated: June 5, 2024

/s/ William Savitt
William Savitt
WACHTELL, LIPTON, ROSEN & KATZ
51 West 52nd Street
New York, NY  10019
(212) 403-1000
wdsavitt@wlrk.com

Counsel for Plaintiffs-Appellees RCM Institutional Master Fund (BVI) Ltd. and CRCM SPAC Opportunity Fund LP